**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-091 (RCL)** |
| | ) | |
| **ISAAC STEVE STURGEON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S MOTION TO DISMISS COUNTS ONE, THREE, FOUR,**
**FIVE, AND SIX OF THE SUPERSEDING INDICTMENT**

The defendant, Isaac Sturgeon, files this motion to dismiss counts 1, 3, 4, 5, and 6 of the

Superseding Indictment filed on November 10, 2021 (*See* ECF No. 53), pursuant to Fed. R.

Crim. P. 12(b).  For the reasons discussed below, these counts fail to state an offense and fail to

give proper notice to the defendant.  Additionally, count five unconstitutionally infringes on Mr.

Sturgeon's First Amendment rights.

**BACKGROUND**

On March 27, 2021, Mr. Sturgeon was arrested on an indictment charging him with

violating 18 U.S.C. §111(a)(1); 18 U.S.C. §231(a)(3); 18 U.S.C. §1752(a)(1), (2), and (4); 40

U.S.C. §5104 (e)(2)(E), and (F); and 18 U.S.C. §1512(c)(2). *See* ECF Dkt. Nos. 3, 14.  On May

7, 2021, the government filed a Superseding Indictment alleging the same offenses and changing

the language under Count 2, 18 U.S.C. §111(a)(1) to allege a felony offense. *See* ECF Dkt. No.

34.  On November 10, 2021, the government filed a second Superseding Indictment changing the

language in counts 4, 5, and 6 to remove the former Vice President Elect as a person who was

"temporarily visiting."  *See* ECF Dkt. No 53.  Mr. Sturgeon is charged alongside two other co-

defendants, Craig Michael Bingert and Taylor James Johntakis.  *Id*.

The government alleges that Mr. Sturgeon entered the Capitol grounds on January 6, 2021, and stood with a large group of individuals on the West Terrace in front of a line of Metropolitan Police Officers ("MPD") officers.  The government further alleges Mr. Sturgeon committed an act of assault by allegedly joining an effort to push a barricade.[1]  However, the government does not allege that Mr. Sturgeon entered the Capitol building at any point in time.

## LEGAL AUTHORITY

An Indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)).  A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(3).  Rule 12 provides that a defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of specificity."  Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United*

---

[1] When looking at the entirety of the video evidence provided by the government, this allegation is unsupported.  The video evidence, does however, show that Mr. Sturgeon actually assisted MPD by handing them an object that accidentally landed on the protester's side that could have been used to hurt them by other protestors.

*States*, 576 U.S. 591, 595 (2015)).  "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259 (1997).  The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement.  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The rule of lenity applies if the terms of the statute are ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail."  *United States v. R.L.C.*, 503 U.S. 291, 293 (1992).  This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should."  *Id*. at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)).  The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute."  *Id*. (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)).  "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words.  Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.  *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co*., 519 U.S. 337, 341 (1997)).

Lastly, government regulation of expressive conduct protected by the First Amendment is only justified if "the regulation is within the constitutional power of the Government; if it furthers an important or substantial governmental interests; if the government interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  *United*

*States v. O'Brien*, 391 U.S. 367, 377 (1968).

Under the foregoing legal authority, counts 1, 3, 4, 5, and 6 of the Superseding

Indictment should be dismissed by the Court.

## ARGUMENT

**I.** **18 U.S.C. §1512(c)(2) as Alleged in the Superseding Indictment Fails to State an Offense**

### a. Congressional Intent and Statutory Construction of 18 U.S.C. §1512(c)(2)

Analyzing the congressional intent and plain meaning of the statute, it is clear that 18

U.S.C. §1512(c)(2)'s purpose is to protect the integrity of hearings before tribunals by preventing

witness tampering and destruction of evidence.

18 U.S.C. §1512(c) provides: "Whoever corruptly –

(1) Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) Otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so…shall be fine….or imprisoned…

§1512(c). In turn, an "official proceeding" is defined as –

(1) A proceeding before a judge or court of the United States, a United states magistrate judge, bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(2) A proceeding before the Congress;

(3) A proceeding before a Federal Government agency which is authorized by law; or

(4) A proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the

business of insurance whose activities affect interstate commerce;

§1515(a)(1).

18 U.S.C. §1512(c) was enacted as part of the Sarbanes-Oxley Act of 2002, which is titled "Corporate Fraud Accountability," and which targets "corporate malfeasance."  Pub.L. No. 107-204, 116 Stat. 745.  Sarbanes-Oxley was designed to "protect investors and restore trust in financial markets following the collapse of the Enron Corporation" after revelations that Enron's outside auditor had "systematically destroyed potentially incriminating documents."  *Yates v. U.S.* 574 U.S. 528, 532 (2015). In *Yates*, the Supreme Court narrowly interpreted the term "tangible object" in §1519 in keeping with the specific context and purpose of Sarbanes-Oxley.[2] Recognizing that, in the Sarbanes-Oxley legislation, "Congress trained its attention on corporate and accounting deception and cover-ups."  *Id.* at 532.  The Supreme Court held that the Act did not contemplate penalizing the act of tossing undersized fish overboard to avoid the consequences of an inspection by federal authorities.  Rather, in the context of the statute's purpose, a "tangible object' must be one used to record or preserve information." *Id*.  So while fish are tangible objects in the ordinary sense of that phrase, they do not qualify as tangible objects for purposes of §1519.

In an amendment to §1512, the Sarbanes-Oxley Act added the current subsection (c)(2), which penalizes corruptly obstructing, influencing, or impeding "any official proceeding."  The term "official proceeding" is defined in §1515 to include a proceeding "before a judge or court of the United States" and a proceeding "before the Congress."  Like the phrase "tangible objects" in

---

[2] 18 U.S.C. §1519 provides: [w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States…..

§1519, the phrase "official proceeding" in §1512 requires interpretation.

"Dictionary definitions of the term 'proceeding' alone…cannot conclusively resolve" whether a proceeding is an "official proceeding" under §1512. *United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013). Further, courts have interpreted "official proceeding" to imply something formal. *See, e.g., United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106; *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) ) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses "events that are best thought of as hearings (or something akin to hearings"). As with the phrase "tangible object" in §1519, the phrase "official proceeding" must be interpreted in light of the statute's express purpose, which is "to enhance and protect the necessary role of crime victims and witnesses in the criminal justice process." *United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008).

In the context of this "witness tampering" statute, an "official proceeding before the Congress" is logically limited to the same type of "adversarial nature" as court proceedings where there is a potential for witnesses to be influenced or documents destroyed. *See* S.Rep. No. 107-146, at *6 (2002). Not only must "the charged conduct have some reasonable nexus to a record, document or tangible object," *United States v. Singleton*, 2006 WL 1984467 *3 (S.D. Tex. 2006), or to witness testimony, *United States v. Kumar*, 617 F.3d 612, 619-20 (2d Cir. 2010), but the obstruction must concern a proceeding involving adjudicative or at least "quasi-adjudicative responsibilities." *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009).

In *Ermoian*, for example, the Ninth Circuit held that an "official proceeding" suggests a "formal appearance before a tribunal;" an FBI field investigation did not qualify. 752 F.3d at

1170-71.  "[W]hen examining the term 'proceeding' within the grammatical structure of the definition at issue, it becomes clear that the term connotes some type of formal hearing." *Id*.  The court focused on the contextual language that §1512 uses when referring to "official proceeding" explaining that §1512 refers to "preventing the attendance or testimony of any person"; "preventing the production of a record, document, or other object, in an official proceeding; and being absent from an official proceeding to which that person has been summoned by legal process." *Id*. at 1171-1172.  It was important to the court that the statute used the words, "testimony," "attendance," "production," and "summons," all of which "strongly implies a hearing before a formal tribunal." *Id.* at 1172.  *Accord United States v. McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014) ("official proceeding" for purposes of §1512(c) did not include an FBI investigation); *Sutherland* at 921 F.3d at 426 (the term "proceeding" implies 'some formal convocation….in which parties are directed to appear") (quoting United States v. Young, 916 F.3d 368, 384 (4ᵗʰ Cir. 2019)).[3]

### b.  The Electoral Count on January 6 Was Not an "Official Proceeding"

When considering the legislative history of 18 U.S.C. §1512 and Congress's role in counting electoral votes pursuant to the 12ᵗʰ Amendment and the Electoral Count Act of 1887, later codified in 3 U.S.C. §15, the electoral count is clearly a ceremonial and administrative event that does not qualify as an "official proceeding."  The Twelfth Amendment and the Electoral Count Act of 1887 place the responsibility on Congress to count electoral votes after the states have already heard any disputes and certified the vote. *Bush v. Gore*, 531 U.S. 98, 154

---

[3] The D.C. Circuit has not addressed the question, except in a pre-Sarbane-Oxley version of § 1512, one that did not include the current subsection (c)(2), where the Court held that by entering into a plan to encourage others to falsify documents and to testify falsely before the Inspector General in a matter that was to be passed to the grand jury, the defendant obstructed an official proceeding. *United States v. Kelley*, 36 F.3d 1118, 1123 (D.C. Cir. 1994).

(2000) (Breyer, J., dissenting).  Members of Congress may make an objection, in writing, and

without argument. 3 U.S.C. §15.  According to the statute, there is no testimony, no witnesses,

no argument, and no evidence. *Id*.  Given this, an electoral count is simply not an adjudicative

proceeding of the type that falls within the ambit of a witness tampering statute such as 18

U.S.C. §1512(c)(2).

The purpose of the Electoral Count Act of 1887 was to resolve years of confusion as to

what exactly Congress's role was in counting the electoral votes.  The seven sections of the Act

attempt to do five things:

> (1) Give the states enough time between election day and elector
> balloting day to settle controversies over the appointment of their
> presidential electors (Section 1);
>
> (2) Encourage the states to establish mechanisms for resolving
> contests over the appointment of presidential electors prior to the
> day of electoral balloting (Section 2);
>
> (3) Publicize and place on the record the states' determination of the
> outcome of their electoral appointment process (Section 3)'
>
> (4) Minimize congressional involvement in resolving controversies
> over elector appointment not authoritatively resolved by the states
> (Section 4);
>
> (5) Settle procedural issues for conducting the joint session at which
> Congress counts the states' electoral votes (Sections 4-7).[4]

The sponsors of the Electoral Count Act hoped that "if the disputes touching the

Constitution of the Electoral Colleges in the States could be disposed of in advance of their

action, the counting of the electoral votes at the seat of government…would be usually a little

more than a *formal ceremony*."[5]  Section 5 of the Act provides that the "State's selection of

---

[4] Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56
FLLR 541, 578 (2004)

[5] Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56
FLLR 541, 585 (2004) (quoting Senator George Edmunds in H.R. Misc. Doc. No. 44-13, supra note 31, at

electors "*shall be conclusive*, and shall govern in the counting of the electoral votes" if the procedural rules have been followed. *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, J., concurrence) (emphasis added).  Thus, the legislative history of the Act demonstrates that Congress's Electoral Count is intended to be a "ceremonial" finalization and recording of the votes that have already been certified by the states.  So while Congress is in session on January 6, it is not an "official proceeding" for purposes of §18 U.S.C. 1512(c) and 1515(b).

Count One of the Superseding Indictment, which charges that Mr. Sturgeon intended to "impede or influence" Congress's certification of the Electoral College vote, is based on the belief that the "ceremonial" vote count is an "official proceeding"  for purposes of 18 U.S.C. §1512(c).  However, as outlined by the legislative history and purpose of the Electoral Act of 1887, "obstruction of an official proceeding before Congress" was never intended to apply to an event, like the vote count, that involves no witness testimony, documentary or tangible evidence, or meaningful adjudication.  Many congressional hearings *do* involve witness testimony and documentary evidence, and allow Congress to exercise their investigatory power. In those instances, Section 1512(c) protects the integrity of witness testimony and evidence.  *See generally United States v. Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991) (discussing how the Victim and Witness Protection Act of 1982 created a new provision, §1512, which prohibits various forms of witness tampering).  By contrast, Congress's counting of the Electoral College votes is not an adjudicative proceeding; Congress was merely tasked the ceremonial and administrative task of confirming the requirements for certification have been followed *after* the states previously have determined that the votes were lawfully certified.

This administrative and ceremonial proceeding is not the target of §1512(c) and

18).

9

the government cannot conveniently group the unique tradition of the Electoral Count with every other Congressional hearing as they are completely different and possess different functions and characteristics.  The government also cannot ignore years of precedent and legislative history plainly demonstrating that 18 U.S.C. §1512(c)(2) is limited to adjudicative hearings where there is a potential for destruction of documents and witness tampering.

      **c.**  **Even if the Court Determines that the Electoral Count is an "Official Proceeding," 18 U.S.C. §1512(C)(2) is Unconstitutionally Vague and is Especially Vague as Applied to this Case**

Under the same principles of *United States v. Johnson,* 576 U.S. 591 (2015) and its progeny, 18 U.S.C. §1512(c)(2) violates due process as it is vague and does not provide fair notice to Mr. Sturgeon as to the conduct it punishes. The statute provides that:

"Whoever *corruptly* –

1. Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an *official proceeding*; *or*

2. *Otherwise obstructs, influences, or impedes any official proceeding*, or attempts to do so…shall be fine….or imprisoned…

18 U.S.C. §1512(c)(1)(2)(emphasis added).  Section 1512(c)(2) uses words throughout both sections that require courts – and anyone reading the statute - to speculate as to their meaning in the context of a defendant's particular actions.  Courts must speculate as to the meaning of the word "corruptly" acted and the phrase "official proceeding." Even more problematic is that subsection (c)(2) is a "residual clause," one that is ambiguous and requires courts to determine exactly what line must be drawn in determining if a defendant is *otherwise* obstructing, impeding, or influencing an official proceeding before Congress.

In *Johnson,* the Supreme Court explained that "the indeterminacy of the wide-ranging

inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." 576 U.S. at 597.  There, the Court found a due process violation where a defendant's sentence was enhanced by the residual clause in the Armed Career Criminal Act if the prior felony "involved conduct that presented a serious potential risk of physical injury to another." *Id.* at 591.  The residual clause violated due process because it required speculation in each case as to what could potentially cause injury in each set of circumstances.  *Id*. at 598.  The resulting ambiguity caused a wide range of interpretation and disparity among courts over the course of nine years and the Court acknowledged that the "failure of persistent efforts to establish a standard can provide evidence of vagueness."  *Id.*

Similarly, the discussion above regarding what constitutes an "official proceeding" illustrates just part of the confusion and lack of cohesiveness among jurisdictions as to what does or does not qualify as an "official proceeding" under §1512(c)(2).  In each case, the courts have had to speculate and attempt to distinguish "official proceedings" from other proceedings or investigations.  While, as discussed above, courts have interpreted "official proceeding" to mean something more than an investigation and something more formal, there is no established standard, leaving ambiguity among the courts.  *See United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006); *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019); *United States v. McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014).

The vagueness of §1512(c)(2) is not limited to the confusion surrounding what constitutes an "official proceeding."  The D.C. Circuit has acknowledged that the word "corruptly" is vague on its face as used in a similar statute, 18 U.S.C. §1505, that prohibits obstruction of a proceeding before departments, agencies or congressional investigations.  The

court held that "in the absence of some narrowing gloss, people must guess at its meaning and application." *United States v. Poindexter*, 951 F.2d 369, 398 (D.C. Cir. 1991). Previously, in *Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir. 1968), the court held a statute that criminalized "leading an immoral or profligate life" vague because it found "immoral" to be synonymous with "corrupt, depraved, indecent, dissolute, all of which would result in "an almost boundless area for the individual assessment of another's behavior." *Poindexter*, 951 F.2d. at 399 (quoting *Ricks*, 414 F.2d at 1097). The court explained that various dictionary definitions of the word "corrupt" did not reduce the confusion as to its meaning for purposes of the statute. *Id*. After an assessment of the legislative history and judicial interpretation, the court concluded that neither of those inquiries provided defendants with the constitutionally required notice that the statute requires, and found the term vague as applied to the defendant making false statements. *Id.* at 406.

Following *Poindexter*, Congress amended §1515 to define "corruptly" for purposes of §1505 only to mean "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." §1515(b). However, this amendment did not resolve the vagueness that still exists in §1512 as Congress did not amend §1515 as it applies to §1512.

Even though the D.C. Circuit later held that the word "corruptly" was not vague as applied, it was because in that case the defendant influenced a witness which fit squarely within the non-vague category that *Poindexter* established. *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996). In *Morrison*, the defendant tried to influence a witness's testimony and "exhorted her to violate her legal duty to testify truthfully in court." *Id*. The Court in *Poindexter*

explained that influencing another to "violate their legal duty" was not vague because "it would both take account of the context in which the term "corruptly" appears and avoid the vagueness inherent in words like "immorally." *Poindexter*, 951 F.2d at 379. However, *Morrison* was not faced with the question of what "corruptly" means in the context of Section 1512(c) and does not resolve the ambiguity that the word presents in conjunction with the rest of the statute. The phrase "corruptly influences" does not resolve the ambiguity because "influence" alone is another vague word that may mean many things and lacks the definiteness of "influencing another to violate their legal duty" stated in §1515. The various meanings of the word "influence" also support the inherent vagueness that exists in the statute especially within the context of January 6, 2021. Many individuals who were there and not charged with obstruction were there to protest the vote and hoped that their voices would be heard, just like thousands of protests that have taken place in this country. So in a sense, that is a type of intended "influence," but it cannot be the intention of Congress to criminalize the right to peacefully protest to effect change. There must be something more, such as physically doing something to influence a proceeding, which is not captured by the statute because it simply says "influence.[6]"

The government's approach to charging defendants with violating §1512(c)(2) based on the events on January 6, 2021, illustrates how vague and arbitrary the enforcement of this statute can be. While the government may contend it has some bright line rules, for example by charging individuals with a violation of §1512(c)(2) if defendants entered the Senate floor,[7]

---

[6] *See* Merriam-Webster (2021) defining influence as "the power to change or affect someone or something: the power to cause changes without directly forcing them to happen," "to affect or alter by indirect or intangible means," "to have an effect on the condition or development of."

[7] *See United States v. Paul Hodgkins*, 1:21-CR-188 (RDM); *United States v. Tommy Allan*, 1:21-CR-064 (CKK); *United States v. Jacob Chansley*, 1:21-CR-003 (RCL); *United States v. Bradley Bennett*, 1:21-CR-312 (JEB); United States v. Leo Brent Bozell IV, 1:21-cr-216 (JDB) (not alleged to be a member of the Proud Boys or the Oath Keepers).

taking a look at some of the defendants that have been charged with a violation of §1512(c)(2), show that improper inconsistencies remain.[8]

(1) *United States v. Sean Michael McHugh*, 21-CR-436:  Defendant allegedly employed bear spray in direction of officers and yelled insults at officers.  Also allegedly used a megaphone and engaged crowd with chants, such as "our house!"  No evidence he entered Capitol building or the Senate floor.

(2) *United States v. Kenneth Grayson,* 21-CR-224:  Defendant alleged to have entered Capitol building, but not alleged to have entered the Senate chamber.  Prior to January 6, 2021, he allegedly wrote in a private message, "I am there for the greatest celebration of all time after Pence leads the Senate flip! OR IM THERE IF TRUMP TELLS US TO STORM THE FUKIN CAPITOL IME DO THAT THEN!

(3) *United States v. Benjamin Larocca,* 21-CR-317:  Defendant allegedly entered Capitol building while screaming "Our House!"  Was with an individual who allegedly was yelling, "You fucking oath breakers!"  Mr. Larocca is not alleged to have entered the Senate floor and is not a member of the Proud Boys or Oath Keepers.

(4) *United States v. Anthony Puma,* 21-CR-454:  Defendant allegedly entered Capitol building while filming with a Go-Pro video.  A day prior to January 6, 2021, he allegedly made certain comments on social media about "storming the house of representatives."  Mr. Puma did not enter the Senate floor and was not met with resistance from law enforcement when he entered the building.  While inside, he was not violent and did not destroy any property.

(5) *United States v. Dale Jeremiah Shalvey,* 21-CR-334:  Defendant allegedly entered the

---

[8] These are just a few cases out of hundreds that share the same inconsistencies.

Senate Chamber and is captured on video rummaging through Senator Cruz's notes. However, he is not alleged to be a part of the Oath Keepers or the Proud Boys.

As these cases illustrate, the government's charging decisions remain inconsistent across the circumstances of each case. Tellingly, the government does not specify what "influence" these defendants had or how exactly they "impeded." The inconsistent charging decisions along with the inherently vague words in the statute, as well as the vague "residual clause" that is the basis for charging these defendants all show that 18 U.S.C. §1512(c)(2) is unconstitutionally vague and does not provide fair notice to Mr. Sturgeon.

Importantly, the statute is especially vague as applied here to Mr. Sturgeon. The government's theory appears to be that by allegedly pushing a barricade outside the Capitol building, then that means he had the intent to obstruct a meeting occurring inside the building, which he never entered or attempted to enter. Based on this, Mr. Sturgeon could not have possibly been on notice that he was committing a felony obstruction of an "official proceeding."

Mr. Sturgeon did not do anything to actually obstruct, influence, or impede Congress. The circumstances of his case mirror those of many defendants on that day whose presence on the Capitol grounds did not place them on notice that they would be committing a felony involving criminal intent to actually "obstruct" or "impede" or "influence" an "official proceeding." Most notably in this matter, Mr. Sturgeon did not enter the Capitol building and was not a part of the group who initially breached the building. His intent was to protest on the grounds of the building and there is no evidence that he had any intent to "influence" or "impede" what was happening inside the building. It is also notable that Mr. Sturgeon did not shout at officers, insult, or threaten them while on the Capitol grounds.

## II.  <u>Section 231(a)(3) is Also Unconstitutionally Vague and Fails to Provide Sufficient Notice</u>

A criminal statute is void for vagueness when it (1) "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden," *United States v. Harriss*, 347 U.S. 612, 617 (1954); or (2) "encourages arbitrary and erratic arrests and convictions." *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972).  For two additional reasons, § 231(a)(3) is subject to a particularly high level of scrutiny under this test.  First, it imposes criminal penalties, and "[c]riminal statutes must be scrutinized with particular care" under the vagueness test. *Hill* at 459.  Second, it threatens to interfere with First Amendment rights, which means "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

> **a.   The Statute's Imprecise Language Improperly Hinders a Person of Ordinary Intelligence from Discerning What Conduct It Prohibits**

Ordinary citizens are entitled to "be informed as to what the State commands or forbids." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (citing *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).  Here, a person of ordinary intelligence must guess at the meaning of Section 231(a)(3) because it is replete with vague and imprecise terms.  The statute provides:

> "Whoever commits or attempts to commit ***any act*** to ***obstruct, impede, or interfere*** with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties ***incident to and during the commission of a civil disorde****r* which in any way or degree ***obstructs, delays, or adversely affects*** commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.."

18 U.S.C. §231(a)(3) (emphases added).

"Any act" can include anything from protected free speech and expressive conduct to an egregious assault.  Further, "to obstruct, impede, or interfere," contains the identical and improper vagueness as 18 U.S.C. §1512, which is discussed above.  The most problematic part

of the statute, however, is how to decipher what "incident to and during the commission of a

civil disorder" means.  The statute defines "civil disorder" as:

> "Any public disturbance involving acts of violence by assemblages
> of three or more persons which causes an immediate danger of or
> results in damage or injury to the property or person of any other
> individual."

18 U.S.C. §232(1).  However, the statute fails to instruct whether a defendant must have

participated in that civil disorder and/or how physically close a defendant must be for the

conduct to count as "incident to."  Lastly, the statute ends again with the vague words, "in any

way *obstructs, delays, or adversely affects* commerce."  This phrase opens the door for endless

subjectivity over (1) what constitutions obstruction and/or delay, and (2) what does or does not

constitute an "adverse effect," and (3) what is sufficiently material "affect upon commerce" to

fall within the proscription of the statute.

Unsurprisingly, a South Carolina ordinance with similar language was found

unconstitutionally vague in *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 554 (D.S.C. 2013).

That ordinance made it unlawful "for any person to interfere with or molest a police officer." *Id*.

Like that ordinance, Section 231 (a)(3) "includes no objective standard to guide the police in

determining that conduct constitutes unlawful interference…."*Id*.  Because there is no standard

to provide such guidance, the statute "authorizes, if not encourages, discriminatory

enforcement." *Id*.  Similarly, the language of Section 231(a)(3) includes the word "interfere" and

there is no standard to guide law enforcement to discern what the word means.  Furthermore, the

neighboring words in the statute do not make the ambiguous words any more clear; if anything,

the other words of the statute increase the confusion.

As discussed above with the vagueness of Section 1512(c)(2)'s "residual clause," Section

231(a)(3)'s language requires courts to undertake an indeterminate, "wide-ranging inquiry" that

denies defendants fair notice and encourages arbitrary enforcement.  *Johnson v. United States*, 576 U.S. 591, 597 (2015).  Moreover, it provides no clearly articulated nexus between the act and the "civil disorder."  And while Section 232(1) provides a definition of "civil disorder," its definition could apply to virtually any tumultuous public gathering involving more than two people.  Because the statute invites the same kind of unwieldy judicial assessment struck down in *Johnson*, Section 231(a)(3) similarly should be held invalid.

Furthermore, by enacting a statute with such imprecise language, Congress created "a criminal prohibition of alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). *Hill*, supra, the Court found that an ordinance's sweeping nature was neither "inevitable" nor "essential to maintain public order." 482 U.S. at 464.  Because the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," it wrongly gave police "unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Id.* at 465.  Similarly, here, § 231(a)(3) casts far too wide a net.  By expansively encompassing "any act" that could interfere with the duties of a police officer or firefighter during a civil disorder, § 231(a)(3) is not limited to "violent acts" or acts that result in bodily injury or that otherwise put persons or property in imminent danger. *C.f. United States v. Reese*, 92 U.S. (2 Otto) 214, 221 (1876) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.").  Moreover, the statute does not weed out those acts with protected expressive content or those that occur in a traditional public forum. Instead, Section 231(a)(3) reaches a substantial amount of expressive conduct, and without clear boundaries, the law chills free speech and invites discriminatory application by law enforcement and the government.

**b.   Section 231(a)(3)'s Reliance on Subjective Reactions Renders Violations Unpredictable**

Section 231(a)(3) also impermissibly requires individuals to predict how others will react to their conduct.  If they fail to predict that reaction accurately, they risk violating the law.  This violates the fair notice requirement under the Due Process Clause.  For example, in *Coates v. City of Cincinnati*, 402 U.S. 611 (1971), the Supreme Court struck down a statute that criminalized conduct "annoying to persons passing by." *Id*. at 614.  The Court reasoned that, while the city was "free to prevent people" from criminalizing certain enumerated conduct, such as "blocking sidewalks" or "littering streets," it could not enforce "an ordinance whose violation may entirely depend on whether or not a policeman is annoyed." *Id*.

Similarly, in *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Supreme Court invalidated a statute that prohibited loitering "with no apparent purpose." *Id*. at 60.  The Court observed that it was "difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose." *Id*. at 57.

Here, as in *Coates and Morales*, it is similarly difficult to imagine how an individual could predict the potential consequences of each act he/she commits that is somehow "incident to or during," a "civil disorder."  Indeed, Section 231(a)(3) triggers criminal liability whenever the defendant's conduct interferes or impedes with a fireman or police officer performing his official duties.  But a gesture, sign, or other act that distracts one officer and makes him/her feel impeded or interfered with, could have no impact at all on another.  Moreover, the individual's "act" may be "incident to and during" a civil disorder that he/she is not involved in at all.

These subjective standards leave much discretion of police and prosecutors to determine whether a particular individual's conduct violates the law, and means that a potential defendant is not provided with fair and sufficient notice of what constitutes unlawful behavior.  Due to this

19

lack of predictability and precision, §231(a)(3) violates the fair notice requirement.

### c. Section 231(a)(3) Lacks a Scienter Requirement, Which Weighs in Favor of the Law's Unconstitutionality

The Court has repeatedly affirmed that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests* at 499. But here, there is no such mitigation, because Section 231(a)(3) contains no scienter requirement, thus creating 'a trap for those who act in good faith.'" *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)).  This absence weighs in further favor of the statute's unconstitutionality.

Additionally, where, as here, individuals must balance multiple factors, and are subject to strict criminal liability when they balance those factors incorrectly, a statute should be held unconstitutional. *See Colautti*, 439 U.S. at 380-95.  In *Colautti*, a Pennsylvania statute required physicians to weigh several variables to determine fetus viability. *Id.*  If the physician made the wrong determination after weighing these variables, the statute imposed strict criminal liability. *Id.* at 395.  The Court struck down the statute, reasoning that "[t]he perils of strict liability [were] particularly acute . . . because of the uncertainty of the viability determination itself." *Id.*

Here, individuals seeking to exercise their First Amendment rights in political protest must balance several factors. They must consider whether they are sufficiently "incident to" a group of two or more people in a situation amounting to a "civil disorder," whether police or firemen are in the vicinity, and whether "any" of their acts could interfere with "any" police officer's duties, as determined by that officer.  If the wrong determination(s) are made, even in good faith, he/she is now subject to criminal liability.  To the extent that a scienter requirement is read into the statute, this does not cure the fair notice issue. Instead, this merely leaves police,

prosecutors, and judges to decide after the fact whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what).

### III.   18 U.S.C. §1752(a)(1) is Unconstitutional as Applied to Mr. Sturgeon's Conduct because it Infringes on his First Amendment Rights

Section §1752(a)(1) is unconstitutional as applied to Mr. Sturgeon because his conduct was expressive and the statute's restrictions on his First Amendment rights go beyond what is essential to further the government's interests. To determine whether § 1752(a)(1) unconstitutionally infringes on Mr. Sturgeon's First Amendment rights, the court must first decide whether his conduct was "expressive in nature." *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016).  If it was, the court must then determine whether the challenged statute "is related to the suppression of free expression." *Id.* (citing *Texas v. Johnson*, 491 U.S. 397, 403 (1989). Here, the statute is unrelated, so the court's inquiry is instead governed by the test announced by the Supreme Court in *United States v. O'Brien*. *Id.*

The O'Brien test has four prongs: "*First*, the challenged regulation must be 'within the constitutional power of government;' *second*, it must 'further[ ] an important or substantial government interest;' *third*, this interest must be 'unrelated to the suppression of free expression;' and *fourth*, the incidental restriction on First Amendment freedoms must be 'no greater than is essential to the furtherance of that interest.'" *Caputo*, 201 F. Supp. 3d at 71 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). If the statute fails to satisfy any of these four prongs, the statute is unconstitutional as applied. *Id.*

### A.  Mr. Sturgeon Engaged in Expressive Conduct

Mr. Sturgeon did not enter the Capitol building and was only protesting on the Capitol steps, an area "traditionally open to the public… and is a unique public forum for free

expression, open to the public throughout the year" *Kroll v. United States*, 590 F. Supp 1282, 1290 (D.D.C. 1983).  As such, to prevail on his as-applied First Amendment challenge, Mr. Sturgeon must first demonstrate that his conduct was sufficiently "expressive," keeping in mind that protected expression "does not end at the spoken or written word."  *Texas v. Johnson*, 491 U.S. 397, 404 (1989).  Instead, the court considers "whether '[a]n intent to convey a particularized message was present and [whether] the likelihood was great that the message would be understood by those who viewed it." *Id*. (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974).

By protesting on the Capitol grounds on January 6, 2021, Mr. Sturgeon passes this test. He was present at the Capitol to convey his disagreement with the results of the 2020 election and the target of his expression was Congress, which was inside the Capitol building, certifying the election results that same day.  *Cf. Tinker v. Des Moines Indep. Cmty, Sc. Dist*., 393 U.S. 503, 505 (1969) (recognizing the expressive nature of wearing black armbands to protest the Vietnam War).  Given these circumstances, Mr. Sturgeon's presence on the Capitol grounds, along with others protesting, "possesses sufficient communicative elements to bring the First Amendment into play…." *Johnson*, 491 U.S. at 404.

**B.  Section 1752(a)(1)'s restrictions on Mr. Sturgeon's First Amendment Rights go Beyond What is Essential to Further the Government's Interests**

Because Mr. Sturgeon's conduct was expressive in nature, the court must determine whether the statute is related to the suppression of free expression. *See Caputo*, 201 F. Supp. 3d at 71. Here, it is undisputed that the statute is unrelated to the suppression of free expression. *See id.* (finding the same). Therefore, the court must review the as-applied challenge under the *O'Brien* test.

If § 1752(a)(1) fails any prong of the *O'Brien* test, it is unconstitutional as applied to Mr. Sturgeon.  Here, there is no dispute that the statute passes the test's first three prongs.  Indeed, the government has both the requisite constitutional power and a substantial government interest in preventing potentially dangerous intruders from accessing Secret Service protectees.  But because the statute's restrictions on Mr. Sturgeon's particular conduct are "greater than is essential" to further this government interest, the statute fails the fourth prong. *Id.*

In *Caputo*, the court upheld a prosecution under § 1752(a)(1) of a defendant who jumped a White House fence to protest the flaws in White House security measures. *Id.* at 72. In upholding the charge, the court acknowledged that § 1752(a)(1) "categorically bars" all fence jumping protests. *Id.* at 71-72.  However, it reasoned that the restriction was "easily justified, given the Government's profound interest in protecting the White House complex, the President, and the functionality of the executive branch." *Id.* at 72.

Here, a categorical bar on all election certification protests on the Capitol steps is not so easily justified.  Unlike White House fence jumpers, who pose a substantial danger to the President, those who protest solely on the Capitol steps pose no similar risk. *See Dellums v. Powell*, 566 F.2d 167, 198 (D.C. Cir 1977) (observing that that there is a "broad and general invitation extended to the citizenry" to visit the Capitol and noting that "Congress invites and welcomes the public"); *Wheelock v. United States*, 552 A.2d 503, 506 (D.C. App. 1988) (quoting *Kroll*, 590 F. Supp. 1282, 1289 (D.D.C. 1983) ("The courts in this jurisdiction have long recognized that 'the United States Capitol is a unique situs for demonstration activity.'").

Moreover, unlike someone who has successfully jumped a fence and entered the White House complex, Mr. Sturgeon retained a substantial distance from both government officials and the election certification. Indeed, Mr. Sturgeon remained behind the barricades that blocked

access to the Capitol building. Given these differences, those who protest only on the Capitol steps cannot properly be treated like white house fence jumpers under the statute. Therefore, § 1752(a)(1) is unconstitutional as applied to Mr. Sturgeon.

**IV.**    **18 U.S.C. §1752 fails to state an offense**

    **a.**    **The United States Secret Service is the Entity that May Designate "Restricted Areas" Under the Statute, Not the United States Capitol Police**

Mr. Sturgeon is charged with three counts of violating 18 U.S.C. §1752 for "entering and remaining in a restricted building or grounds," engaging in "disorderly and disruptive conduct in a restricted building or grounds," and "engaging in physical violence in a restricted building or grounds." *See* ECF Dkt. No 53.  When this statute was enacted, it is clear that the purpose was to designate the United States Secret Service ("USSS") to restrict areas for temporary visits by the President.  *See* S. Rep. No. 91-1252 (1970).  At the time of enactment, the USSS was part of the Treasury.  Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President."  18 U.S.C. §1752(d)(1).  It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." §1752(d)(2).  There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding the Capitol building.

The USSS's duties and responsibilities are outlined in 18 U.S.C. §3056, which include:

> (e)(1): When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.

>  (2) At the end of each fiscal year, the President through such
>  agency or office as the President may designate, shall report to the
>  Congress--

>  **(A)** what events, if any, were designated special events of national
>  significance for security purposes under paragraph (1); and

>  **(B)** the criteria and information used in making each designation.

§3056(e)(1)(2)(A)(B).  The statute does not state that any other agency is permitted to designate

events for security purposes and only explains that the USSS would be under the designation of

the Department of Homeland Security instead of the Treasury Department.  The statute makes

the exclusive role of the USSS even clearer in §3056(g), which states:

>  (g) The United States Secret Service shall be maintained as a
>  *distinct entity* within the Department of Homeland Security and
>  shall not be merged with any other Department function. *No
>  personnel and operational elements of the United States Secret
>  Service shall report to an individual other than the Director of the
>  United States Secret Service*, who shall report directly to the
>  Secretary of Homeland Security without being required to report
>  through any other official of the Department.

(emphases added).

### b.  The Government Does Not Allege that the Secret Service Restricted the Capitol Grounds on January 6, 2021

The Superseding Indictment charges Mr. Sturgeon with remaining or entering "restricted

building or grounds," however it does not allege that the USSS designated that area as being

restricted.  Nor could it do so now because in *United States v. Griffen*, the government conceded

that it was the United States Capitol Police that attempted to designate the area as restricted that

day and not the USSS.  21-CR-92 (TNM) at Dkt. No. 33.  The court in *Griffen* denied a motion

to dismiss a §1752 charge on the ground that the statute (Congress) did not specifically state who

must designate the "restricted areas."  *Id*. at Dkt. No. 41.

However, the plain language of 18 U.S.C. §1752(c)(B), defines "restricted building or

grounds" as a "building or grounds where the President or other person protected by the Secret

Service is or will be temporarily visiting."   Since it is the Secret Service who protects the

President or "other person," it is the Secret Service who must designate the area "restricted." The

legislative history bolsters this interpretation.[9]

The court in *Griffen* also hypothesized that the President would be unable to gave an to

rely on the military fortification at Camp David already in existence when he visits that facility if

the Secret Service was not the only entity with the statutory authority to restrict the area.  *See*

*Griffen* ECF Dkt. No. 41 at pg. 11.  However, Camp David is a military installation and is not a

"public forum" that needs an entity to "cordon off" areas and restrict them in light of a

Presidential visit.  Military bases have security and are not otherwise open to the public.  And

each military installation is subject to other laws that protect the facility, and those within it,

from intruders.  *See, e.g*., 18 U.S.C §1382 (barring any person from entering any military

installation for any purpose prohibited by law).  Military bases are heavily guarded and have

entrance and exit points and are different than federal buildings that need sections to be

"cordoned" off in order for the general public to know which area is restricted.  For these

reasons, the example offered by the *Griffen* court is inapposite and does not support the court's

decision.

Furthermore, if a deficiency in a statute creates an absurd result or creates arbitrary

enforcement, it should not be enforced until it is amended to provide clarity and provide fair

---

[9] Congress enacted 18 U.S.C. §1752 as part of the Omnibus Crime Control Act of 1970.  Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971).  At that time, the USSS was a part of the Treasury Department.  The Senate Judiciary Committee report accompanying the current version of §1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service.  S. Rep. No. 91-1252 (1970).

notice to a defendant.  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  The *Griffen* court's reasoning creates a different kind of absurd result –viz, anyone claiming to be a part of law enforcement could post a sign designating an area as restricted and a criminal defendant could then be penalized for trespassing because they "willfully" ignored the sign.

> **c.   Even if the Capitol Police were Authorized to Restrict the Grounds, 18 U.S.C. §1752 is Not Applicable Because Former Vice President Pence Was not "Temporarily Visiting" the Capitol Building on January 6, 2021**

Under the plain language of 18 U.S.C. §1752, the statute does not apply here.  Section 1752 prohibits conduct in or near "any restricted building or grounds." The statute expressly defines the term "restricted buildings or grounds" as follows:

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c); *see United States v. Samira Jabr*, Criminal No. 18-0105, Opinion at 12, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

Counts Four, Five, and Six of the Superseding Indictment charge Mr. Sturgeon with conduct "in a restricted building and grounds, that is, any posted, cordoned-off and otherwise restricted area *within the United States Capitol and its grounds, where the Vice President was temporarily visiting . . .*" *See* ECF No. 53, (emphasis added).  The government's attempt to shoehorn Mr. Sturgeon's conduct into the statute fails.  Accordingly, those three counts should be dismissed.

The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of § 1752(c)(1).

Nor did the Capitol grounds become "restricted grounds" on January 6, 2021, because of a "temporary vice-presidential visit," as the government asserts in the Superseding Indictment.

The plain meaning of "temporary" is "lasting for a time only."  Black's Law Dictionary (11th Ed. 2019).  "Visiting" is defined as "invited to join or attend an institution for a limited time." Merriam-Webster (2021).  Together, the phrase "temporarily visiting" connotes temporary travel to a location where the person does not normally live or work on a regular basis.

The former Vice President was not "temporarily visiting" the Capitol on January 6, 2021. The Capitol is a federal government building in the District of Columbia, where he lived and worked.  Moreover, he actually worked at the Capitol Building and grounds—it was his place of employment.  In his official capacity as the "President of the Senate," he had a permanent office "within the United States Capitol and its grounds."  The Vice President was not "visiting" the Capitol Building, he was working there, carrying out his sworn official duties to by "presiding," over the vote count ceremony.  *See* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall *meet* in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and *the President of the Senate shall be their presiding officer*.") (emphasis added).

Past cases support this plain, common-sense reading of the statute, as they involve conduct in and near areas where the President and Vice President were clearly "temporarily visiting."  *See, e.g., United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his

way through a restricted area where then Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by United States Secret Service agents); *Blair v. City of Evansville, Ind*. 361 F. Supp.2d 846 (S.D. Indiana 2005) (defendant charged with 18 U.S.C. §1752 at protest during then Vice President Richard Cheney's visit to the Centre in Evansville, Indiana). These cases all involve the President and Vice President actually traveling outside of D.C., where they live and work, and "visiting" another location for a "temporary" purpose. As a result, those cases are entirely consistent with the plain meaning of section 1752(c)(1)(B).

Here, by contrast, former Vice President Pence was not traveling to a speaking event or a political rally. He was meeting with other government officials in a federal government building where he had a permanent office as part of fulfilling his official duties as Vice President/President of the Senate. Thus, he was not "temporarily visiting" the Capitol building as required by the plain language of 18 U.S.C. §1752.

For the above reasons, Section 1752 does not apply as charged and Counts Five, Six, and Seven, of the Superseding Indictment should be dismissed.

## <u>CONCLUSION</u>

For all of reasons discussed above, the Court should dismiss counts 1, 3, 4, 5, and 6 of the Superseding Indictment.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Maria N. Jacob
D.C. Bar No. 1031486

29

Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Maria_Jacob@fd.org