**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Case No. 21-91 (RCL)** |
| **ISAAC STEVE STURGEON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**DEFENDANT ISAAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS**
**TO MOTION TO DISMISS COUNTS ONE, THREE, FOUR, FIVE, AND SIX, OF**
**THE SUPERSEDING INDICTMENT**

The defendant, Isaac Sturgeon, files this reply to the government's response filed on

January 4, 2021.  *See* ECF Dkt. No. 60 (hereafter "Gov't. Res."). For the reasons discussed

below, Counts One, Three, Four, Five, and Six of the Superseding Indictment still fail to state

an offense and fail to give proper notice to the defendant.

**I.     THE PLAIN LANGUAGE, LEGISLATIVE HISTORY, AND**
**CONGRESSIONAL INTENT CONTINUE TO SUPPORT A CONCLUSION**
**THAT NO VIOLATION OF 1512(c)(2) HAS BEEN STATED HERE**

In his moving papers, Mr. Sturgeon showed, among other things, that he did not disrupt

an "official proceeding" of the government for purposes of 18 U.S.C. §1512(c)(2). *See* Def. Mot.

at 4-10 (ECF Dkt. No. 55).  Section 1512(c)(2)'s purpose is to protect the integrity of hearings

before tribunals and its remit does not extend to ceremonial and administrative events such as the

electoral count that took place on January 6, 2021, which does not qualify as an "official

proceeding" under the statute. *Id*.

In response, the government contends that Mr. Sturgeon has inserted an "adjudicatory

gloss" to the "official proceeding" definition that is unsupported.  *See* Gov't Res. at 19.  The

government is wrong.  While §1512(c)(2) does not include the specific word "adjudicatory," the

Court's inquiry does not end there.  Rather, the Court should examine the legislative history of

the statute and carefully analyze the key words contained therein. *See* Antonin Scalia & Brayn A.

Garner, Reading Law: The Interpretation of Legal Texts 73 (2012) (where a statute addresses a

technical subject, it is a "term of art" that requires a look at its ordinary legal meaning).  Here,

§1512(c)(2)'s legislative history, and the ordinary legal meaning of the term "proceeding" that is

contained in the statute, supports dismissal of this count.

Section 1512(c)(2)'s legislative history shows that its abiding purpose is protecting the

integrity of hearings before tribunals by preventing witness tampering and destruction of

evidence.  Likewise, the ordinary legal meaning of "proceeding" is:

> 1. The regular and orderly progression of a lawsuit, including all acts and events
> between the time of commencement and the entry of judgment. 2. Any procedural
> means for seeking redress from a tribunal or agency. 3. An act or step that is part
> of a larger action. 4. *The business conducted by a court or other official body; a
> hearing*. 5. *Bankruptcy*. A particular dispute or matter arising within a pending
> case – as opposed to the case as a whole.

Black's Law Dictionary, "proceeding" (11th ed. 2019) (emphasis added).  The legal definition of

"proceeding" plainly describes the word to mean "a hearing" and "hearing" means "the hearing

of the arguments of the counsel for the parties upon the pleadings, or pleadings and proofs;

corresponding to the trial of an action at law." *Id*. (definition of hearing).  These legal definitions,

together with the legislative history, strongly support the conclusion that there must be some

kind of adjudicative hearing – i.e., an "official decision about who is right in (a dispute)."

(Merriam-Webster.com Dictionary, definition of "adjudicate" (2021)). *See also United States v.

Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) ) (investigation conducted by Bureau of

Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses

"events that are best thought of as hearings (or something akin to hearings").

If not "adjudicative," the term "a proceeding before the Congress" in §1515(a)(1)(B) requires, at a minimum, some kind of investigative or legislative action or purpose. Here, there was no adjudicative, investigative, or legislative purpose to the gathering of Congress to certify the electoral vote. The event on January 6, 2021 was purely a ceremonial meeting of both houses of Congress. The outcome was already finally determined. Any objections or speeches were purely political performances that could have no impact on the outcome. No "proceeding before the Congress" took place, because there was nothing towards which to "proceed."

The government tries to contend that the definition of "proceeding before congress" as outlined in §1515(a)(1)(B) should be read broadly because, unlike 18 U.S.C. §1505, no specific agencies and committees are identified. *See* Gov't. Res. at 16. However, Mr. Sturgeon does deny that Congress is covered by §1512(c)(2), the issue is whether Congress's ceremonial vote count that day qualified as a "proceeding" (a word that exists in both statutes).

In an unpersuasive effort to transform the Joint Session on January 6, the government notes that the Joint Session is a deliberative body where objections are permitted and a decision must be made pursuant to the procedures set forth in 3 U.S.C. §15. *See* Gov't. Res. at 19. However, the courts interpret "official proceeding" more narrowly. It is not enough to be a deliberative body where decisions are made. There also must be characteristics of a hearing, such as findings of fact, and the power to issue subpoenas. *See, e.g., United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (explaining that agency investigations may qualify as "proceedings" under 18 U.S.C. §1505 if those investigations involve "some adjudicative power" such as the power to issue subpoenas, and compel sworn testimony in conjunction with an investigation). In other words, it is not enough that a decision is made in a formal environment, but rather that the characteristics surrounding the event must be "akin to a hearing." *Id*. *See also*

*United States v. Sandlin*, 21-CR-88 (DLF), Dkt. No. 63, Memorandum Opinion at 7 (ruling that an "official proceeding" under §1512(c)(2) does not include any and all series of actions before Congress; rather, the proceeding must be akin to a formal hearing).

Nor does the fact that 3 U.S.C. §15 provides Congress with the authority to lodge objections transform the Joint Session into a "hearing" or "official proceeding." Although the Electoral Count takes place in a "formal environment," has proscribed procedures, it is not a "hearing."  It is, in the plain text of the statute, simply a "meeting" of both houses. 3 U.S.C. §15. And although 3 U.S.C. §15 provides for the lodging of objections; these "objections" are not the same type of objections that exist in a typical "proceeding before Congress," as contemplated in §1512.  As explained in detail in the defendant's motion to dismiss, the Congress's "counting of the votes" is purely ceremonial; the count is predetermined because the Joint Session does not have the authority to change any of the votes that have been certified by the states.  Congress makes no decision because there is no decision for Congress to make.  Moreover, the vote count is neither investigative nor legislative.  Simply put, the "counting function" of Congress does not have an "adjudicative," or "judicial" or "hearing" aspect to it.  The "electoral vote is merely ministerial.  Vasan Kesavan, "*Is the Electoral Count Act Unconstitutional*?" 80 North Carolina Law Review 1653, 2002, at page 258.

Five recent district courts have found that the vote count on January 6 was a "proceeding before Congress."[1]  In neither case, however, did those courts consider or resolve the arguments raised by Mr. Sturgeon here.  In *Caldwell*, for example, the district court did not address the

---

[1] *United States v. Caldwell et al.*, 21-CR-28 (APM) (hereafter "*Caldwell*"), *United States v. Sandlin, Degrave*, 21-CR-88 (DLF) (hereafter "*Sandlin*")*, United States v. Nordean et al.,* 21-CR-175 (TJK) (hereafter "*Nordean*"), *and United States v. Montgomery, Brady, Knowlton,* 21-CR-046 (RDM) (hereafter "*Montgomery*"), and *United States v. Mostofsky*, 21-cr-138 (JEB) (hereafter "Mostofsky").

ceremonial and predetermined nature of the electoral count, and how that predetermination is antithetical to the vote count being considered a "proceeding" or "hearing." *See Caldwell* Opinion. The *Caldwell* and *Montgomery* courts ruled that an "official proceeding" means "the business conducted before an official body." *Caldwell* Opinion at 8-10; *Montgomery* Opinion at 13, 19.  The *Nordean* court had the most broad interpretation ruling that an "official proceeding" is a "series of actions" that requires "some formal convocation." *Nordean* Opinion at 11.  Lastly, the *Sandlin* court ruled that a "proceeding" need not be "court-like" and did not require an "administration of justice," however requires more than just a formal convocation and must be akin to a hearing. *See* Sandlin Opinion at 7-9.

In reaching those determinations, the *Caldwell*, *Nordean*, and *Montgomery* courts left a crucial part of the definition of "proceeding" out of its analyses.  *See Caldwell* Opinion at 9; *Nordean* Opinion at 11; *Montgomery* Opinion at 11.  Black's Law Dictionary defines "proceeding" to be "the business conducted by a court or other official body; *a hearing*." (11th ed. 2019) (emphasis added). The word "hearing," which was left out of the three courts definitions, provides crucial context to the definition of "proceeding" by requiring something more than a "formal convocation" or "business conducted before an official body."

Furthermore, not considered by any court, is whether the Joint Session is not a "proceeding" at all because 3 U.S.C. §15 that governs the Joint Session repeatedly makes clear, A Joint Session is simply a "meeting" of both Congressional bodies:

> The Senate and House of Representatives shall ***meet*** in the Hall of the House of Representatives……..When the two Houses have voted, they shall immediately again ***meet***….

3 U.S.C. § 15. (emphases added).  Not only does the language of the statute governing the Joint Session plainly describe it as a meeting, the House and the Senate meet together only for

ceremonies or events. (i.e., for the State of the Union, *see* U.S. Const., Article II, Section 3, and to hear speeches from visiting dignitaries).  In fact, the only time the Constitution mentions "proceedings" in reference to Congress, the **bicameral** nature of the Congress is stressed.[2]  It follows that a "proceeding before Congress" in §1512 must refer to a separate and bicameral adjudicative, investigative, or legislative functions of the House or the Senate.

As stated above, the *Sandlin* court agreed that a "proceeding" must be akin to a formal hearing.  *See* Sandlin Opinion at 7, 9; *See also Mostofsky* Opinion at 21-22.  A "hearing" is defined as a "judicial session, open to the public, held for the purpose of deciding issues of fact or of law. Black's Law Dictionary (11th ed. 2019).  The *Sandlin* court, however, reasoned that the vote count is a formal hearing because of the procedures it must follow pursuant to 3 U.S.C. § 15, but did not address the "ceremonial and ministerial" nature of the meeting, or consider the procedures that govern the meeting in the context of the meeting's ceremonial nature.  *See Sandlin* Opinion at 7-9.  The ceremonial nature of the vote count, however, is crucial to determining whether or not that count is akin to a formal hearing and, in turn, whether it may constitute a "proceeding."  The vote count is entirely ministerial – it certifies vote counts that have been determined.  It does not meaningfully decide any issues of fact or law because those have already been decided by each state, and the Joint Session does not have the power under the Constitution to actually reject the votes of any State. *See* Vasan Kesavan, "*Is the Electoral Count Act Unconstitutional*?" 80 North Carolina Law Review 1653, 2002 (hereafter, "Kesavan").

The history of objections lodged at the Electoral Count were mostly made in the 1800's because of the confusion of when new states were admitted to the union and how that impacted

---

[2] "Each House may determine the Rules of its *Proceedings*….[e]ach House shall keep a Journal of its *Proceedings*…" Article I Section V. (emphases added).

whether their votes should count.  Objections were ultimately rejected because it was determined that the Joint Session did not have the authority to judge the proceedings already had in the states.  *See* Kesavan at 1678-1694.  In 1876, the most tumultuous election, Samuel Tilden and Rutherford Hayes were separated by one electoral vote and four states sent Congress multiple electoral returns. *Id.*  Instead of the Joint Session resolving this issue, Congress formed a separate commission to sort through the chaos and decide the issues of fact and law presented.  *Id*.  To address issues like this that arose during these rare occasions in history, Congress drafted the Electoral Count Act of 1887, placing on the states, the responsibility on the states to resolve disputes about electors and their appointments and certifications.  Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 540, 543 (July 2004).

In 1969, there was an objection that a vote sent up to Congress from North Carolina should not be counted because it reflected the "faithless" elector that had refused to give his vote to Richard Nixon, despite Nixon winning the popular vote in that State.  The objection was rejected, and the vote at issue counted, because of the strong reminder of representatives such as R. Rarick who said, "We are not election supervisors nor given the discretion to recompute the vote received from a sovereign state.  The Constitution clearly proscribes our duty as to 'count the electoral votes,' the *ministerial* function of a central *collecting agency* and a *tabulating* point." *See Kesavan* at 1694, 2022 (emphases added).  For all these reasons, the Electoral Count is not a proceeding akin to a formal hearing.  Rather, it is a ceremonial meeting of both houses of Congress steeped in the tradition that decides nothing.  It is a political performance conducted in order to give the country a feeling of finality over the already final election results.  As a result, the Electoral Count does not qualify as an "official proceeding" and count One of the

Superseding Indictment should be dismissed.

## II.     THE COUNT AT ISSUE ALSO SHOULD BE DISMISSED BECAUSE" 18 U.S.C. §1512(C)(2) REMAINS UNCONSTITUTIONALLY VAGUE

In his moving papers, Mr. Sturgeon explained that 18 U.S.C. § 1512(c)(2) is unconstitutionally vague because it requires a factfinder to speculate as to the meaning of "corruptly...influences," the phrase "official proceeding," and where exactly the line must be drawn in determining if a defendant is *otherwise* obstructing, impeding, or influencing an official proceeding before Congress.  *See* Def. Mot. at 10-14.  In response, the government contends that a provision is only impermissibly vague if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *See* Gov't. Res. at 21. That, however, is precisely the situation confronting Mr. Sturgeon here.  In, *United States v. Williams*, the Supreme Court reversed a circuit court's finding of vagueness with regard to a pandering statute.  553 U.S. 285 (2008). *Id*.  The Supreme Court reasoned that:

> "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but *rather the indeterminacy of precisely what that fact is*.  Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent" – wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

*Id*. at 306. (emphasis added).  The reasoning in *Williams* is exactly what Mr. Sturgeon argues -viz, that the language in §1512(c)(2) would leave a juror to doubt precisely what fact or facts are needed to make a decision.  The word "corruptly" in §1512(c)(2) creates the same problem as the words "annoying" and "indecent" that the *Williams* court acknowledged were impermissibly vague in the pandering statute.

Try as it might, the government cannot successfully ignore the vagueness of the language of 18 U.S.C. §1512(c)(2).  It cites to a series of cases to argue that "corruptly" is not vague and

that the defendant's reliance on *United States v. Poindexter,* 951 F.2d 369, 379 (D.C. Cir. 1991)
is misplaced. *See* Gov't. Res. at 22-25. It is the government, however, that misunderstands the
crux of *Poindexter*.

In *Poindexter*, the Court ruled *specifically* that the adverb "corruptly" should be read
"transitively" and requires that the defendant "corrupt" *another* into violating their legal duty.
The reason that *Poindexter* reached a different outcome than *United States v. Morrison*, 98 F. 3d
619 (D.C. Cir. 1996) was because, in *Morrison*, the word "corruptly" was applied exactly as
described in the statute, i.e., persuading another to violate their legal duty. *Id*. at 630.  So,
*Morrison* and *Poindexter* are not at odds as the government suggests.  Rather, the cases go hand
and hand to rule that the word "corruptly" is only clear when it is applied transitively to
circumstances where one individual corrupts another to violate their legal duty.  That is because
the word "corruptly" in the statute at issue in *Poindexter* and *Morrison* is followed by another
phrase that provides context and identifies the specific action required to violate the law.  Such
circumstances are absent in this case as §1512(c)(2) has no such requirement.  Indeed, the phrase
"corruptly influences" does not resolve the ambiguity – it heightens the unconstitutional
vagueness of the statute – because "influence" alone is another vague word that may mean many
things and lacks the definiteness of "influencing another to violate their legal duty" at issue in
*Poindexter* and *Morrison*.  *See also Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir.
1968) (holding that a statute that criminalized "leading an immoral or profligate life" vague
because "immoral" is synonymous with "corrupt, depraved, indecent, dissolute," all of which
would result in "an almost boundless area for the individual assessment of another's behavior").

The government further questions *Poindexter* by citing to *Arthur Andersen v. United
States*, 544 U.S. 696 (2005), a case that involved a jury instruction that failed to "convey the

requisite consciousness of wrongdoing." *Id*. at 698.  This holding is not inconsistent with *Poindexter*, which involved an entirely different dispute and has no bearing or effect on why the word "corruptly" was deemed vague in *Poindexter*.  The cases the government cite from other circuits are inapposite for the same reason.  *See* Gov't. Res. at 24-31.  *Poindexter* remains good law and identifies one of the many problems that the word "corruptly" presents in the obstruction statute.  It is impermissibly vague because it does not provide a discernable standard for what conduct is prohibited, thereby allowing for arbitrary or discriminatory enforcement as in this case.  For this reason too, count One of the Superseding Indictment should be dismissed.

　　　The five recent district court decisions, *Sandlin, Caldwell, Nordean, Montgomery, and Mostofsky,* did not resolve the vagueness of §1512(c)(2) as applied to Mr. Sturgeon.  In *Sandlin,* the Court refused to find the word "corruptly" vague as applied to the defendants because it found there was a clear nexus between their alleged conduct and the intent to obstruct the vote. *Sandlin* Opinion at 24-26.  In *Sandlin*, the defendants allegedly engaged in advance planning, forcibly breached the Capitol building, assaulted Capitol police officers inside the building, and encouraged others to steal paperwork from the Senate Chamber. *Id*.   In contrast to *Sandlin*, there is no nexus between Mr. Sturgeon's alleged actions and an intent to obstruct the vote count.

　　　In *Sandlin*, the Court found the term "corruptly" in §1512(c)(2) to mean "wrongfully" and "independently criminal" and therefore was not impermissibly vague in that case because the defendants' alleged behavior was so intertwined with his concerted efforts to obstruct the vote that it fit squarely within the term.  *Id.* at 25. *See also Nordean* at 24; *Motofsky* at 24 (agreeing with *Sandlin*). The *Sandlin* Court noted, however, that other cases with different facts could present closer questions. *Id*.  This case is a perfect example of one that presents a closer question. Here, Mr. Sturgeon's conduct does not fit squarely within the core coverage of "corruptly"

because his actions are not inextricably intertwined with an intent to obstruct the vote count.  Mr.

Sturgeon did not enter the Capitol building and did not take any actions or say any words that

demonstrated an intent to obstruct the vote count.  The government's claim that he tried to

"advance" on the Capitol building by allegedly pushing a barricade quite far from the entrance is

purely speculative, especially in light of the fact that Mr. Sturgeon could have easily entered the

Capitol building later in the afternoon when hundreds of other defendants were able to simply

walk in.  *See* Gov't Res. at 27.

     At most, Mr. Sturgeon's actions are typical of a protest, similar to the thousands that

have occurred in our country where protesters mass and law enforcement has to contain the

crowd by deploying tear gas and control tactics.  Being involved in a protest, or even a riotous

protest, does not mean that one has the specific intent to obstruct a proceeding.  The most glaring

problem with charging some January 6 defendants with §1512(c)(2) is that it conflates their other

alleged conduct, such as the alleged assaults on police officers on the grounds of the Capitol with

an intent to obstruct the vote count taking place in the Capitol building.  Here, there is no

evidence- and the government does not contend – that Mr. Sturgeon entered the Capitol building

or even tried to enter the Capitol to disrupt the Electoral Count.  Accordingly, §1512(c)(2) is

vague as to Mr. Sturgeon.

     Shortly after the *Sandlin* decision, the district courts in *Caldwell* and *Nordean* also ruled

that §1512(c)(2) is not impermissibly vague.  *See Caldwell* and *Nordean* Opinions.  In *Caldwell*

and *Nordean*, the district courts agreed that the term "corruptly" must be understood in its

intransitive form and that is why *Poindexter* does not control in a prosecution under §1512(c)(2).

*Caldwell* Opinion *at* 22-33; *Nordean* Opinion at 22.  However, it is the intransitive form of the

term "corruptly" that makes it especially vague in this case.  Mr. Sturgeon did not personally act

"corruptly" with respect to any intent to obstruct the vote count. Furthermore, it cannot be that the alleged assault via barricade is evidence of intent to obstruct the vote, a separate crime with a separate *mens rea* – without any further indication of intent to obstruct the vote count itself.  It also could not have been the statements the government alleges he made while present on the Capitol grounds because none of those statements indicated a desire to stop the vote count.  In fact, one of those statements expressed a desire to peacefully protest and "not to hurt the police" but to "represent a real issue, STAND." *See* Gov't. Res. at 7.  Simply put, there is no action that could have put Mr. Sturgeon on notice that he was acting corruptly with regards to the allegation that he tried to stop the vote count.

The district court in *Caldwell* relied on *Arthur Anderson* and other circuit decisions that interpreted "corruptly" to require the "consciousness of wrongdoing." *Caldwell* at 23-24.  The Court found that interpretation readily applied to the *Caldwell* defendants who were allegedly members of the Oath keepers and conspired and pre-planned their January 6, 2021 activities and that (except for one) forcibly breached the Capitol.  *Id.* at 3-5 (defendants allegedly collected paramilitary gear and were armed with such gear on January 6, chatted together about plans prior to January 6, and some were allegedly part of a group that pushed through a line of officers inside the Capitol building).  With those alleged facts, none of which are present here, the Court found a logical nexus existed between the inherent "consciousness of wrongdoing" and the intent to halt the vote count. *Id.* at 23-24.  That same nexus, however, does not exist or apply to those individuals, like Mr. Sturgeon, who did not plan anything in advance and did not even enter the Capitol building.  Further, the "consciousness of wrongdoing" of the acts attributed to Mr. Sturgeon – protesting on the Capitol grounds and allegedly pushing a barricade– are unconnected to the intent or "consciousness" of halting a vote count.

In *Montgomery*, the court also found that a "nexus" requirement is consistent with past

decisions.  *Montgomery* Opinion at 44-45 (defendants allegedly wore tactical vests, used

violence on officers, and stormed the Senate).  The court reasoned that §1512(c)(2) requires the

defendant's conduct to have the "natural and probable effect of interfering with an official

proceeding and the accused must have known his actions were likely to affect a particular

proceeding." *Id*. (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).  In this case, that

link cannot be made.  It is not reasonable to say that Mr. Sturgeon's actions of protesting on the

Capitol grounds had the "natural and probable effect" of halting the vote when there was no

particular action that Mr. Sturgeon took that could be reasonably linked to the interference of the

vote.  For these reasons, the statute is unconstitutionally vague as applied to Mr. Sturgeon.

## III.     SECTION 231(A)(3) IS STILL UNCONSTITUTIONALLY VAGUE

In his moving papers, Mr. Sturgeon explained that §231(a)(3)'s imprecise language is

overbroad and unduly vague, both generally and as applied to him, and impermissibly relies on a

police officer's subjective reaction to the conduct of others to determine whether or not the

statute has been violated. *See* Def. Mot. at 16-20.

To try to paper over these material flaws in the statute, the government purports to read

an express *mens rea* requirement into §231(a)(3) by contending there must be an intent on the

part of the defendant to impede or interfere.  *See* Gov't Res. at 41.  In so contending, the

government ignores that various parts of the statute do not rely on the defendant's *mens rea* but

rather allow for police officers and the government to subjectively determine what does, or does

not, constitute improper conduct by a defendant, rather than providing enumerated conduct that

can be readily understood and uniformly applied.  In this regard, it is not the defendant who

decides whether or not there is (1) a civil disorder; (2) if his conduct is "incident to" that civil

disorder; and (3) whether that conduct delayed, obstructed, or adversely affected commerce. That leaves a lack of an express scienter requirement as whole because it is impossible to intend to obstruct or impede a civil disorder where a potential defendant that (1) has no way of knowing what civil disorder is; (2) cannot know if their actions are incident to that civil disorder and; (3) cannot possibly know whether their conduct delays or obstructs or adversely affects commerce.

Moreover, the government fails to address Mr. Sturgeon's remaining arguments regarding the inherent vagueness that exists in the statute.  Nor does the government address why §231(a)(3) is not impermissibly vague as applied to Mr. Sturgeon.  Mr. Sturgeon could not have been on notice that he was allegedly committing a civil disorder given the unconstitutionally vague nature of the statute.

The government cites to *Nordean*, which recently ruled that §231(a)(3) is not unconstitutionally vague, explaining that its terms are not dependent on the subjective reaction of others. *See Nordean* Opinion at 35.  However, the Court did not reason why it found so, leaving the question of how its terms are any less subjective than the terms "annoying" or "indecent" found to be vague in *Williams*. *See Williams,* 553 U.S. at 306.  In *Nordean*, the court also found §231(a)(3) was not vague as applied to the defendants in that case because their alleged actions of "evading detection by law enforcement on January 6" and charging over metal barriers and past law enforcement officers toward the Capitol that day, fit within the type of conduct prohibited by §231(a)(3). *See Nordean* Opinion at 36.  However, the Court did not explain why those alleged actions fit squarely within all of the required elements of the civil disorder statute. To be convicted of §231(a)(3), it is not sufficient just to "interfere with law enforcement," one must do so during a *civil disorder* and in way that *obstructs* or *delays* or *adversely affects* interstate commerce.  As such, the *Nordean* decision does not resolve the vagueness of

14

§231(a)(3) on its face or as applied to Mr. Sturgeon.

### IV.   18 U.S.C. §1752(a)(1) DOES INFRINGE UPON MR. STURGEON'S FIRST AMENDMENT RIGHTS

In response to Mr. Sturgeon's argument that §1752(a)(1) unconstitutionally infringes on his First Amendment rights, the government asserts he is not shielded from prosecution because he allegedly shoved a barricade into police officers.  *See* Gov't. Res. at 43.  However, to be convicted of §1752(a)(1), there need not be an act of assault, it simply penalizes anyone who enters and remains in a restricted area.  It is this alleged conduct that Mr. Sturgeon argues is protected conduct, not allegedly pushing a barricade into an officer.  Therefore, the government's entire reasoning is flawed because it has based its analysis on all of the conduct alleged in the indictment, and not specifically the conduct alleged in Count Four.

The government incorrectly relies on *Nordean*, which ruled that §1512(c)(2) does not violate the First Amendment.  *See Nordean* Opinion at 28-30.  However, §1512(c)(2) requires an action or series of actions that result in obstruction, which is why the *Nordean* court ruled it not "expressive" conduct.  *Id.* at 29.  Section 1752(a)(1) only requires presence in a restricted area.  Mr. Sturgeon argues that the restriction of his presence on the Capitol grounds is a violation of the First Amendment.  The government cannot conflate his other alleged conduct that is separate and apart with this particular allegation that has First Amendment implications.  Therefore, the *O'Brien* factors do apply.

The government then argues, that even if the *O'Brien* factors apply, that protecting the integrity of the Presidential Election is a substantial government interest that outweighs the First Amendment.  *See* Gov't. Res. at 46.  However, the government does not support its argument with any further reasoning.  It simply cites to a case that upheld a ban on overnight camping on the National Mall.  *Id.* (citing *Clark Cmty. For Creative Non-Violence*, 468 U.S. 288, 299

(1984)).  However, that case involved a group of demonstrators who were permitted to protest on the National Mall but were prohibited simply from sleeping there overnight. *Id*. That case is not on point as the discussion here is whether the Capitol grounds can be restricted to demonstrators during a congressional meeting, not whether or not they can sleep on the grounds overnight.

V.   **18 U.S.C. §1752 REMAINS AMBIGUOUS AND THE LEGISLATIVE HISTORY CONTINUES TO COMPEL THE CONCLUSION THAT THE UNITED STATES SECRET SERVICE IS THE ONLY ENTITY DESIGNATED TO RESTRICT AREAS UNDER THE STATUTE**

The government argues that 18 U.S.C. §1752 is unambiguous and, therefore, there is no need to consider the legislative history of the statute.  *See* Gov't. Res. at 48.  The government is wrong.

The language of §1752 is unclear.  It states: "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area."  Yet, it does not identify who may do the restricting, and Congress could not possibly have intended that anyone could impose a restriction.  This lack of clarity and guidance to law enforcement or to the public as to who is authorized to impose restrictions under the statute makes the statute ambiguous.  Given this ambiguity, we must look to the legislative history to determine what Congress intended.  *See U.S. v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir.  2008) (citing *Staples v. United States*, 511 U.S. 600, 605 (1994)).

The government is incorrect that the legislative history supports broad authority for any entity to restrict Congressional grounds.  *See* Gov't. Res. at 49-50 (citing *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2015)).  *Bursey*, however, involved in *what manner* the area is deemed restricted, holding that §1752 did not require a physical demarcation and that the presence of law enforcement was sufficient to mark the area as restricted.  *Id*. at 308.  *Bursey* actually supports Mr. Sturgeon's position, fully supported by the legislative history, that only the Secret Service is

16

vested with the power to set federal restricted areas because, in *Bursey*, the Secret Service was the entity that designated an area at the Columbia airport as restricted.  *Id*. at 304.

The government seeks to have the Court forego any consideration of the legislative history of §1752 even though the Senate Judicial Committee report unambiguously vests the Secret Service with the power to set federal restricted areas.  S. Rep. No. 91-1252 (1970) at 7.  If Congress did not intend to vest that authority with the Secret Service, it would not have named that agency specifically.  Moreover, vesting this power with the Secret Service makes perfect sense, as it is the entity that is charged with protecting the President and Vice President.

The government contends that, because the current version of the statute does not specifically reference the Secret Service, that means Congress purposefully removed it to broaden the authority to other entities.  This assumption is unfounded and the government cites to no legislative statement or other authority stating that this was intended as part of revising the statute.  In the absence of any such clear direction, the Court should not interpret §1752 to provide authority for any entity to restrict the grounds other than the entity that protects the President and Vice President and has historically had the sole authority to do so.

## VI.   THE COUNTS AT ISSUE SHOULD BE DISMISSED BECAUSE FORMER VICE PRESIDENT MIKE PENCE WAS NOT "TEMORARILY VISITING" THE U.S. CAPITOL ON JANUARY 6, 2021

As an initial matter, the government cannot amend the Grand Jury's indictment through a pleading.  The Superseding Indictment in this case charges Mr. Sturgeon with conduct "*where the Vice President was temporarily visiting.*"  *See* ECF No. 53 (emphasis added).  The Superseding Indictment does not charge that "Vice President Mike Pence and his family were present" in the U.S. Capitol building when Mr. Sturgeon is alleged to have violated 18 U.S.C. § 1752.  *See* Gov't. Res. at 51.  The indictment does not charge what the government now

17

apparently wishes it did and those counts at issue cannot stand on the basis of what might have

been.  Moreover, even if the Superseding Indictment did charge that "Vice President Mike Pence

and his family were present" in the U.S. Capitol building on January 6, 2021, the indictment still

would fail to state any offense. Section 1752 requires, in pertinent part, that the restricted area be

"grounds where the President or other person protected by the Secret Service is or will be

temporarily visiting." 18 U.S.C. § 1752(c).

The government acknowledges, as it must, that Vice President Pence worked at the

Capitol building.  *See* Gov't. Res. at 51.  Contrary to the government's assertion, this fact is

crucial when analyzing the plain text of the statute.  It could not be more relevant that Vice

President Pence lived in D.C. and had a permanent U.S. Capitol office. The statute and the

"temporarily visiting" part of the statute, was promulgated specifically to address the difficulties

of protecting the President "when he is outside the White House complex traveling or residing

temporarily *in some other section of the country.*"  Auth. Of Sec'y Treasury to Ord. Closing of

Certain Sts. Located Along the Perimeter of the White House, 19 Op. O.L.C. 109 (1995)

("*Authority of the Secretary*") (emphasis added).[3]  In the floor debate on the bill, legislators

discussed "the problems confronting the Secret Service when protecting the President *outside of

Washington.*"  *Id*. (emphasis added).  Nonetheless, Mr. Sturgeon does not suggest the statute

applies "only to locations outside the District of Columbia." Mr. Sturgeon simply highlights the

obvious:  that a person generally cannot be said to be "temporarily visiting" his own office

building located approximately four miles from his residence.

The government contends Vice President Pence was only "temporarily visiting" the

Capitol because he was "physically present . . . for a particular purpose" and "intended to leave

---

[3] Available at https://www.justice.gov/file/20226/download.

at the close of the session." *See* Gov't Res. at 52.  This novel interpretation of "temporarily visiting" proves too much and is unworkable.  If adopted by the Court, every person "physically present" at the Capitol that day—or any day- every Congressperson, every staffer, every U.S. Capitol Police officer—is just "temporarily visiting" the Capitol.  By that logic, only a person meandering aimlessly through the Capitol for no purpose, or a person who never intended to leave the Capitol, would fall outside the scope of "temporarily visiting."  The Court should reject the government's invitation to effectively read all meaning out of an express limitation in a criminal statute.  *See United States v. Wiltberger*, 18 U.S. 76, 95 (1820) ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself" and "is founded on the tenderness of the law for the rights of individuals . . . .").

To the extent that unidentified family members of Vice President Pence are now alleged to constitute a basis to impose federal criminal liability on thousands of people for trespassing on January 6, the government's argument fares no better. *See* Gov't. Res. at 52.  Members of Vice President Pence's family were, in the government's own words, allegedly "present" to "attend" and "to observe" a Congressional meeting in a federal building where the Vice President maintains a *permanent* office and *presides*.  The Vice President's family members were not on vacation or at a speaking event.  That a family member may not work independently or have an independent office at the U.S. Capitol does not transform the U.S. Capitol into a "temporary visit," as expressly required by the criminal statute at issue.  After almost one year of charging January 6 defendants and just weeks after filing a Superseding Indictment that does not mention them, the government now tries to shoehorn new protectees into this case out of the blue and without providing a basis for why they were "temporarily visiting" as intended by Congress. The Court should reject the government's transparent and improper efforts to save Counts that

should be stricken.

In effect, the government reads the words "temporarily visiting" out of the statute completely.  Under the government's limitless interpretation, the words "temporarily visiting" are meaningless and superfluous.  "The Government's reading is thus at odds with one of the most basic interpretive canons, that 'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'"  *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)); *see also Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative") (citing *United States v. Menasche*, 348 U.S. 528, 538–539 (1955)).

If Congress wanted to define "restricted building or grounds" to encompass anywhere a Secret Service protectee "is or will be physically present" at any given time, Congress easily could have, and would have, omitted the words "temporarily visiting" or used the words "physically present" instead in § 1752(c)(1)(B).  *See Burgess v. United States*, 553 U.S. 124, 130 (2008) ("As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated.") (alteration and ellipsis in original) (quoting *Colautti*, 439 U.S. at 392-393 n. 10).  "Congress did not write the statute that way."  *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Naftalin*, 441 U.S. 768, 773–774 (1979)).  Consequently, the statute simply does not restrict any government building in which a Secret Services protectee is or will be "physically present."  *Id*.  And, "[r]eading the statute to proscribe a wider range of offensive conduct," as the government now urges, "would raise the due process concerns underlying the vagueness doctrine."  *Skilling v. United States*, 561 U.S. 358, 408 (2010).

Section 1752 expressly delineates three definitions of the term "restricted building or

grounds" pursuant to which individuals may be criminally punished.  "When 'a statute includes an explicit definition' of a term, 'we must follow that definition . . . .'"  *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (quoting *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020)).  In addition, section 3056(d) criminalizes obstruction and interference with a Secret Service officer's performance of his or her "protective functions," including deterring and punishing those individuals who the government fears may seek unauthorized access to the President's or Vice President's location.  See 18 U.S.C. §3056(d); s*ee also Authority of the Secretary*, 19 Op. O.L.C. at 109 (§ 3506 "grants the Secretary broad authority to take actions that are necessary and proper to protect the President").

The government's purported concern should be directed to Congress to amend the statute, not to a request that this Court interpret a statute contrary to its language.  The Supreme Court has recently rejected other government attempts to stretch federal criminal statutes beyond their natural boundaries.  *See Kelly v. United States*, 140 S.Ct. 1565, 1574 (2020) (government's use of federal fraud statutes to try to criminalize the regulatory actions of government officials an impermissible and overbroad application of the statute); *Van Buren*, 141 S.Ct. at 1661 (finding the government's broad construction of the computer fraud and abuse statute would implicate a large amount of commonplace activity not meant to be covered by the statute).  This Court should reject the government's attempt to do the same here.

## CONCLUSION

For all of the reasons discussed above, and his moving motion to dismiss, Isaac Sturgeon,

respectfully requests that the Court dismiss counts One, Three, Four, Five, and Six of the

Superseding Indictment.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____
Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Maria_Jacob@fd.org