**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-91-RCL** |
| **CRAIG MICHAEL BINGERT**, *et al.*, | |
| *Defendants.* | |

**<u>MEMORANDUM OPINION</u>**

On January 6, 2021, a violent mob attacked the United States Capitol as Congress attempted to certify the Electoral College vote. Defendants Isaac Sturgeon, Craig Bingert, and Taylor Johnatakis allegedly joined the fray and rammed a line of police officers with a metal barricade. The government charged each defendant with eight different offenses related to their participation in this unsuccessful insurrection. *See* Superseding Indictment, ECF No. 53. Isaac Sturgeon moved to dismiss Counts One, Three, Four, Five, and Six of the Superseding Indictment, arguing that these counts do not state an offense and do not give defendants fair notice. *See* Defs.' Mot. 1, ECF No. 55.[1] He also argues that Count Five infringes on defendants' First Amendment rights. *Id.* Johnatakis and Bingert moved for joinder. ECF Nos. 56 & 59. The government opposed, Gov't Opp'n 1, ECF No. 60, and Sturgeon replied, Defs.' Reply, ECF No. 62. Upon consideration of the parties' filings, applicable law, and the record herein, the Court will **DENY** defendants' motion to dismiss.

---

[1] Because all defendants ultimately joined in this motion, the Court will refer to ECF No. 55 as "defendants' motion."

## I.    BACKGROUND

On January 6, 2021, both houses of Congress assembled in the United States Capitol building to certify the vote count of the Electoral College of the 2020 Presidential election.[2] Compl. 1, ECF No. 1. As President of the Senate, former Vice President Michael Pence was present to perform his duties under the Twelfth Amendment. *Id.* United States Capitol Police secure the Capitol 24 hours a day, and on January 6, 2021, police had closed off both the Capitol building itself and the exterior plaza to members of the public. *Id.* The police blocked off the entrances to the Capitol with temporary and permanent barricades. *Id.*

As the certification proceeded in full swing, a large crowd began to gather outside of the Capitol. *Id.* Many members of the crowd had attended then-President Donald Trump's political rally on the National Mall, where he decried the 2020 election as fraudulent. *United States v. McHugh*, No. 1:21-cr-453 (JDB), 2022 WL 296304, at *1 (D.D.C. Feb. 1, 2022). At the rally, President Trump implored the crowd to march towards the Capitol and "demand that Congress do the right thing and only count the electors who have been lawfully slated." *Id.* When members of the mob who braved the two-mile trek from President Trump's rally arrived at the Capitol, the scene soon dissolved into chaos. Gov't Opp'n 5. Agitated protestors became enraged rioters. *Id.* Rioters forced their way through police line perimeters and past metal barricades, assaulting officers and breaking Capitol windows in an attempt to reach the lawmakers inside. *Id.* Many of these rioters were armed; they brought "tire irons, sledgehammers, bear spray, and Tasers." *Id.*

Defendants Sturgeon, Bingert, and Johnatakis were videotaped at the front of a large crowd on the west terrace of the Capitol grounds. *Id.* at 6. Together with other members of the mob, they picked up a metal fence and heaved it into a line of police officers. *Id.* Johnatakis, armed with a

---

[2] For the purposes of this motion, the Court will assume that the government's alleged facts are true.

bullhorn, urged the crowd to "push them out of here, we're just using our bodies." *Id.* Once the defendants jammed the barricade into the line of police officers, they ducked underneath it. *Id.* at 7. The police officers used chemical irritants and physical force to push them back. *Id.*

The government has arrested and charged more than 800 individuals for their conduct on January 6, 2021—a riot that caused millions of dollars in damage to the Capitol, injured over one hundred police officers, and caused multiple deaths. Sturgeon, Bingert, and Johnatakis were each arrested after the Federal Bureau of Investigation ("FBI") posted photos and body-worn camera footage of the three men and requested the public's help to identify them. Compl. 2. All three were charged with eight counts related to their participation on January 6, 2021. *See* Superseding Indictment.

Defendants now challenge several of the counts charged in their indictments. They move to dismiss Count One, obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2), arguing that the Electoral College certification is not an "official proceeding" as contemplated in § 1512 and that the statute is unconstitutionally vague. Defs.' Mot. 7, 10. They also move to dismiss Count Three, obstructing a police officer during civil disorder in violation of 18 U.S.C. § 231(a)(3), maintaining that § 231(a)(3) is unconstitutionally vague and fails to provide proper notice. Defs.' Mot. 15. Then, they argue that 18 U.S.C. § 1752(a)(1), the statute undergirding Count Four, is unconstitutional as applied because it violates their First Amendment rights. Defs.' Mot. 21. Finally, they move to dismiss Counts Four, Five, and Six, arguing that the Capitol complex was not a "restricted building or grounds" as contemplated by § 1752. Defs.' Mot. 24. The government opposed on all counts. Gov't Opp'n. Defendants' motion is now ripe.

Defendants' arguments echo those that other January 6, 2021 defendants have filed. Plenty of ink has been spilled in this district denying motions that raise a combination of these arguments.[3] One judge, however, has granted a motion to dismiss based on one of defendants' arguments— that § 1512(c)(2) does not apply to the conduct alleged. *United States v. Miller*, No. 1:21-cr-119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022). Now, this Court has the opportunity to consider these questions anew.

## II.   LEGAL STANDARD

The purpose of an indictment is to "inform the defendant of the nature of the accusation against him." *Russell v. United States*, 369 U.S. 749, 767 (1962). Accordingly, an indictment need only contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The indictment must inform the defendant of the "precise offense" he is accused of so that "he may prepare his defense and plead double jeopardy in any further prosecution for the same offense," *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014), but need not include detailed allegations, *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007).

Rule 12 of the Federal Rules of Criminal Procedure permits defendants to raise by pretrial motion "any defense, objection, or request that a court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Under Rule 12, a defendant may move to dismiss an indictment for "failure to state an offense" or "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii), (v). Because

---

[3] *See McHugh*, 2022 WL 296304; *United States v. Puma*, No. 1:21-cr-0454 (PLF), 2022 WL 823079 (D.D.C. Mar. 19, 2022); *United States v. Andries*, No. 1:21-cr-093 (RC), 2022 WL 768684 (D.D.C. Mar. 14, 2022); *United States v. Bozell*, No. 1:21-cr-216 (JDB), 2022 WL 474144 (D.D.C. Feb. 16, 2022); *United States v. Grider*, No. 1:21-cr-0022 (CKK), 2022 WL 392307 (D.D.C. Feb. 9, 2022); *McHugh*, 2022 WL 296304; *United States v. Montgomery*, No. 1:21-cr-046 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean*, 1:21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021); *United States v. Mostofsky*, No. 1:21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Caldwell*, No. 1:21-cr-028 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Sandlin*, No. 1:21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Griffin*, No. 1:21-cr-92 (TNM), 549 F. Supp. 3d 49 (D.D.C. July 2, 2021).

a motion to dismiss an indictment "challenges the adequacy of an [i]ndictment on its face," a court determining a Rule 12(b) motion must accept all allegations in the indictment as true. *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011). The relevant question in a Rule 12(b) motion is whether the allegations are "sufficient to permit a jury to find that the crimes charged were committed." *Id.* at 146. This standard is not difficult to meet—dismissal under Rule 12(b) is granted "only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

## III.    COUNT ONE OF THE INDICTMENT PROPERLY STATES AN OFFENSE

Count One of the Superseding Indictment alleges that all three defendants "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College" in violation of 18 U.S.C. § 1512(c)(2). Superseding Indictment 1–2, ECF No. 52. The relevant statute states that

> (c) Whoever corruptly—
>
>> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>>
>> (2) otherwise obstructs, influences, or impedes an official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c). Defendants raise three challenges to this count of the indictment. First, they argue that the certification of the Electoral College vote was not an "official proceeding." Defs.' Mot. 7. Second, they assert that § 1512(c)(2) is unconstitutionally vague both facially and as applied to this case. *Id.* at 10. Third, they contend that their alleged conduct does not fall within the bounds of § 1512(c)(2). ECF No. 64. None of these arguments persuade the Court.

A. **Congress's Certification of the Electoral College Vote Is An "Official Proceeding"**
   **For The Purposes Of 18 U.S.C. § 1512(c)**

Defendants aver that an "official proceeding" under § 1512(c) must involve "adjudicative

or at least 'quasi-adjudicative responsibilities.'" *Id.* (quoting *United States v. Perez*, 575 F.3d 164,

169 (2d Cir. 2009)). They appeal to "legislative history" and "Congress's role in counting electoral

votes" to support their argument that the certification of the Electoral College is not an adjudicative

hearing, but instead a "ceremonial and administrative event that does not qualify as an 'official

proceeding.'" Defs.' Mot. 7.

The Court starts, "as it must, with the text." *United States v. Little*, No. 1:21-cr-315 (RCL)

2022 WL 768685, at *3 (D.D.C. Mar. 14, 2022). When statutory language is disputed, a court must

first determine if the statute "has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*,

519 U.S. 337, 340 (1997) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)).

Here, Congress has explicitly defined the term "official proceeding" as used in § 1512 as, among

other things, "a proceeding before Congress." *See* 18 U.S.C. § 1515(a)(1)(B). This eliminates the

need to determine whether the vote certification was "official." But this definition does not fully

answer the question. Because § 1515 does not explicitly define the term "proceeding," "some

interpretation is required." *Puma*, 2022 WL 823079, at *5.

"Proceeding" could be interpreted two ways: It could be read broadly by its lay

interpretation as any "act or step that is part of a larger action," *Proceeding*, Black's Law Dictionary

(11th ed. 2019), or it could be read more narrowly as a formal proceeding. For several reasons, the

Court agrees with all other judges in this district to face the question that it is the formal, legal

understanding of the term "proceeding" that is implicated by § 1512(c). *Puma*, 2022 WL 823079,

at *5 (collecting cases). First, when a Court confronts a legal "term[] of art," those terms should

be given their technical meanings. *See* Antonin Scalia & Bryan Garner, Reading Law: The

Interpretation of Legal Texts 73. Second, using the broad lay interpretation here (any "act or step that is part of a larger action") would rip the term from its statutory context: the proceeding here must be one "before" Congress, which implies that Congress "has convened in some *formal* respect for the purpose of conducting that business." *Montgomery*, 2021 WL 6134591, at *5 (emphasis added). And there are additional statutory clues that support a technical reading of the term: as defendants note, the term "official proceeding" further suggests a "formal appearance before a tribunal." Defs.' Mot. 6 (quoting *United States v. Ermoian*, 752 F.3d 1165, 1170–71 (9th Cir. 2013)). Accordingly, under this understanding, a "proceeding before Congress" must involve something akin to "a formal assembly or meeting of Congress for the purpose of conducting official business," as opposed to merely a "step that is part of the larger action." *Montgomery*, 2021 WL 6134591, at *5.

Defendants are unsatisfied with this definition and seek to narrow the term further. They would interpret "proceeding" as an adjudicative or quasi-adjudicative event that involves "witness testimony," "documentary" evidence, or other "tangible evidence." Defs.' Mot. 9. They justify this narrow reading by moving beyond the text itself and emphasizing the legislative history of the Sarbanes-Oxley Act, through which Congress enacted § 1512(c)(2). But when the language of the statute is "unambiguous, the 'judicial inquiry is complete.'" *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003)). And besides, "[h]ad Congress intended to limit the definition of 'official proceeding' to judicial and 'quasi-judicial' proceedings, to proceedings at which witnesses appear and give testimony, or to proceedings related 'to the administration of justice' . . . it could easily have done so." *Montgomery*, 2021 WL 6134591, at *6. For example, other statutes within the same chapter explicitly require a quasi-adjudicative setting: 18 U.S.C. § 1505 criminalizes obstruction of "the due and proper

administration of law under which any pending proceeding is being had." 18 U.S.C. § 1505. The Court will not read "proceeding" to require a specific adjudicative event.

The Court can reject defendants' final argument off the bat because it is not interpretive at all—it instead assumes a different set of facts and attempts to recharacterize the alleged proceeding at question here. Defendants reason that the Electoral College certification is not a proceeding under § 1512(c)(2) because it is merely "administrative" and "ceremonial." Defs.' Mot. 8. This Court disagrees. It is "inaccurate to characterize the Certification . . . as a purely ministerial, legislative vote-counting event." *Caldwell*, 2021 WL 6062718, at *7. Even defendants concede that Congress's role in counting electoral votes includes "[s]ettl[ing] procedural issues for conducting the joint session at which Congress counts the states' electoral votes" and determining generally whether "procedural rules have been followed." Defs.' Mot. 8–9. Such tasks are hardly "ceremonial" in nature. This Court will also reject defendants' contention that, because 3 U.S.C. § 15 (which governs counting electoral votes) twice uses the phrase "meet," the Electoral College certification is merely a ceremonial "meeting" of Congress and not a proceeding. *See* Defs.' Reply 5. The language they quote from 3 U.S.C. § 15 conveniently skips over the extensive procedural requirements of the Electoral College certification delineated in the same section. The use of the term "meeting" does not negate the fact that the certification is a proceeding before Congress.

Like every other court in the district to decide the issue, this Court concludes that the Electoral College vote certification constituted an official proceeding as described in 18 U.S.C. § 1512(c).

**B.  18 U.S.C. § 1512(c)(2) Is Not Unconstitutionally Vague**

Defendants next argue that § 1512(c)(2) is unconstitutionally vague and fails to provide fair notice of the conduct it punishes. Defs.' Mot. 10. A criminal law violates the Fifth Amendment

if it is either "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Unconstitutional vagueness accordingly involves two separate but often interlocking inquiries. Subsection 1512(c)(2) is not vague under either rubric.

First, criminal statutes do not provide fair notice when they tie culpability to "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008). Fair notice does not concern itself with the possibility that "it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved." *Id.* Instead, to provide fair notice the relevant incriminating fact simply must not be "indetermina[te]." *Id.* A statute is not vague because certain cases may present "close calls," *id.* at 305, or because it is "broad," *United States v. Andries*, No. 1:21-cr-93 (RC), 2022 WL 768684, at *9 (D.D.C. Mar. 14, 2022). A statute is vague if it is unclear what the relevant incriminating fact is.

Second, a law authorizes "arbitrary and discriminatory enforcement" when it lacks any standards to govern the discretion it grants. *Agnew v. Gov't of D.C.*, 920 F.3d 49, 55 (D.C. Cir. 2019). This category includes laws whose application turns on subjective judgments or preferences. *Id.* A statute that criminalized "annoying" a passerby, for example, would invite arbitrary and discriminatory enforcement—what "annoys some people does not annoy others." *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). But a statute that sets an "imprecise" but ultimately comprehensible normative standard is not unconstitutionally vague. *Id*.

Using both of these frameworks (often somewhat interchangeably), a majority of defendants' argument is addressed towards the term "corruptly." Subsection 1512(c) criminalizes one who "corruptly . . . [o]therwise obstructs, influences, or impedes any official proceeding." 18

U.S.C. § 1512(c). Defendants rely on *United States v. Poindexter*, where the D.C. Circuit held that the term "corruptly" as used in 18 U.S.C. § 1505[4] was unconstitutionally vague. 951 F.2d 369, 379 (D.C. Cir. 1991). They argue that here, too, "corruptly" invites arbitrary enforcement and requires people to guess at its meaning. Defs.' Mot. 11–12. But subsequent Supreme Court decisions and acts of Congress have cabined *Poindexter* into a narrow holding related solely to 18 U.S.C. § 1505, not a broad holding about the term "corruptly."

In *Poindexter*, former National Security Advisor John M. Poindexter was charged with violating 18 U.S.C. § 1505 by lying to or misleading Congress during the Iran/Contra Affair. 951 F.2d at 371. The Court first found that, absent some "narrowing gloss," the term "corruptly" was vague because people are forced to "guess at its meaning and differ as to its application." *Id.* at 378. Analogizing to phrases like "immoral," the Circuit explained that "corruptly" affords too much discretion for "individual assessment of the morality of another's behavior." *Id.* at 379. The Circuit found no help from Congress to decipher the term, either. "If the legislative history of § 1505 clearly indicate[d] a more specific meaning of the term 'corruptly,' then the statute might constitutionally be applied to conduct" within that meaning. *Id.* But the Circuit found no such instruction from Congress. Nor had the statute "been sufficiently clarified by prior judicial decisions to give requisite notice and to protect against" prosecutors and jurors with their own agendas and interpretations. *Id.* at 384. Ultimately, while noting that "corruptly" can either be

---

[4] At the time, 18 U.S.C. § 1505 provided that:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1505 (1991).

intransitive (a person acting corruptly) or transitive (a person acting to corrupt another), the Circuit concluded that reading the statute intransitively to cover conduct related to lying to Congress was too broad and failed to give constitutionally required fair notice. *Id.* at 386.

But five years after *Poindexter*, Congress expressly defined "corruptly": "As used in section 1505, the term 'corruptly' means acting with improper purpose, *personally or by influencing another*, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or another information." 18 U.S.C. § 1515(b) (1996) (emphasis added). So while defendants argue that the Circuit in *Poindexter* "ruled *specifically* that the adverb 'corruptly' should be read 'transitively' and requires that the defendant 'corrupt' *another*," Defs.' Reply 9, that holding is of no matter—Congress has cured any vagueness by setting forth a more specific meaning of the term and endorsing the intransitive reading. Defendants maintain that "this amendment did not resolve the vagueness that still exists in § 1512 as Congress did not amend § 1515 as it applies to § 1512." Defs.' Mot. 12. But defendants ask the Court to find § 1512 vague *because* of the similarities to § 1505 and the issues the Circuit raised in *Poindexter*. So the fact that Congress promptly set forth a new definition for § 1505 is highly relevant.

Additionally, § 1512(c)(2) has now "been sufficiently clarified by prior judicial decisions to give requisite notice." *Poindexter*, 951 F.2d at 384. First, "courts of appeal since *Poindexter* have refused to extend its holding to other obstruction provisions." *Caldwell*, 2021 WL 6062718, at *9 (collecting cases). "[N]o court of appeals, including the D.C. Circuit [in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996)], has read *Poindexter* to mean, as [d]efendants seem to urge, that the term 'corruptly' in any obstruction statute is fatally vague." *Id.* Even the Supreme Court now has had the opportunity to address the term "corruptly" in 18 U.S.C. § 1512(b). In *Arthur Andersen LLP v. United States*, the Supreme Court defined "corrupt" and "corruptly" as

terms "normally associated with wrongful, immoral, depraved, or evil." 544 U.S. 696, 705 (2005).

Relying on these terms to provide the *mens rea* requirement of § 1512(b)(2), the Supreme Court

did not raise any issues of vagueness. *Id.*

The term "corruptly" thus requires the government to prove that a defendant not only

intended to obstruct but also had "consciousness of wrongdoing." *Id.* at 706; *see Caldwell*, 2021

WL 6062718, at *11 (holding that the term "corruptly," "at the very least, requires [d]efendants to

have acted with consciousness of wrongdoing"). The courts of appeals have "built upon this focus

to interpret 'corruptly'" as requiring "at least an 'improper purpose' and an 'intent to obstruct.'"

*Andries*, 2022 WL 768684, at *10 (quoting *Montgomery*, 2021 WL 6134591, at *21 & n.4

(collecting cases)). Using this definition does not rely on an "individual assessment of the morality

of another's behavior," *Poindexter*, 951 F.2d at 378, and resolves the vagueness issues the D.C.

Circuit identified in *Poindexter*.

Moving beyond "corruptly," defendants also gesture towards the term "official

proceeding" to illustrate that § 1512(c)(2) is unconstitutionally vague. Defs.' Mot. 11. But while

they highlight the potential for "resulting ambiguity caused by a wide range of interpretation and

disparity among courts," *id.*, this Court does not find any ambiguity in practice. Every court in this

district to address the issue has come to a similar conclusion as to what constitutes an "official

proceeding." To be sure, the "failure of persistent efforts to establish a standard can provide

evidence of vagueness." *Johnson*, 576 U.S. at 598. But there is no such failure here.[5]

---

[5] Defendants also point to the "government's approach to charging defendants with violating § 1512(c)(2)" to "illustrat[e] how vague and arbitrary the enforcement of this statute can be." Defs.' Reply 13. This argument misunderstands the nature of the vagueness challenge. The mere fact that a statute is precise but includes a wide variety of conduct does not make it vague. Subsection 1512(c)(2) may be a "broad, catch-all prohibition" but that does not mean it is "a vague one." *Andries*, 2022 WL 768684, at *9. Defendants' sister argument, that Sturgeon "could not have possibly been on notice that he was committing a felony obstruction of an 'official proceeding,'" Defs.' Mot. 15, similarly misunderstands the theory of unconstitutional vagueness. If defendants' argument is that Sturgeon did not *intend* to obstruct a proceeding occurring inside the building, that problem is "addressed, not by the doctrine of

Neither the term "corruptly" nor the phrase "official proceeding" render § 1512(c)(2) unconstitutionally vague.

### C. Defendants' Conduct Fits Within The Scope Of 18 U.S.C. § 1512(c)(2)

The district courts have uniformly held that the certification of the Electoral College was an official proceeding and that the term "corruptly" is not unconstitutionally vague. But in a supplemental notice, defendants raise a new argument that the term "otherwise" in § 1512(c)(2) indicates that the subsection is limited by § 1512(c)(1) and should be narrowly construed to prohibit only actions taken "with respect to a document, record, or other object." ECF No. 64 at 3. The government responds both that this understanding of § 1512(c)(2) is improper and that even if this was the proper interpretation, pretrial dismissal based on this interpretation is premature. ECF No. 65 at 1, 22. Though this argument has split the district, the Court agrees with the government's broad interpretation of § 1512(c)(2). Defendants' conduct fits within the scope of § 1512(c)(2) and so Count One properly states an offense against them.

### 1. The Plain Meaning Of § 1512(c)(2) Indicates That It Is Not Narrowed By § 1512(c)(1)

To determine what conduct is proscribed by § 1512(c)(2), the Court again starts with the text. A court must, after all, read a criminal statute "in accordance with its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). And if the meaning of the statute's language is plain, the court has no need to inquire further. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020). To refresh, § 1512(c) states:

> (c) Whoever corruptly—

---

vagueness, but by the requirement of proof beyond a reasonable doubt." *Williams*, 553 U.S. at 305. Perhaps it may be difficult to determine whether Sturgeon intended to impede or obstruct the Electoral College vote certification with an improper purpose. But "what renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved"; instead, a statute is vague when it is unclear precisely what that fact is. *Id.* at 306. There is no such indeterminacy here.

> (1) *alters, destroys, mutilates, or conceals a record, document, or other object*, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) *otherwise* obstructs, influences, or impedes an official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c)(2) (emphasis added).

The crux of defendants' argument is the meaning of the term "otherwise." The term "otherwise" is typically interpreted to mean "in a different way." *United States v. McHugh*, No. 1:21-cr-453 (JDB), 2022 WL 1302880, at *4 (D.D.C. May 2, 2022); *see Otherwise*, Webster's Third New Int'l Dictionary (1965) (defining otherwise as meaning "in a different way or manner"). Using this definition, § 1512(c)(2) would criminalize all activity that "obstructs, influences, or impedes" an official proceeding "in a different way" than the examples listed in § 1512(c)(1). The government urges the Court to adopt this broader reading—a reading which, to this Court, appears the most natural.

Relying on *United States v. Miller*, defendants entreat this Court to interpret "otherwise" more narrowly: as essentially meaning "in a different, but similar in type, way." ECF No. 64 at 2. They contend the term "otherwise" renders § 1512(c)(2) "a residual clause . . . for the prohibition contained in subsection [(c)(1)]." *Id.* (quoting *Miller*, 2022 WL 823070, at *9). The court in *Miller* rested this textual interpretation on the Supreme Court's discussion of the meaning of the word "otherwise" in *Begay v. United States*, 553 U.S. 137 (2008). *Miller*, 2022 WL 823070, at *6–15. But this narrow interpretation strains the statute beyond its ordinary meaning.

To start, the decision in *Begay* does not compel the defendants' requested meaning of the term "otherwise." In *Begay*, the Supreme Court determined whether driving under the influence

was a "violent felony" as defined by the Armed Career Criminal Act ("ACCA"). The ACCA

defines a "violent felony" as "any crime punishable by imprisonment for a term exceeding one

year" that

> (i) has as an element the use, attempted use, or threatened use of
> physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves the use of explosives,
> or *otherwise involves conduct that presents a serious potential risk
> of physical injury to another.*

18 U.S.C. § 924(e)(2)(B) (emphasis added). The Supreme Court concluded that the examples at

the beginning of clause (ii), which appear before the term "otherwise," "limit the scope of the

clause to crimes that are similar to the examples themselves." *Begay*, 553 U.S. at 143. In other

words, the conduct that "otherwise . . . presents a serious potential risk of physical injury" must be

similar in type to burglary, arson, or extortion. But the Supreme Court's conclusion hardly rested

on the term "otherwise" itself. In a single paragraph, the Supreme Court noted that "otherwise" is

not "*sufficient* to demonstrate that the examples do not limit the scope of" clause (ii), because the

word "can (we do not say must) refer to a crime that is similar to the listed examples in some

respects but different in others." *Id.* at 144 (emphasis in original) (citation omitted).

It was only Justice Scalia's concurrence (and Justice Alito's dissent) that opined

extensively on the function of the term "otherwise." Justice Scalia argued that "otherwise"

"signifies a similarity" between the example crimes and the unenumerated crimes. *Id.* at 150

(Scalia, J., concurring in the judgment). And that similarity is the "*particular* similarity specified

after the 'otherwise'—*i.e.*, that they all pose a serious potential risk of physical injury to another.

They need not be similar in any other way." *Id.* at 151. Justice Alito's dissent, which Justice Souter

and Justice Thomas joined, reiterated this understanding of the term "otherwise." Justice Alito

explained that "offenses falling within the residual clause must be similar to the named offenses

in one respect only: They must 'otherwise'—which is to say, 'in a different manner,'—'involv[e] conduct that presents a serious potential risk of physical injury to another.'" *Id.* at 159 (Alito, J., dissenting) (citations omitted) (alteration in original).

So the textual discussion of the term "otherwise" from *Begay* does little to help defendants here. Five Justices held that "otherwise" *can* "refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144. Four Justices contend that "otherwise" *must* refer to a crime that is similar based only on the specified similarity that appears after the term "otherwise." *Id.* at 151 (Scalia, J., concurring in the judgment); *id.* at 159 (Alito, J., dissenting). No Justices contend that the term "otherwise," on its own, somehow inherently narrows the scope of a statute so that the antecedent clause is limited by what precedes "otherwise"—the defendants' requested interpretation of the term.

Because the *Begay* decision tells us little about the meaning of the term "otherwise" and because the plain, ordinary meaning of the term "otherwise" would not limit § 1512(c)(2) to only those crimes which are "different, but similar in type" to those enumerated in § 1512(c)(1), the Court rejects defendants' requested interpretation of § 1512(c)(2). "[G]iving 'otherwise' its ordinary meaning—'in a different way'—makes paragraph (c)(2) a catch-all provision that prohibits a set of actions inclusive of, but broader than, the acts proscribed by paragraph (c)(1)." *McHugh*, 2022 WL 1302880, at *7.

In total, the Court finds that the text answers the question of whether defendants' alleged behavior is criminalized under § 1512(c)(2): it is. And so the inquiry can stop there—"if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,'" a court need not look any further. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United*

*States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)). But the Court will address defendants'

additional arguments and why they are unpersuasive.

### 2. Neither The Context Of § 1512(c)(2) Nor Its Historical Development Suggest That § 1512(c)(2) Is Limited By 1512(c)(1)

Moving beyond the text itself, defendants argue that the context and purpose—the

"structure and scope"—of § 1512 "suggests that subsection (c)(2) has a narrow focus, because the

other subsections criminalize specific conduct in narrow contexts." ECF No. 64 at 2. They present

a number of contextual reasons why, contrary to the plain meaning of the statute's text, it should

be read narrowly. None is sufficient to "displace the statute's ordinary meaning." *McHugh*, 2022

WL 1302880, at *7.

First, this Court can find no case law or statutory interpretation canon that insists that

narrow and broader criminal provisions cannot exist side-by-side in the same statutory section.

While Congress may not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531

U.S. 457, 468 (2001), there is no hiding here—the elephant has been "standing before us all along,"

*Bostock*, 140 S. Ct. at 1753. Within a statute that targets various types of obstruction and

harassment, Congress has criminalized directly obstructing or impeding an official proceeding.

This Court will not disregard Congress's plain text because defendants feel it is not similar in

breadth to neighboring subsections. It is similarly unsurprising that, if § 1512(c)(2) is interpreted

broadly, the main or more comprehensive offense of § 1512(c) is included in the second

subsection. "[T]hat is simply how catch-alls work. Indeed, the exact same critique could be

levelled at any . . . statutes that end with catch-all provisions introduced by 'otherwise.'" *McHugh*,

2022 WL 1302880, at *7.

Nor does this Court agree that "the historical development of § 1512 supports the

conclusion that § 1512(c)(2)" is limited by the offenses in § 1512(c)(1). ECF No. 64 at 3. As

another court in this district has identified, "[p]rior to the enactment of subsection 1512(c) in 2002,

§ 1512 made criminal only actions directed at other persons." *Miller*, 2022 WL 823070, at *12.

Subsection 1512(b)(2), for example, stated:

> b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> > (2) *cause or induce any person to*—
> >
> > > (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
> > >
> > > (B) *alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding*;
> > >
> > > (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
> > >
> > > (D) be absent from an official proceeding to which such person has been summoned by legal process; . . .
>
> shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. §§ 1512(b)(1) (1996) (emphasis added). This created a gap in the statutory scheme—

persuading others to take certain actions was criminalized, while taking those actions directly was

not. When § 1512(c) was added in 2002, § 1512(c)(1) quoted language from only one subsection

of § 1512(b)(2) nearly verbatim:

> (c) Whoever corruptly—
>
> > (1) *alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or*
> >
> > (2) otherwise obstructs, influences, or impedes an official proceeding, or attempts to do so,

> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c) (emphasis added). Defendants theorize this indicates § 1512(c) was used

merely "close the gap," not criminalize *other* obstructive behavior. ECF No. 64 at 3.

    *Miller* further highlights that, when Congress added § 1512(a)(2)(b) the same year, which

created harsher penalties for using force against another, Congress adopted "*all* of § 1512(b)(2) in

§ 1512(a)(2)(B)." 2022 WL 823070, at *13. The new § 1512(a)(2)(B) provided:

> (2) Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—
>
>     (B) cause or induce any person to—
>
>         (i) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
>
>         (ii) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
>
>         (iii) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
>
>         (iv) be absent from an official proceeding to which such person has been summoned by legal process; . . .
>
> shall be punished as provided in paragraph (3).

18 U.S.C. § 1512(a)(2)(B).

    Relying on *Miller*, defendants argue that by "drawing heavily from a single provision

already included in subsection (b)," Congress intended § 1512(c) to have a narrow, limited focus.

*Miller*, 2022 WL 823070, at *13. Defendants contend that Congress's choice to adopt all the

language from § 1512(b)(2) in § 1512(a)(2)(B), which it could have done in § 1512(c), further

supports a narrow reading. But none of this historical reasoning reckons with the fact that Congress

chose to include a second, broader statement about other types of obstruction in § 1512(c).

In their last contextual argument, relying on the canon against surplusage, defendants argue that if § 1512(c)(2) could be read broadly, Congress would not need many of the other subsections: "'the majority of § 1512 would be unnecessary' and paragraph (c)(2) would be 'a duplicate to nearly all of § 1512.'" *McHugh*, 2022 WL 1302880, at *8 (quoting *Miller*, 2022 WL 823070, at *12); *see* ECF No. 64 at 1. When interpreting a statute, courts "presume that Congress did not 'include words that have no effect,' and so we generally 'avoid a reading that renders some words altogether redundant.'" *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 176-77). Defendants' argument recalls the Supreme Court's considerations in *Begay*, which in truth relied much more on the canon against surplusage than the term "otherwise." *Begay*, 553 U.S. at 142. Unluckily for defendants, the canon against surplusage does not aid them here for three reasons.

To start, the canon against surplusage is not helpful where, like here, the plain meaning of the statutory text is clear. Textual redundancies that are "subtle or pitted against otherwise plain meanings" are "feeble interpretive tools." *Mercy Hosp., Inc.*, 891 F.3d at 1068. While courts should avoid interpreting ambiguous statutes in a way that creates redundancies in the law, a court cannot rewrite an unambiguous statute because it identifies a purported redundancy.

Second, the Court is not convinced there is a redundancy here. Defendants' argument ignores crucial differences between the subsections within § 1512. Subsection 1512(c)(2) criminalizes *direct* obstruction (specifically obstructing, influencing, or impeding an official proceeding), while other subsections of § 1512 criminalize *indirect* obstruction (taking action against a witness or evidence with the intent of ultimately obstructing, influencing, or impeding an official proceeding). Direct obstruction necessarily includes indirect obstruction—like "squares and rectangles, every example of indirect obstruction—say, threatening a witness to keep them

from testifying at a hearing—is also an example of (or an attempt at) direct obstruction, since the act of threatening the witness itself obstructs, influences, or impedes the hearing." *McHugh*, 2022 WL 1302880, at *8. So a broad reading of § 1512(c)(2) would not swallow the other subsections of § 1512 and render them surplusage: the statutes have different direct objects and target different types of behavior. *Montgomery*, 2021 WL 6134591, at *12. While it is true that the conduct criminalized sometimes overlaps, substantial overlap between criminal statutes is "not uncommon." *See Loughrin v. United States,* 573 U.S. 351, 411 n.4 (2014).

Third, using defendants' proposed narrow interpretation would not solve the alleged surplusage problem they identify. Even using their narrower definition of § 1512(c)(2), "conduct proscribed by seven other provisions of § 1512—subparagraphs (a)(1)(B), (a)(2)(B)(i)–(iii), and (b)(2)(A)–(C)—would also violate § 1512(c)." *McHugh*, 2022 WL 1302880, at *9. The "canon against surplusage merely favors that interpretation which *avoids* surplusage"—it is not a tool for the court to use to "substitut[e] one instance of superfluous language for another." *United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013). The alleged redundancy present here would not be avoided with a narrower interpretation of § 1512(c)(2).

### 3. The Legislative History Here Is Neither Helpful Nor Dispositive

Legislative history is an uneven tool that cannot be used to contravene plain text. When, for example, a court is "presented, on one hand, with clear statutory language and, on the other, with dueling committee reports, [it] must choose the language." *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011). And because § 1512(c) originated as a floor amendment, this Court lacks even the guidance of committee reports. 148 Cong. Rec. S6542 (daily ed. July 10, 2002). Instead, it is left with mere floor statements, which the Supreme Court has considered a wholly unreliable form of legislative history for over a hundred years. *See Duplex Printing Press Co. v. Deering*, 254 U.S.

443, 474 (1921) ("By repeated decisions of this court it has come to be well established that the debates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the law-making body."). The text of 18 U.S.C. § 1512(c)(2) is unambiguous, however, and so the Court need not analyze the scant legislative history here.

## IV. SECTION 231(A)(3) IS NOT UNCONSTITUTIONALLY VAGUE

Mirroring their § 1512(c)(2) arguments, defendants argue that 18 U.S.C. § 231(a)(3) is void for vagueness because it fails to give fair notice and encourages arbitrary enforcement. Defs.' Mot. 16. Section 231(a)(3) provides:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function . . . [s]hall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(3). Defendants claim that this statute lacks a scienter requirement, relies on "subjective reactions" that render violations unpredictable, and hinders a "person of ordinary intelligence" from deciphering what conduct it prohibits. Defs.' Mot. 16, 19–20. Each of these three claims is incorrect. Like all other courts in this district to have considered the question, the Court holds that § 231(a)(3) is not void for vagueness.

The Court will start with the scienter argument because much of defendants' arguments rest on the concern that an individual "could not predict the potential consequences" of his or her actions during a civil disorder. *See* Defs.' Mot. 19. Section 231(a)(3) has a scienter requirement: it criminalizes "any act" done *with the intent* "to obstruct, impede, or interfere with a law enforcement officer" during the commission of a civil disorder. While the D.C. Circuit has not

addressed the issue, the Seventh and Eighth Circuits have both found that § 231(a)(3) requires the defendant to act with obstructive intent. *McHugh*, 2022 WL 296304, at *14 (citing *Nat'l Mobilization Comm. to End War in Vietnam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) and *United States v. Mechanic*, 454 F.2d 849, 854 (8th Cir. 1971)). This specific intent requirement "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). And because specific intent is required, defendants' arguments that an individual could not predict the consequences of her actions is baseless—to be convicted under § 231(a)(3), obstruction must be the intended outcome.

Moving next to subjectivity, Section 231(a)(3) does not criminalize conduct that relies on subjective reactions. As explored above, *see supra* Part III.B, statutes that rely on a subjective reaction—like whether conduct is "annoying"—do not give fair notice. *See Coates*, 402 U.S. at 614. What annoys one person might not annoy another. Accordingly, a statute that criminalizes "annoying" conduct does not give a citizen sufficient notice to properly conform their conduct with the law. But § 231(a)(3) contains no such subjective terms.

First, defendants' argument that Section 231(a)(3) requires a police officer to subjectively "*feel* impeded or interfered with" has no basis in the text of the statute, which requires specific intent. Defs.' Mot. 19 (emphasis added). The officer's feelings are irrelevant.

Second, the phrase "incident to and during a civil disorder" is not subjective. Defendants claim a person has "no way of knowing what civil disorder is." Defs.' Mot. 62. But the statute itself defines a civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). While certain parties may

disagree whether a given action is "incident to and during" a civil disorder, "there is a crucial difference between reasonable people differing over the meaning of a word and reasonable people differing over its application to a given situation—the latter is perfectly normal, while the former is indicative of constitutional difficulty." *McHugh*, 2022 WL 296304 at *16. Here, the terms "incident to a civil disorder" are not subjective like "indecent" or "annoying," words defendants cite. Defs.' Mot. 14. They do not require a potential defendant or a jury to guess at their meaning or import their own sense of morality. *See United States v. Fischer*, No. 1:21-cr-00234 (CJN), 2022 WL 782413, at *3 (D.D.C. Mar. 15, 2022) ("[T]he terms [defendant] attacks do not carry the potential for misunderstanding or make the statute 'so standardless that it invites arbitrary enforcement.'" (quoting *Johnson*, 576 U.S. at 595)).

Defendants final argument is that the statute uses "imprecise language" that would "hinde[r] a person of ordinary intelligence from discerning what conduct it prohibits." Defs.' Mot. 16. But an "ordinary person would have an intuitive understanding of what is proscribed by a ban on obstructing, impeding, or interfering with law enforcement." *McHugh*, 2022 WL 296304, at *16. An ordinary person would intuitively understand what it means for an act to be "incident to *and* during" a civil disorder—which the statute defines in detail. These are questions of fact that can be determined. The statutory language is precise. That some people may differ on their interpretation of *what conduct* falls under this statutory language, which may not "mean the same thing to all people, all the time, everywhere," does not render the statute unconstitutionally vague. *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Roth v United States*, 354 U.S. 476, 491 (1957)). "The law is full of instances where a man's fate depends on his

estimating rightly . . . some matter of degree." *Johnson*, 576 U.S. at 604 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).[6] That does not make those statutes unconstitutionally vague.

## V.  18 U.S.C. § 1752(A)(1) IS CONSTITUTIONAL AS APPLIED TO DEFENDANTS' CONDUCT

Section 1752(a)(1) criminalizes "knowingly enter[ing] and remain[ing] in any restricted building or grounds without the lawful authority to do so." 18 U.S.C. § 1752(a)(1). Defendants argue that, as applied to their conduct, § 1752(a)(1) violates the First Amendment because the statute's "restrictions on [their] First Amendment rights go beyond what is essential to further the government's interests." Defs.' Mot. 21. Prevailing on an as-applied First Amendment challenge requires defendants to demonstrate that the statute is unconstitutional as applied to their particular expressive activity. *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). But if defendants' activity was not expressive conduct, defendants cannot succeed on their challenge. *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016). Defendants' activity here was plainly not expressive conduct.

As the government points out, defendant Sturgeon's actions "culminated with him grabbing a barricade on Capitol grounds and pushing it into officers to gain further access to restricted grounds," Gov't Opp'n 45—actions that were allegedly caught on video, *see* ECF No. 20 at 5. Defendants Bingert and Johnatakis face similar allegations and were caught on video allegedly ramming a metal barricade into a line of police officers. Compl. at 3, ECF No. 1-1. In fact, an image of the three men at the barricade together appears in the first complaint on the

---

[6] Like our fellow district judge, this Court rejects defendants' comparison of this statute to the statute held unconstitutionally vague in *McCoy v. City of Columbia*, 929 F. Supp. 2d 541 (D.S.C. 2013). Defs.' Mot. 17; *see McHugh*, 2022 WL 296304, at *16 n.24. The statute there made it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties." *McCoy*, 929 F. Supp. 2d at 546. The district court found that the statute was "not intelligible" in part because it lacked "neighboring words" that would give the statute "more precise content." *Id.* at 553 (quoting *United States v. Stevens*, 559 U.S. 460, 474 (2010)). But the statute here contains a number of additional words that clarify and narrow the statute. *McCoy* is not relevant here.

docket. *Id.* This is not expressive conduct. "[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). The mere fact that defendants were "present at the Capitol to convey [their] disagreement with the results of the 2020 election" does not render this conduct expressive. Defs.' Mot. 22. "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

The Court is not required, as defendants suggest, to consider *only* defendants' alleged trespassing when determining whether their conduct was "expressive." Defs.' Reply 15. Defendants emphasize that only trespass, not assault, is required for conviction under § 1752(a)(1). "It is *this* alleged conduct that [defendants] argu[e] is protected conduct, not allegedly pushing a barricade into an officer." *Id.* (emphasis added). But the Court is not limited in considering only defendants' conduct that would be *sufficient* for conviction. The Court considers defendants' "particular expressive activity." *Caputo*, 201 F. Supp. 3d at 71. And here, that activity allegedly included violence against police officers. That is not expressive conduct. *Grayned*, 408 U.S. at 116.

## VI.    COUNTS FOUR, FIVE, AND SIX STATE AN OFFENSE

Counts Four, Five, and Six charged defendants with "entering and remaining in a restricted" area in violation of 18 U.S.C. § 1752. Defendants argue that these counts fail to state a claim because only the United States Secret Service ("Secret Service") can designate restricted areas under § 1752. Defs.' Mot. 25. Because the Capitol Police, not the Secret Service, designated the Capitol as "restricted" on January 6, 2021, defendants claim the area does not qualify as "restricted" for the purposes of § 1752. *Id.* In the alternate, defendants argue that the area could

not have been restricted because the Vice President was not "temporarily visiting" the Capitol. Defs.' Mot. 27.

### A. The Capitol Police May Properly Designate Restricted Areas Under § 1752

Section 1752 criminalizes various activities related to trespassing in any "restricted building or grounds." 18 U.S.C. § 1752(a). The statute explains that a "restricted building or grounds" is any "posted, cordoned off, or otherwise restricted area . . . of a building where the President or other person protected by the Secret Service is or will temporarily visiting." *Id.* § 1752(c)(1)(B). The Vice President and his family are protected by Secret Service. 18 U.S.C. § 3056(a)(1). From this language, defendants fashion a bizarre requirement, seemingly out of thin air: that *only* the Secret Service can designate an area as restricted. Defs.' Mot. 24.

Nothing in the text indicates that the Secret Service is the only agency that can designate a restricted area. And the statutory history defendants point to leaves them grasping. It is true that when § 1752 was enacted, it granted the Treasury Department (and the Secret Service, as part of the Treasury) the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President" and "prescribe regulations governing ingress or egress to . . . posted, cordoned off, or otherwise restricted areas" where Secret Service protectees were present. 18 U.S.C. § 1752(d) (1971). But the previous statute "did not say *who* must restrict an area of a building or grounds." *United States v. Griffin*, 549 F. Supp. 3d 49, 55 (D.D.C. 2021). And even if § 1752(d) did limit who could designate a restricted area, Congress removed that subsection in its entirety in 2006. *See* USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. 109-177, 120 Stat. 192, 252 (Mar. 9, 2006). So what does this statutory history really tell us? As Judge McFadden explained, "Not much." *Griffin*, 549 F. Supp. 3d at 56.

### B. Former Vice President Michael Pence Was "Temporarily Visiting" The Capitol Building On January 6, 2021

Defendants' final argument is perhaps their most peculiar: because former Vice President Michael Pence, in his capacity as President of the Senate, maintains an office within the Capitol building, he was not "temporarily visiting." Defs.' Mot. 27. Accordingly, the area could not be restricted under § 1752(c)(B).

The semantic games defendants play here are laughable. They define "temporary" as "lasting for a time only." Defs.' Mot. 28 (citing Black's Law Dictionary (11th ed. 2019)). "Visiting," they contend, means "invited to join or attend an institution for a limited time."[7] *Id.* (citing Merriam-Webster Online (2021)). Despite the opportunity to cherry-pick the exact definitions of "temporarily" and "visiting" that would support their argument, defendants' chosen definitions confirm what is evident to anyone with a basic grasp of the English language: former Vice President Pence was temporarily visiting the Capitol building on January 6, 2021. He was "invited to join or attend" a meeting of Congress for a finite time—a period "lasting for a time only." The former Vice President did not remain or reside in the Capitol building indefinitely. Defendants' bizarre alternate construction of the phrase "temporarily visit"—"temporary travel to a location where the person does not normally live or work on a regular basis," Defs.' Mot. 28— would mean that no one could "temporarily visit" a place they attend regularly.

Because the Capitol Police properly restricted an area where the former Vice President was temporarily visiting, Counts Four, Five, and Six state a claim against defendants.

---

[7] Defendants provide the definition for the adjective "visiting"—as in, "visiting professor" or "visiting team." *See* Defs.' Mot. 18. But the word "visiting" in the statute is used as a present continuous and future continuous verb. *See* 18 U.S.C. § 1752(c)(1)(A) (". . .where the President *is* or *will be* . . . *visiting*."). And the verb definitions of "visit" support the government's argument that the former Vice President was temporarily visiting the Capitol building. *See Visit*, Webster's Third New Int'l Dictionary (1965) (defining "visit" as, *inter alia*, "to go to see or sojourn at (a place) for a particular purpose (such for business, pleasure, or sightseeing)" and "to go or come officially to oversee or correct the operation of").

## VII.    CONCLUSION

Based on the foregoing, the Court will **DENY** defendants' motion to dismiss by separate

order.

Date: _____5/25/22_____

Royce C. Lamberth
United States District Judge