## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ISAAC STURGEON,<br><br>        Defendant. | Crim. Action No. 21-91 (RCL) |

### ISAAC STURGEON'S MOTION FOR TRANSFER OF VENUE

Isaac Sturgeon, through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 21(a), hereby respectfully requests that this Court transfer the proceedings to his home district in Montana based on credible findings that he will not be able to receive a fair trial in the District of Columbia. *See* Exhibit 1, Jury Survey.[1]

### ARGUMENT

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is fundamental to Due Process and, notwithstanding constitutional venue prescriptions, when prejudice makes it such

---

[1] The jury survey attached was created by an expert hired by the Office of the Federal Public Defender as an effort to assess the federal jury pool in the District of Columbia. This motion to transfer venue is largely based on a similar motion filed in *U.S. v. Gieswein*, 21-cr-24 (EGS) and *United States v. Sean McHugh*, 21-453 (JDB).

that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court *must* transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire bias and actual juror bias). As recently as 2010, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide the lower courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage. [2] *Skilling*, 561 U.S. at 378.

Where it attaches, the Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728

---

[2] Though not relevant to the instant motion, the Court identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt.

(1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, under this precedent, *voir dire* is simply not a cure for significant and substantiated Due Process concerns about the jury pool.

Each of those concerns is pressing in this case.

## A. The size and characteristics of the District of Columbia jury pool weigh in favor of finding a presumption of prejudice.

The foundation for the presumption of prejudice is found in *Rideau*. 373 U.S. at 727. In *Rideau*, the first factor that the Court weighed in favor of a finding of prejudice was that about half of the small jury pool had been exposed to prejudicial media reporting about the case. *See id*. Despite the fact that *voir dire* revealed that only three jurors had actually seen the broadcasts at issue, the Court found that the share of the pool that was tainted was significant enough as to render the defendant presumptively prejudiced. *See id*.

Because measuring the reach and impact of negative media reporting is difficult, in applying *Rideau*, many courts have focused on population size and diversity as a proxy for the share of the population that was likely impacted. For

example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal, and because Houston is the fourth-largest city in the United States, and is highly diverse, a significant number of prospective jurors would have had no connection to Enron whatsoever. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.").

In contrast to Houston, the District of Columbia is one of the smaller major US cities, with a population under 700,000.[3] And the impact of the events of January 6 on the residents of the District of Columbia were far more widespread than that of Enron in Houston, affecting a far greater share of residents than the conduct at issue in *Skilling*.

First, as the Court is no doubt aware, a huge proportion of District of Columbia residents either work for the federal government themselves or have friends or family who do. Specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater DC area (excluding postal workers, federal bureau of investigation workers, and staff on several federal commissions).[4] Nearly 200,000 of those workers and annuitants

---

[3]   District of Columbia Population – April 1, 2020, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/washingtoncitydistrictofcolumbia,US.

[4]   *Federal Civilian Employment*, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.

are within the District itself. *Id*. With a total population of around 690,000, it seems clear that any given member of the District jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the DC Policy Center, *active* federal employment (including postal workers) accounts for nearly a third of all jobs in the District itself.[5] And of course, for each federal worker, there are many friends and family members who are closely connected to the federal government by proxy.

In particular, nearly 15,000 individuals work for Congress directly, and many more residents have friends and family who do.[6] Another large share are in, or have friends and family in, the many law enforcement groups who took part in responding to January 6.[7] This means that an enormous share of District of Columbia residents

---

[5]*Trends in Federal Employment in DC,* DC Policy Center (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

[6]*Vital Statistics on Congress*, Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.

[7] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. *Human Capital Strategic Plan 2021-2025*,U.S.Capitol Police (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. *See Metropolitan Police Force Annual Report 2020*, DC.gov (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.pdf ; *see also About Us*, DC National Guard (2020), https://dc.ng.mil/About-Us/. More than 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html. And while not all individuals employed by these agencies reported to

have significant and unique connections with individuals or institutions that were affected by January 6. Such connections are not likely to be present in any other comparable district. The government has characterized the events of January 6 – including the attempted obstruction in which the government alleges Mr. Sturgeon participated – as an attack on our elections, government institutions generally, and democracy as a whole, suggest that those District residents closely connected to the government are more likely to view themselves as the direct victims of the events.

Second, even District residents that have no direct connection to the government reported feeling deeply traumatized by the events that took place so close to where they live and work. For example, one DC resident shared in an interview that:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door[.] I've been having a lot of conversations with people this morning, loved ones. We're all hurting. We're terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45-year existence.[8]

---

the Capitol on January 6, all 9,350 individuals *were* directly and adversely affected by the January 6 events in the form of increased presence and overtime demands in the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, The Hill (July 7, 2021), https://thehill.com/policy/national-security/561832-more-than-75-capitol-police-officers-have-quit-amid-low-morale-since.

[8] *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021), https://www.cbc.ca/radio/asithappens/as-it-happens-thursday-edition-1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns-atrocities-at-u-s-capitol-1.5864894.

Such accounts are typical of those gathered in interviews in the days following January 6, during which the Mayor declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend inauguration.[9] District neighborhoods became occupied by the Metropolitan Police and over 25,000 military personnel in the weeks that followed.[10] Indeed, a local subsidiary of the national public broadcasting network, *DCist*, reported that:

> Residents have rescheduled medical appointments or switched up their bike and run routes to steer clear of downtown D.C. or the Capitol complex. Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection. Some are making plans to leave the city for inauguration. And many have feelings of anger, sadness, and heightened anticipation for the near future. […] Some residents are also worried that a stepped up military and police presence in the city may only add to their unease.[11]

---

[9] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today;*Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021) (noting the many street closures),https://www.washingtonian.com/2021/01/11/dc-mayor-says-americans-should-not-come-to-washington-for-the-inauguration/.

[10] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan. 15, 2021),https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.

[11] Jenny Gathright and Rachel Kurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, DCist (Jan. 13, 2021), https://dcist.com/story/21/01/13/dc-state-of-emergency-residents/.

Moreover, as the Court is no doubt aware, the effects of these events continue to be felt in the District. Indeed, District residents reacted with fear in anticipation of protests planned for September of 2021 that were intended to show support for individuals detained in connection with prosecutions arising from the events of January 6. For example, the *New York Times* ran a piece titled "Washington, D.C. On Edge Over January 6 Protests,"[12] and the Associated Press similarly reported "In Edgy Washington, Police Outnumber Jan 6 Protestors," capturing the District's overall tenor and response to these ongoing demonstrations.[13]

Third, an overwhelming number of District of Columbia residents — over 92 percent — voted for President Biden.[14] According to the government's theory of the case, Mr. Sturgeon and the others charged in connection with January 6 did what they did in order to prevent Joseph Biden from becoming President notwithstanding his share of the electoral and popular vote.[15] That is, the government's theory is that Mr. Sturgeon and others were seeking to nullify the votes of an overwhelming majority of District residents[16] – in the *only* national election in which District

---

[12] Jonathan Weisman and Matthew Rosenberg, *Washington, D.C., on Edge Over Protest of Jan. 6 Arrests*, N.Y. Times (Sept. 18, 2021), https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html.

[13] Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021),https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters.

[14] *General Election 2020: Certified Results*, DC Board of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

[15] *See, e.g.*, Gov't Mem., ECF No. 19 at 13 (characterizing the events as an attempt to occupy the Capitol in order to prevent the certification of the Electoral College results).

[16] *See id.*

residents have any say, given their lack of representation in Congress. *See, e.g.*, *Castanon v. United States*, 444 F. Supp. 3d 118, 139 (D.D.C. 2020) ("Article I contemplates that only 'residents of actual states' have and may exercise the House franchise") (citing *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000)), *reconsideration denied*, No. CV 18-2545, 2020 WL 5569943 (D.D.C. Sept. 16, 2020), *aff'd*, No. 20-1279, 2021 WL 4507556 (U.S. Oct. 4, 2021). Finally, the government, the media, and even judges in this division speak of these prosecutions as designed to prevent "another January 6," and District of Columbia residents know that a repeat of January 6 can only take place in their home.[17] As such, the residents of the District sitting as jurors are highly likely to view Mr. Sturgeon not only as someone who victimized them, but also as someone who might victimize them again in the future, raising a concern about punishing for propensity.

Given the electoral makeup of the District, it would be impossible to empanel a jury that was not full of people that the government charges were the targets of Mr. Sturgeon alleged offenses. *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (the

---

[17] *See, e.g.*, Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021) https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump-documentary-what-matters/index.html*; see also* Jordan Fischer et. al, *Judge Skewers DOJ At January 6 Sentencing*, WUSA9 (Oct. 28, 2021) (explaining that the sentence was **designed to alert** "others who might consider attacking the Capitol to know their punishment would 'hurt.'"), https://www.wusa9.com/article/news/national/capitol-riots/resolving-the-crime-of-the-century-with-misdemeanors-judge-skewers-doj-at-january-6-sentencing-beryl-howell-jack-griffith-anna-morgan-lloyd/65-352274e8-7279-4792-a878-cf4cb0cc20ae.

population of the greater metro area, including Virginia and Maryland, was large enough to not support an inference of prejudice by media reporting). Thus, though significantly more populous than the pool in *Rideau*, for example, Mr. Sturgeon submits that the impact of the events of January 6 was felt by a far greater proportion of the residents and felt much more personally and viscerally. The events of January left those residents—and therefore the jury pool—neither impartial nor indifferent.

**B. The nature and volume of national and local media coverage weigh in favor of finding that there is a presumption of prejudice because of greater saturation and impact at the local level.**

Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is especially true where publicity is both extensive and sensational in nature. *Quiles-Olivo*, 684 F.3d at 182. That said, observing that "prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance," the Supreme Court has repeatedly rejected claims of prejudice that rely exclusively on negative but dispassionate media reporting. *Skilling*, 561 U.S. at 358 (citing *Irvin*, 366 U.S. at 722). Something more, such as charged rhetoric or the reporting of gruesome details, is needed to establish prejudice. *See id.* (rejecting the argument that media coverage was prejudicial where "media coverage, on the whole, had been

objective and unemotional, and the facts of the case were neither heinous nor sensational."). The Court has repeatedly recognized that "something more" exists when the media coverage is particularly inflammatory, and where it pervades the court proceedings. *See Murphy*, 421 U.S. at 799 (1975) ("In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings"); *see also id.* ("[P]roceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled"). Finally, the problematic media must either be local in distribution, or must have greater local saturation or impact than in other districts; otherwise, there is no disparate prejudicial effect between different (comparable) venues.

For example, in *Skilling*, the defendant cited to hundreds of media reports about the Enron scandal in his motion for a transfer of venue. 561 U.S. at 358. He argued that as the former Chief Executive Officer, such articles necessarily implicated him by proxy, if not directly. *See id.* The Court disagreed, referencing its earlier opinions concerning the modern ubiquity of news media, and reiterating its former conclusion that volume does not, on its own, create prejudice. *See id.* at 382. Rather, it is sensationalism of the type that would be easily remembered—not an objective reporting of the facts—that was found to be prejudicial in prior cases before the Court.[18] *Id.* at 381. The Court observed that the stories that *Skilling* cited about

---

[18] Of course, as the concurrence in part pointed out, *voir dire* later revealed that these "objective" media reports had indeed created a bias among many potential jurors, and that the District Court failed to properly vet their assurances of impartiality after those biases were revealed. *See id.* at 427 (Sotomayor, J., concurring in part).

Enron contained "no confessions, no blatantly prejudicial information," and were "largely objective and unemotional." *Id.* at 370-71, 382 (observing that none of the reports "invited prejudgment of his culpability"). As such, the Court held that it was inappropriate to apply a broad presumption of prejudice.

Here, in a city still feeling the impacts described *supra*, the pre-trial publicity—both national and local–has only served to enhance and sustain the effects and by extension, sentiments about the participants. The volume, depth of coverage, and duration of the reporting about January 6 has been almost entirely unprecedented, perhaps only comparable to the reporting following September 11.[19] And viewers who identified as Democrats—like most of the District population—were 20% more likely to have reported hearing "a lot" about the events than those who identify as Republicans.[20] It has also been sensational, including the repeated showing of select snippets of photographic and video footage appearing to show the destruction of the Capitol property and officers in distress. Indeed, some of these officers have testified before Congress about their experiences that may or may not have been

---

[19] "Nearly seven-in-ten adults (69%) say they have heard 'a lot' about the rioting at the U.S. Capitol on Jan. 6." *Views on the Rioting at the US Capitol*, Pew Research Center (Jan. 15, 2021), https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ ; *compare with The War On Terrorism*, Pew Research Center (May 23, 2002), https://www.pewresearch.org/journalism/2002/05/23/the-war-on-terrorism/.

[20] *See id.*

representative of the whole—testimony that was also widely circulated in print and through video.[21]

The language used in media coverage of the events of January 6 and of the defendants involved in those events has been especially charged and inflammatory. Reporters and their interviewees, including members of Congress, consistently refer to the defendants as "insurrectionists," "rioters," "seditionists," "domestic terrorists" "white supremacists" and "criminals" in the media.[22] For example, in late January, President Biden referred to those involved in the January 6 events as "a group of thugs, insurrectionists, political extremists, and white supremacists."[23] Similarly, representative Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack."[24] The coverage of the scene itself has also been sensationalist, relying on gruesome details in click-bait headlines to galvanize the public. For example, a recent video released on CNN began:

> Hours after the last rioters had been pushed from the
> Capitol, when there was still glass on the stairs and ***blood***

---

[21] *See, e.g.*, *Police Officers Deliver Emotional Testimony About Violent Day at the Capitol*, Washington Post (July 27, 2021), https://www.washingtonpost.com/politics/2021/07/27/jan-6-commission-hearing-live-updates/.

[22] *See* Ex. 1 (subset of media coverage in summary form).

[23] *Remarks by President Biden at Signing of an Executive Order on Racial Equity*, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-anexecutive-order-on-racial-equity/.

[24] *Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief'*, NBC4 Washington (Jan. 13, 2021), https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-in-chief/2540892/.

> ***on the floors***, Congress tried to get back to the business of democracy . . . [25]

Furthermore, recent testimony from the House of Representatives Select Committee chosen to investigate January 6, 2021, further highlights the inflammatory and conclusory nature of statements made by our nation's leaders. In the recent June 9, 2022 hearing of the Select Committee investigating the events of January 6th, Chairman Bennie Thompson started his opening statement with the following:

> I'm from a part of the country where people justify the actions of slavery, the Klu Klux Klan, and lynching.  I'm reminded of that dark history as I hear voices today try and justify the actions of the insurrectionists on January 6th, 2021.[26]

This is hardly comparable to the "unemotional" reporting on Enron's collapse and the white collar crime allegations against its management as described by the Court in *Skilling*. 561 U.S. at 371-72, 382. Some courts who have denied similar motions to transfer venue in this district have doubted whether the media coverage has specifically biased the DC community or whether it has been just general national coverage. However, DC community leaders have specifically commented on the topic on a consistent basis – also adding to the inflammatory and conclusory language

---

[25] Wolf, *supra* note 16 (emphasis added).

[26] https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript

regarding all January 6 defendants. See below for a summary of some of these statements clearly affecting specifically the DC community:

(1) **Derrick Johnson, President and CEO of the NAACP in USA today on January 6, 2022:**

White supremacy invaded our Capitol on Jan. 6. It continued to invade our lives through every television news and social media feed that replayed horrifying clips of insurrectionists flooding the halls of democracy. Now, white supremacy is brazenly re-invading our constitutional right to vote.[27]

(2) **Recent Public Testimony at the Select Committee Hearings investigating the events of January 6, 2021:**

Chairman Bennie Thompson started his opening statement with the following:

I'm from a part of the country where people justify the actions of slavery, the Klu Klux Klan, and lynching. I'm reminded of that dark history as I hear voices today try and justify the actions of the insurrectionists on January 6th, 2021.[28]

Capitol Police Officer Caroline Edwards who said she saw officers with "blood all over their faces" and was "slipping in people's blood.[29]"

(3) **The Washington Commanders head coach, Ron Rivera, commenting after fining Defensive Coach Jack Del Rio for comments related to January 6, 2021.**

"[Coach Del Rio's] comments do not reflect the organization's views and are extremely hurtful to our great community in the DMV. As we saw last night in the [Congressional] hearings, what happened on the Capitol on Jan. 6,

---

[27] https://www.usatoday.com/story/opinion/2022/01/06/naacp-white-supremacy-january-6/9092954002/

[28] https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript

[29] https://www.nbcnews.com/video/capitol-police-officer-injured-in-jan-6-riot-says-she-was-slipping-in-people-s-blood-141829189901

2021, was an act of domestic terrorism. A group of citizens attempted to overturn the results of a free and fair election, and as a result, lives were lost and the Capitol building was damaged. Coach Del Rio did apologize for comments on Wednesday and he understands the distinctions between the events of that dark day and peaceful protests which are a hallmark of our democracy.  He does have the right to voice his opinion as a citizen of the United States and it most certainly is his constitutional right to do so.  However, words have consequences and his words hurt a lot of people in our community.  <u>I want to make clear that our organization will not tolerate any equivalency between those who demanded justice in the wake of George Floyd's murder and the actions of those on January 6 who sought to topple our government</u>.[30]" (emphasis added)

### (4) Statements by District of Columbia Mayor Muriel Bowser at the Congressional Black Caucus hearing on January 13, 2021:

Thank you for holding this hearing on the acts of domestic terrorism and sedition that unfolded in our Nation's Capitol just one week ago…..I'm calling on the Joint Terrorism Task Force to investigate, arrest and prosecute any individual who entered the capitol, destroyed property, or incited the acts of domestic terrorism last week.  I urge the Congress to create a non-partisan commission to understand the catastrophic security failures and both to hold people accountable and ensure that it never happens again.  It is not lost on me, as we heard in president's comments who stoked the flames of this extremism and on January 6th encouraged the acts of terrorism and sedition that we saw, that resulted in the deaths of two United States Capitol Police Officers and Four Others. As you have heard today, the members of the Congressional Black Caucus know better than most there is inextricable tie between those, and the speech and actions undeniable.  This is not the end, this is the beginning of us needing as a country to be focused on radicalization of mostly white men who we saw in the Capitol that Day…[31]

### (5) Statements of DC Delegate Eleanor Holmes Norton

One year ago today, we witnessed an outrageous assault on our U.S. Capitol as Congress was meeting to count the electoral votes from the 2020 presidential election.  The attack was not only an attack on

---

[30] https://www.si.com/nfl/2022/06/10/commanders-announce-fine-jack-del-rio-ron-rivera-january-6-comments

[31] https://www.c-span.org/video/?507965-1/congressional-black-caucus-hearing-us-capitol-attack

democracy; it was also an attack on the District of Columbia.  The D.C. police department, which is paid for by D.C. residents, who are denied voting representation in the House and Senate and full self-government, moved voluntarily to save the lives of members of Congress and congressional staff, the Capitol and democracy itself.  Yet House Republicans thanked D.C. by voting against the D.C. statehood bill only a few months after the attack.[32]

**(6) Statements from Local Senators and Representatives**

**Democratic Senator Tim Kaine stated:**

 "One year ago, on January 6, 2021, a violent mob attempted to overturn the   presidential election results and rob the American people of their duly elected leaders. Urged on by President Trump, right-wing insurrectionists stormed the U.S. Capitol aiming to commit the greatest voter disenfranchisement effort in recent American history. The insurrection led to the tragic loss of multiple heroic law enforcement officers from Virginia, and my heart is with their loved ones on this anniversary.[33]

**A public statement from Democratic Senator John Warner provides, in part:**

"One year ago today, the world watched as a violent mob stormed and desecrated the U.S. Capitol in an effort to rob the American people of the sacred right to elect their President. Despite these insidious efforts, democracy prevailed due to the brave actions of the Capitol Police, Metropolitan Police, Virginia State Police, Maryland State Police, and members of the National Guard who put themselves in peril, saving many lives and in some cases, losing their own. It is my hope that we will continue to honor those who lost their lives by remembering that democracy must be upheld each and every day. We must realize that what happened on January 6 did not end on January 6. Efforts to sow doubts about the integrity of our elections are chipping away at the values upon which our nation was founded. As state legislatures across the country continue to exploit Donald Trump's Big Lie to restrict access to the ballot,

---

[32]  https://rollcall.com/2021/12/14/d-c-files-lawsuit-against-two-groups-for-costs-of-jan-6-response/
[33] https://www.kaine.senate.gov/press-releases/kaine-statement-ahead-of-january-6-anniversary

we must act to protect the right to vote and safeguard our democracy once more.[34]"

**A public statement from Democrat Maryland Senator Ben Cardin provides, in part:**

Men and women died on that day and shortly after because of what happened at the U.S. Capitol. Police officers were brutally attacked. A mob went hunting through the hallways for Vice President Mike Pence, Speaker Nancy Pelosi and others. If we do not understand what happened leading up to and on that day, and why it happened, *it will happen again.*[35]

**A public statement from Democrat Maryland Senator Chris Van Hollen provides, in part:**

"The violent mob unleashed by Donald Trump a year ago stormed and sacked this Capitol. Insurrectionists scaled the ramparts, tore through the barricades, and breached this building. They used flagpoles to beat Officer Michael Fanone and used chemical spray to assault Officer Brian Sicknick – who tragically died the next day. A gallows was built outside of this Capitol while rioters chanted, "Hang Mike Pence." Like many others, I recall watching horrifying television footage of a rioter pulling down an American flag and raising up a Trump flag in its place. Confederate flags and banners of far-right extremist groups were paraded through these halls. This citadel of our democracy was violently attacked. The Capitol Hill community was traumatized and so was the country.[36]

**Public statement of Democrat Representative Don Beyer Representing Closest   Virginia District to DC, provides, in part:**

"One year ago today insurrectionists launched a violent assault on the home of American democracy.

"The crowd that attacked the Capitol included white supremacists and violent rightwing paramilitary groups. They constructed a gallows, and called for the assassination of the Vice President and the Speaker of the House. Incited by the Big Lie of a lawless President bent on retaining power at any cost – a fact we know is true because the insurrectionists themselves

---

[34] https://www.warner.senate.gov/public/index.cfm/pressreleases?id=B4F94BD9-0BA5-48B6-9AF3-D5D0698197CB

[35] https://www.cardin.senate.gov/letters/not-pretty-but-important/

[36]    https://www.vanhollen.senate.gov/news/press-releases/van-hollen-delivers-floor-speech-on-anniversary-of-january-6th-insurrection

repeatedly confirmed it – they hoped to halt the peaceful transfer of power and overturn the results of an American election. They failed.

"They failed because of the courageous actions of heroes in uniform, many of whom have not fully recovered from the significant injuries they suffered that day. Some of them lost their lives. Today we remember the pain and suffering inflicted on those who defended the Capitol, and their incredible heroism. We remember USCP Officers Brian Sicknick and Howie Liebengood and MPD Officers Jeffrey Smith, Kyle DeFreytag, and Gunther Hashida, and the anguish their families still feel.[37]

These public statements were said by local leaders whose audience is the DC community. It is no surprise, then, that the jury survey conducted showed 90% of potential jurors polled were exposed to media coverage and that most of them say the media coverage implied that the defendants are "guilty of the charges brought against them." *See* Exhibit 1, Jury Survey at pg. 3. Seventy-two percent of the respondents said that they are likely to find the defendants guilty, even when given the choice if "it is too early to decide." *Id.* Most notably, it appears as though the overwhelming majority of D.C. respondents have already concluded that those who entered the Capitol were acting with the intent that the government must prove at trial. Respondents overwhelmingly concluded that January 6 defendants were:

- Trying to overturn the election and keep Donald Trump in power (85%)

- Insurrectionists (76%) and/or

- Trying to overthrow the United States government (72%)

---

[37] https://beyer.house.gov/news/documentsingle.aspx?DocumentID=5417

*Id.* at 15, 18. Additionally, much of the early reporting has since been shown to be factually inaccurate. For example, immediately following the events of January 6, President Biden, among other high-profile individuals, claimed that January 6 protestors *killed* Officer Brian Sicknick, and he repeated the claim months after it became clear that there was no basis for it.[38] Even the official press release stated that:

> Officer Brian D. Sicknick passed away *due to injuries sustained while on-duty.* Officer Sicknick was responding to the riots on Wednesday, January 6, 2021, at the U.S. Capitol and was injured while physically engaging with protesters.[39]

These claims were widely circulated and did reputational damage to defendants before the medical examiner quietly reported—more than four months later—that Officer Sicknick died of two strokes, and that he sustained no internal or external injuries from his exposure to chemical spray on January 6.[40]

The saturation of this charged and inflammatory reporting in the District is so substantial that it would be surprising to identify any potential jurors who have not been exposed to the coverage.  One only need look to the Washington Post comments section to observe the inflammatory attitudes of its readers who convict defendants

---

[38] Christian Datoc and Jerry Dunleavy, *Biden Claims Jan. 6 Rioters Killed Capitol Police Officer Brian Sicknick*, Washington Examiner (June 17, 2021), available at https://www.yahoo.com/now/biden-claims-jan-6-rioters-161300824.html.

[39] *Press Release: Loss of USCP Officer Brian Sicknick*, United States Capitol Police (Jan. 7, 2021) (emphasis added), https://www.uscp.gov/media-center/press-releases/loss-uscp-colleague-brian-d-sicknick.

[40] *Capitol Police Officer Died of Natural Causes, Officials Say*, Washington Post (Apr. 19, 2021), https://www.washingtonpost.com/local/public-safety/brian-sicknick-death-strokes/2021/04/19/36d2d310-617e-11eb-afbe-9a11a127d146_story.html.

who are still pending trial.[41] And although some in the jury pool may not have heard of Mr. Sturgeon specifically, his presence at the Capitol that day will necessarily cause prospective jurors to link his conduct to the January 6 reporting generally. And as the Court found in *Rideau*, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." 373 U.S. at 726.

Finally, the inflammatory comments have invaded court proceedings. The media has widely reported comments of U.S. District Court Judges in this District regarding the events of January 6. For example, in comments that were widely reported, a judge stated that "*everyone* participating in the mob contributed to [the January 6] violence," and went on to conclude that "[m]embers of a mob who breach barriers and push back officers to disrupt the joint session of Congress are not trespassers, they are criminals."[42] Other judges in the same district have also made similar comments at sentencing:

> During a sentencing hearing for Kenneth Reda on Wednesday, Senior U.S. District Judge Thomas Hogan said the psychology of the Donald Trump supporters who overran police and stormed the Capitol on Jan. 6 reminded him of "lynchings hundreds of years ago.[43]
>
> **CNN also reported on statements of U.S. District Judge Randolph Moss:**

---

[41] *See* Ralph Joseph Celentano III, accused Capitol rioter, charged with pushing officer over ledge - The Washington Post

[42] https://www.politico.com/news/2021/10/28/almost-schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442; *see also* Fischer et al., *supra* note 16.

[43] https://lawandcrime.com/u-s-capitol-breach/federal-judge-compares-jan-6-riot-to-lynch-mob-they-regret-it-afterwards-but-they-joined-in-it/

"It means that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation. It means that we are now all fearful about the next attack in a way that we never were," Moss said.[44]

**As noted in a CNN article, the chief judge of the federal court in Washington DC emphasized the *local* nature of the damage[45]:**

We're still living here in Washington, DC, with the consequences of the violence that this defendant is alleged to have participated in," she said. "Just outside this courthouse… are visible reminders of the January 6 riot and assault on the Capitol.

There is no doubt that more than only District residents were exposed to these comments, which were in effect legal conclusions about every January 6 defendant who will go before a jury in this District. In reality, the district court has been imposing sentences based on the individual characteristics of the defendants, taking into account each defendant's specific conduct. However, these statements that have been widely reported, nonetheless, do not include the sentencing rationales that individualize each defendant but rather the statements reported are only the sensational and inflammatory ones that have been taken completely out of context when listening to the entirety of these hearings. That is essentially the problem with all of the media reporting – is that it mostly highlights the bad and conveniently leaves out the good, or at a minimum the accurate full picture of what happened at

---

[44] https://lite.cnn.com/en/article/h_31b637faf602c63056995f01ea19baba
[45] https://www.cnn.com/2021/01/28/politics/capitol-beryl-howell-richard-barnett-pelosi/index.html

each hearing. Unfortunately, now, that means the jury pool has only heard and read the bad.

### C. The timing of the proceedings weighs in favor of finding a presumption of prejudice.

Finally, in determining whether any prior prejudice has been mitigated by the passage of time, the Supreme Court has considered the years between the exposure of the offense conduct and the trial. For example, in *Skilling*, the Court found that because more than four years had passed between the Enron scandal and the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse," and any exposure to the early reporting would have become attenuated. *Skilling*, 561 U.S. at 383.

Here, in the almost two years since January 6, 2021, media reporting about the events of January 6 remains at an all-time high. This has been especially true in recent months, given the high-profile House Select Committee activities focused on investigating the events and airing live testimony also available on Hulu for later viewing.[46] Additionally, many documentaries that include extensive footage of the day have been released—footage that would likely be offered into evidence by the prosecution at trial. For example, HBO just released a feature-length *Four Hours at the Capitol* in late October, which includes one of the most widely-circulated videos from that day: the breaking of a Capitol window.[47] There is no reason to think that

---

[46] Jan. 6 Panel Is Poised To Return Amid Growing Signs That Accountability Is Coming (msn.com); The January 6 committee is holding a collection of public hearings - Insider N News

[47] *Four Hours at the Capitol*, HBO (Oct. 4, 2021); *see also Day of Rage: How Trump Supporters Took the U.S. Capitol* at 18:17-21, N.Y. Times (June 30, 2021),

coverage will wane before Mr. Sturgeon's May trial, especially given the recent activities of the Select Committee.

Lastly, the media coverage regarding recent January 6 trials that have taken place has been consistent. Most notably, all jury trials have resulted in guilty verdicts across the board.[48] These guilty verdicts have a further prejudicial impact on the potential juror pool. Notably, the DC juror candidate pool grows increasingly small as each of these trials takes place. When denying a similar motion filed earlier this year, the Honorable John D. Bates discussed if and how the number of guilty verdicts that pile up could potentially create a bias jury pool. *See United States v. McHugh*, 21-cr-453 (JDB), Motions hearing Transcript on May 4, 2022, at page 14-16. There is little doubt that as each jury is selected for a January 6 trial, that the jury pool becomes more tainted after hearing the many guilty verdicts that preceded before it. More practically speaking, the potential jury pool becomes smaller based on sheer numbers after potentially not being able to find jurors who have not already either served on January 6 trial or at least was selected in the much larger pool initially.

---

https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

[48] *See US v. Guy Reffit*, 21-cr-032 (DLF); *US v. Thomas Robertson*, 21-cr-034-1 (CRC); *US v. Dustin Thompson*, 21-cr-161 (RBW); *US v. Robert Anthony Williams*, 21-cr-377 (BAH); *US v. Russell Dean Alford*, 21-cr-263 (TSC); *US v. Douglas Jensen*, 21-cr-006 (TJK). (may not be an exhaustive list and does not include the several bench trials that have also resulted in guilty verdicts).

Based on all of these factors, interest in the events of January 6 has been high since that day, and it has not waned in the District in the short time since. As such, the timing of the proceedings weighs in favor of a finding of presumed prejudice.

## CONCLUSION

Because each of the *Skilling* factors weighs in favor of finding a presumption of prejudice, Mr. Sturgeon requests that the Court transfer the case to the District of Montana.

A.  J. Kramer
Federal Public Defender for the
District of Columbia


By: /s/Maria Jacob
Assistant Federal Public Defender
625 Indiana Avenue
Suite 500
Washington D.C.
Telephone: (202) 208-7500