UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 21-091 (RCL) |
| ) | |
| ISAAC STURGEON, ) | |
| ) | |
| Defendant. ) | |

### ISAAC STURGEON'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO TRANSFER VENUE

Isaac Sturgeon, files this reply in further support of his motion to transfer venue to a district that will ensure him a fair jury trial. Nowhere in its opposition to Mr. Sturgeon's motion to transfer venue *see* ECF No. 92 ("Gov. Opp."), does the government address the many compelling reasons to transfer venue, which would protect Mr. Sturgeon's constitutional right to a fair trial. Instead, the government attacks the objective jury survey that provides statistical data which suggests that it would be near impossible to impanel a fair jury in this case.

The government then suggests a novel solution – it encourages the Court to spend time and resources, empanel a venire, and undertake a time consuming voir dire and then decide if the objective data in the jury survey is in fact accurate.

For the reasons discussed below, the government's arguments are without merit and do not address the main issue before the court: the irreparable bias that exists if venue were deemed to be proper in Washington, D.C. (herein after "D.C.").

1

I.  **The Government Fails to Undermine the Jury Survey that Exposes the Clear Bias that Exists in the D.C. Jury Pool**

To elucidate, Mr. Sturgeon argues that one reason the jury pool shows bias is the continuous negative media coverage that the January 6 defendants, their defense lawyers and their cases have received. *See* Def. Mot. The data that supports this argument is found in the jury survey attached to the motion that explains that after potential jurors were polled, 90% of them were exposed to media coverage and that most of them say the media coverage implied that the defendants are "guilty of the charges brought against them." *See* Def. Mot., Exhibit 1, Jury Survey at pg. 3.

The government tries to undermine the jury survey itself by suggesting that the Court should not consider the data because (1) courts have "commonly rejected such polls" and (2) based on only one critique as to the methodology employed. *See* Gov. Opp. at 14-18.

> **a. The Government selects past cases where the polls were distinguishable from the instant one.**

In its opposition, the government cites cases that found survey results could not support a finding of presumed prejudice. *Id*. However, in many of those cases, the survey participants were asked entirely different questions than the ones asked here. Most notably, in many of those cases, the participants were not asked to opinion on the "guilt" of the defendants. *See, e.g., United States v. Campa*, 459 F.3d 1121 (2006) (survey in support of transfer motion in Miami district were not asked to opine on anyone's guilt).

Furthermore, the government's reliance on *U.S. v. Haldeman*, 559 F. 2d 31, 64

2

n. 43 (D.C.C. 1976), relegated to a footnote is misplaced for two reasons. First, the government generalizes that polls can be open to errors and should be viewed as suspect because appellants pay the expert to conduct the poll. *Id*. But, the government routinely pays the expert it hires, and surely the rules for the DOJ are no different than those for a defendant. All experts are paid and that goes to weight not admissibility. Also relevant is that the *Haldeman* court does not address why the specific expert hired in *Haldeman* was not to be trusted and why or how that poll was flawed.

Secondly, in *Haldeman*, the Court reviewed the media coverage and the overwhelming pre-trial publicity was found to consist of "straightforward, unemotional factual accounts of events" rather than the inflammatory nature of the media coverage in these cases. *Id.* at 61, *See also U.S. v. Rodriquez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19 (cited by the government but where court also found the poll did not demonstrate the media coverage being "inflammatory"). Therefore, *Haldeman* is entirely different than the instant matter and provides no support or basis for rejecting the poll results here.

> **b. The critique that the poll does not provide an option of "unsure" about guilty is unavailing.**

The government's only critique of the questions asked by the expert in conducting the poll is that the expert did not instruct the participants that they could answer by saying they were "unsure" about the guilt of January 6 defendants. *See* Gov. Opp. at 18. However, the government relies only on a single source, without further argument, that opined that respondents must be made aware of this option.

3

*Id*. The government offers no evidence such an option is widely adopted by other experts in the area. That comes as no surprise as peer-reviewed research published four years after the government's citation explains precisely why offering an option of "don't know" (or unsure) may ultimately discourage people to "generate a meaningful answer from expressing it." Jon A. Krosnick & Stanley Presser, "Question and Questionnaire Design," in *Handbook of Survey Research* (2d. ed. 2010, Peter V. Marsdean & James D. Wright, eds.) at 263, 282.[1] Lastly, as the government points out, the jury survey results here reveal that about a quarter of respondents did not respond concretely and rather said they did not know or that it depends or refused to answer all together. *See* Def. Mot., Exhibit 1, Jury Survey at pg. 14. Clearly people know even when not specifically not instructed, that "unsure" is always an available response.

### c. Mr. Sturgeon is not Required to Choose Another Appropriate Venue

Lastly, the government harps on the fact that the survey provided did not survey the District of Montana. *See* Gov. Opp. at 17. Realistically, the Federal Defender agency could not survey every district in the United States and so it initially chose Atlanta as a comparable district because of its similar size and characteristics. However, that is not relevant at this stage as the first determination the court must make is whether a fair trial can be obtained in this district. Fed. R. Crim. P. 21(a). The Federal Rules do not require a defendant to specify another district, it simply

---

[1] Emerald_HSR-V017_9 263..313 (stanford.edu)

4

mandates that the court transfer the proceeding "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." *Id*. The government inserts a requirement that simply is not present in the statute. The first relevant determination is whether Mr. Sturgeon can have a fair trial here and he argues that he cannot.

## II. The Government Ignores the Impact of the Constant Pre-trial Publicity in January 6 Cases whose Uniqueness is conceded by Attorney General Garland and the DOJ.

Simply put, this is the most unique set of prosecutions in American history and is a case of first impression. Mr. Sturgeon does not argue that the "mere existence" of pre-trial publicity creates a presumption of prejudice, but rather that the pre-trial publicity has been constant, unrelenting, and has been irreversibly biased towards the guilt of these defendants. The government attempts to compare the pre-trial publicity of January 6, 2021, to other high profile cases such as the Boston Marathon bomber prosecution, the fraud trial of CEO of Enron, the Watergate prosecutions, and the 9-11 prosecutions. *See* Gov. Opp. at 9. And yet it ignores the biggest difference between those cases and the January 6 prosecutions. Unlike any other case, the January 6 prosecutions involve over 800 individuals so far with the DOJ being on the record as saying that 1000 more arrests are to be expected. Below is what the Attorney General proclaimed about the January 6 prosecutions:

**Extraordinary resources devoted to the Jan. 6 probe**

> Every FBI office, almost every U.S. attorney's office in the country is working on this matter. We've issued thousands of subpoenas, seized

and examined thousands of electronic devices, examined terabytes of data, thousands of hours of videos. People are working every day, 24/7, and are fully aware of how important this is. This had to do with the interference with the peaceful transfer of power from one administration to another. And it doesn't get more important than that.[2]

Media coverage has been relentless. As the jury survey points out, 93% of the D.C. jury pool is aware that "several hundred people were arrested on charges related" to January 6, 2021. *See* Def. Mot., Exhibit 1, Jury Survey at pg. 2. The almost daily reporting of capitol protest prosecutions makes this case more like *Rideau v. Louisiana*, 373 U.S. 723, 727 (1963), where the Supreme Court found the people of Calcasieu Parish saw and heard Rideau's confession too many times and as a result a fair trial was not possible there. Similarly, the people of D.C. have been exposed to the January 6 prosecutions almost on a daily basis and have read too many articles depicting defendants in a negative and inflammatory fashion. We are hard pressed to find a single mainstream newspaper article that casts a January 6 defendant in a positive or unbiased light.

In its original motion, Mr. Sturgeon provided a long list of local politicians and leaders publicly characterizing the actions on January 6, 2021. Not a single one of these actors provide the caveat that some of these defendants could be innocent and that our society is built on the fundamental principle of "innocent until proven guilty." Rather, in an orchestrated fashion, these leaders drill in themes of white supremacy, the violent mob, terrorism, and threats to democracy.

---

[2] *See* https://www.npr.org/2022/03/10/1085016383/garland-says-the-jan-6-investigation-wont-end-until-everyone-is-held-to-account.

Mr. Sturgeon has shown that he cannot receive a fair and impartial trial in D.C. because the constant media coverage affects D.C. residents in a way that does not affect other parts of the country. D.C. residents were present in the city during a national disaster that directly affected them, making them alleged "victims" in a sense. As a result, D.C. residents would be more afraid of a January 6 recurrence than anyone else in the country. The D.C. local media coverage is also more consistent because this is where all of the hearings are taking place, making it more of a priority to regularly report.

### III. Voir Dire Cannot Fix this Problem

The government proposes that voir dire is the solution here pointing to past jury trials where the government opines that a fair jury was selected. *See* Gov. Opp. at 21-25. The first flaw with the government's argument is that it does not allow for any scenario in which a transfer of venue is granted short of proceeding to voir dire. If presumptive prejudice exists, it follows that the prejudice is carried into voir dire and irreversibly comprises the process no matter how many safeguards are in place. At that point, it is not the Court's fault that a fair jury cannot be selected, it is a virus that has spread with no cure. If voir dire could fix any presumptive prejudice, then a transfer of venue would never be granted and the defendant in *Rideau v. Louisiana*, 373 U.S. 723 (1963) would have remained convicted in violation of his Sixth Amendment right to a fair trial. In *Rideau*, the court emphatically stated:

> We do not hesitate to hold, *without pausing to examine a particularized transcript of the voir dire examination of the members of the jury*, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised

interview.

*Id.* at 727 (emphasis added). The Court in *Rideau* recognized that what had transpired in that community was far too pervasive to be cured by the voir dire process. While Mr. Sturgeon did not participate in a televised confession, the media continues to release every piece of negative evidence found in all January 6 cases. The community has been bombarded by incriminating evidence of all January 6 defendants and it will be impossible for a jury in D.C. to put aside what has been already hammered into them – that these defendants are not only all guilty but that they are terrorists and insurrectionists.

Voir dire is not a perfect process as the government suggests, especially in a courtroom where the media is watching every move and reporting on it. Even without that added spotlight, many people do not want to admit that they cannot be fair even if that is what they feel. There is an obvious temptation to not want to recognize your own prejudice, which makes a telephone poll when there is no pressure and anonymity more likely to produce honest results.[3]

## CONCLUSION

For all the reasons discussed above, and those in his moving papers, the Court should grant Mr. Sturgeon's motion to transfer venue.

---

[3] Eileen C. Moore, Judicial Voir Dire More Important Than Ever, 13 Cal. Litig. 45, 45 (2000) ("I have concluded from my experience as a trial judge . . . that, perhaps due to political correctness, agendas or disgust with the system, many jurors either attempt to hide their true feelings, or approach their task with preconceptions, cynicism and activism."); Jerry Markon, Jurors With Hidden Agendas, Wall St. J., July 31, 2001, at B1.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

Maria N. Jacob
Assistant Federal Public
Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

9