UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-CR-91 |
| CRAIG BINGERT and ISAAC STURGEON, | |
| Defendants. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Craig Bingert and Isaac Sturgeon each to 135 months' incarceration (the bottom of the 135-to-168-month guideline range), three years' supervised release, $2,000 in restitution, and a mandatory special assessment of $385. The government is also asking that a fine be imposed against Bingert for $1,865, the current balance of his GiveSendGo account.

## I.    INTRODUCTION

The defendants, Craig Bingert and Isaac Sturgeon, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

As further detailed below, on January 6, 2021, Bingert and Sturgeon obstructed Congress and assaulted law enforcement, among other crimes.   They separately traveled to Washington, D.C., attended the Stop the Steal rally, and then marched to the U.S. Capitol grounds.   Acting independently, Bingert and Sturgeon went onto restricted grounds and joined the mob on the West Front, at the base of the inaugural stage, when the mob reached its full strength, violently breaking down the police line and forcing the officers to retreat.   After the officers were forced up the southwest stairs under the scaffolding, Bingert and Sturgeon followed mere minutes later.   They climbed through the inaugural stage scaffolding, up the southwest stairs, and made their way to the front of the mob at the top of the stairs where police had formed a line behind a row of bike racks being used as a barricade to defend the Capitol.

At approximately 2:45 p.m., Bingert and Sturgeon stood side-by-side directly in front of the bike racks and police at the top of the southwest stairs.   Co-defendant Taylor Johnatakis stood beside them, calling out to them and other rioters to "pack it in" and instructing them that the mob was going to move "one foot" at a time.   Johnatakis then counted, "one, two, three, GO!" and on his count, Bingert and Sturgeon grabbed the metal bike rack in front of them and pushed it hard against the police, resulting in injury to at least one officer.   Bingert and Sturgeon both remained on the Upper West Terrace for at least two hours after this assault; a large portion of that time was spent watching the brutal attacks on the police occurring on the Lower West Terrace below them. Both Bingert and Sturgeon remained on restricted grounds until police officers forcibly removed them, maintaining a presence on the Upper West Terrace and further thwarting the certification process.

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Both defendants were convicted of all seven counts[2] in the Superseding Indictment after a bench trial, including obstruction of Congress, interfering with law enforcement during a civil disorder, assault of a law enforcement officer, and various misdemeanors for offenses on Capitol grounds. The guideline imprisonment ranges are the same for both defendants—135 to 168 months—and the government recommends low-end 135-month imprisonment terms for both. Each sentence is sufficient but not greater than necessary to achieve the goals of sentencing, including specific and general deterrence and just punishment.

## II.     FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts filed in this case, ECF 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Craig Bingert's Actions on January 6, 2021

On January 5, 2021, Bingert traveled from his home in Allentown, Pennsylvania to Washington, D.C. On the morning of January 6, 2021, Bingert took a rideshare alone to the Stop the Steal rally near the Washington Monument. After listening to President Trump's speech at the rally, Bingert marched with thousands of others to the U.S. Capitol building. Once there, Bingert made his way through the crowd to the police line on the West Plaza, where he observed multiple police officers and also saw rioters fighting with the police. Bingert even filmed the police line on his phone.

At approximately 2:35 p.m., rioters overwhelmed the police line on the West Plaza, and

---

[2] The government voluntarily dismissed Count Seven prior to the start of trial.

the police near Bingert retreated up the southwest stairs to the Upper West Terrace. Moments later, Bingert followed. Bingert climbed through the scaffolding on the West Plaza, walked up two flights of stairs, and stopped at the top of the stairs where a police barricade had been established. The barricade consisted of two rows of bike racks – one layer of silver bike racks approximately three feet tall and one layer of shorter black barricades – and several police officers standing behind the bike racks. The officers at the bike racks included uniformed officers with the Metropolitan Police Department. One of the bike racks bore a white sign that read "AREA CLOSED" in large red letters. While Bingert stood in that area he: (1) filmed the police line with his phone; (2) chanted "let us in!" with other rioters; and (3) filmed another rioter who sprayed the police line with a fire extinguisher as Bingert cheered "go go go!" and "wooooo hooooo!"

At approximately 2:45 p.m., co-defendant Taylor Johnatakis,[3] who had a bullhorn, shouted repeatedly for rioters to move up to the police line or "pack it in."   Bingert, who had been standing at the police line on the Upper West Terrace for approximately 10 minutes, then took a step forward in front of other rioters so that he was standing at the top of the stairs and right up against the bike racks and the police line.   Johnatakis and co-defendant Sturgeon stood on either side of Bingert. Johnatakis then instructed the crowd through the bullhorn that they were going to push the bike racks "one foot" at a time.   Around this time, Johnatakis looked to Sturgeon, Sturgeon said "push?" and Johnatakis nodded. Bingert looked on between them. Approximately twenty seconds later, Johnatakis counted, "one, two, three, GO," and all three defendants placed their hands on the bike rack in front of them and pushed it forcibly into the line of police officers.   The defendants pushed for at least 15 seconds, requiring numerous additional police officers to reinforce and maintain the police line.   *See* Government Trial Exhibits 204A and 206A.   Below is a still image

---

[3]The Court severed Johnatakis's trial from his co-defendants. Johnatakis is currently undergoing a mental competency evaluation, and his trial will be scheduled later.

depicting Bingert (circled in yellow) pushing the bike rack at the top of the southwest stairs to the

Upper West Terrace:



*Image 1: Still Image from Government Trial Exhibit 206A*

After several seconds of pushing against the police, Bingert and fellow rioters lifted the

barricade up and attempted to duck underneath it. Below is another still image depicting Bingert

(circled in yellow) at the top of the stairs to the Upper West Terrace ducking below the bike rack

which is now above his head:



*Image 2: Still Image from Government Trial Exhibit 206A*

The defendants pushed the bike racks so forcefully that they struck Officer Juan Gonzalez—who was directly in front of the defendants on the other side of the bike racks—in the leg with a barricade, causing him to stumble away from the police line and fall to the ground.   At trial, Officer Gonzalez testified that he believed he was hit by one of the smaller barricades and that he hurt his leg.   He testified that he experienced an "angry crowd that was being assaultive. I hurt my leg in the process, just a minor injury…at the time it felt like – it felt like a serious injury."   May 15, 2023 Trial Transcript at 138:8.   The pain was so severe that Officer Gonzalez stumbled back from the line and fell to the ground.   *See* Government Trial Exhibit 101 at timestamp 2:46–2:47. Officer Gonzalez testified, "it was just a matter of seconds but it was a really strong physical altercation. And at that time, I felt that I had sustained an injury to my leg.   So I had to sit down." May 15, 2023 Trial Transcript at 146: 1-3.   Additionally, Officer D'Avignon testified about the assault: "It was frightening.   I thought we were going to die."   May 15, 2023 Trial Transcript at 180:23-24.

After the assault, Bingert remained on the same stairs to the Upper West Terrace for at least another hour and a half.   During that time, at approximately 3:19 p.m., Bingert watched a rioter near him punch a police officer in the head.   Immediately after, other rioters took advantage of the scuffle and pulled down multiple barricades into the crowd and away from the police. Police sprayed the crowd, including Bingert, with OC spray multiple times during this second assault.

At approximately 4:20 p.m., Bingert walked around the corner from the stairs to a ledge overlooking the Lower West Terrace area known as "the tunnel." Bingert remained in that area looking down on the tunnel for almost an hour. During the time he was there, Bingert watched as rioters dragged an officer in to the crowd.

At approximately 5:10 p.m., police removed Bingert from the Upper West Terrace. However, Bingert remained on restricted Capitol grounds until after dark and had to be removed from the West Lawn by police officers.

During the investigation, law enforcement obtained consent to search Bingert's cellular phone.   On the phone, law enforcement found several screenshots of social media posts by other people about alleged election fraud.   Bingert also received and responded to updates from others about the progress of the certification proceeding on January 6.   For example, at 1:18 p.m., he received a text message stating, "its on pause to discuss Arizona."   Bingert also received a text message from his mother at 2:33 p.m. stating "Us Capitol is on lockdown." Bingert received that message at approximately the same time that he was at the West Plaza before he advanced up the stairs and before he pushed the bike rack against the police.

While video evidence from other sources showed Bingert filming at multiple points on January 6, law enforcement did not recover any videos from January 6–including videos from the locations where Bingert was seen filming–from Bingert's phone. For example, below are two

screenshots showing Bingert holding his phone up and apparently filming the police.



*Image 3: Government Trial Exhibit 201A.2*



*Image 4: Government Trial Exhibit 205A.4*

In fact, at trial, Bingert admitted that he was filming on his phone during the times depicted

above. *See* May 23, 2023 Trial Transcript 50:18-20 (admitting he was filming as depicted in Image 4); 57:15-17 (same); 14:5-13 (stating he was checking a text or taking a picture while on the West Plaza as depicted in Image 3). However, corresponding videos were not recovered from his phone by the FBI.

Bingert's phone did include, however, a screenshot he had taken of the FBI BOLO ("Be On the Lookout") poster that included Bingert's picture.   According to metadata from Bingert's phone, that screenshot was taken on January 17, 2021, one day before Bingert's lawyer contacted the FBI about Bingert's self-surrender.

At trial, Bingert testified on his own behalf. In its Factual Findings, filed at ECF 166, the Court found that Bingert's testimony was not credible on at least four different topics, including: (1) that Bingert's intent in pushing the bike rack was not to interrupt the proceeding (*see* ECF 166 at 2); (2) that Bingert did not hear references to Vice President Pence's role in the certification during President Trump's speech (*id.* at 4); (3) that Bingert's "woo hoo" noise at various points on January 6 was a nervous tic (*id.* at 5); and (4) that Bingert was trying to protect himself and "an elderly woman" when he grabbed the bike rack (*id.* at 8).

The government submits that Bingert's testimony was also not truthful with respect to the following topics: (1) that he was not aware of the certification proceeding occurring at the U.S. Capitol on January 6, 2021; (2) that he did not know U.S. Capitol grounds were closed or restricted that day; (3) that he did not know Vice President Pence was present at the U.S. Capitol that day; (4) that he was only present on the Lower West Terrace to look at the Washington Monument; and (5) that he was not filming and cheering for another rioter who was spraying the police line with a fire extinguisher while on the southwest stairs.

### C.    Isaac Sturgeon's Actions on January 6, 2021

Sturgeon also attended the Stop the Steal rally on the morning of January 6. After listening

to President Trump's speech, Sturgeon marched to the U.S. Capitol building, where he made his way through the dense crowd to the front of the police line at approximately 2:31 p.m. Shortly thereafter, rioters overwhelmed the police line, and the police were forced to retreat up the southwest stairs.   Sturgeon followed closely behind the retreating officers, climbing through the scaffolding while filming a video on his phone at 2:35 p.m.—seconds after the last officers ran up the southwest stairs to the Upper West Terrace.   Sturgeon then climbed up the two flights of stairs on the southwest side of the U.S. Capitol building and was one of the first handful of rioters to approach the police line established at the top of the stairs following the police retreat.

At the top of the stairs, like Bingert, Sturgeon encountered the two-layered bike barricade with the "AREA CLOSED" sign on it and the rows of police officers behind the barricade. Like Bingert, Sturgeon slowly made his way to the top of the steps so that he was right in front of the barricade and the police. As set out above, Johnatakis called other rioters to move forward, and Sturgeon confirmed with Johnatakis that he (Sturgeon) would "push." Immediately after Sturgeon said "push," he noticeably removed both of his hands from his pants pockets and reached toward the bike rack. Sturgeon then realized that it was not yet time to push and so stealthily put his hands back in his pockets and waited for Johnatakis's count. *See* Government Trial Exhibit 204A at timestamp 14:46:20. After this false start, Johnatakis counted the rioters down saying, "1, 2, 3, GO," and Sturgeon, with Bingert, grabbed the bike rack and pushed it against the police.



*Image 5: Still Image from Government Trial Exhibit 206A*

Sturgeon, along with Bingert and others, attempted to duck underneath the bike rack toward the police line during the assault.



*Image 6: Still image from Government Trial Exhibit 206A*

Sturgeon remained on the stairs to the Upper West Terrace until approximately 3:01 p.m., when he walked around the corner to the area overlooking the tunnel. Sturgeon stood on a ledge

close to the mouth of the tunnel for at least 90 minutes, looking down on the assaults against the police below.   During this time, Sturgeon took at least four videos of rioters assaulting police at the tunnel, and he posted some of these to his Instagram account.   During one video, which showed a police officer in some kind of enclosed space on the Lower West Terrace, Sturgeon narrated, "The people grabbed one of the cops and drug him down the steps, but they put him inside here to take care of him. Because we love the police, but this is a fucking revolution."

At approximately 5:00 p.m., police officers were attempting to clear the area on the Upper West Terrace where Sturgeon was located.   They ordered Sturgeon to get down off the ledge several times, but Sturgeon refused to comply, and at one point, he affirmatively turned and walked away from the officers, farther down the ledge out of their reach.   Finally, one of the officers physically pulled Sturgeon down off the ledge.   Sturgeon laughed and asked the officers, "can I take a selfie?" The police then had to physically push Sturgeon and other rioters out of the area. Sturgeon was removed from the Upper West Terrace at approximately 5:10 p.m.

During the investigation, law enforcement obtained consent to search Sturgeon's cell phone and warrants to search his Instagram and Facebook accounts. Law enforcement found several videos on Sturgeon's phone that he had recorded on January 6.   Notably, law enforcement did not recover any videos taken at the police line at the stairs to the Upper West Terrace where Sturgeon pushed the bike rack against police, despite police body worn camera footage that showed Sturgeon filming on his phone while in that area.



*Image 7: Government Trial Exhibit 204A.1*



*Image 8: Government Trial Exhibit 204A.1 Zoomed in on Sturgeon Filming*



*Image 9: Government Trial Exhibit 214A.1*



*Image 10: Government Trial Exhibit 214A.1 Zoomed in on Sturgeon Filming*

Like Bingert, there was also evidence on Sturgeon's cell phone that he was aware he was

being investigated by the FBI prior to his arrest.   Specifically, on January 26, Sturgeon texted a

friend in law enforcement and asked if there was a warrant out for him. His friend confirmed that he was wanted by the FBI.   Sturgeon did not self-surrender, but instead was arrested after deboarding a plane almost six weeks later on March 6, 2021.

Sturgeon's cell phone also contained several messages he exchanged with others on January 6.   For example, Sturgeon texted a friend at 2:19 p.m. (minutes before he advanced to the West Plaza) that "They're storming the capital." Similarly, Sturgeon texted another individual at 3:25 p.m., "Been sprayed couple times … in D.C."

Significantly, Sturgeon also sent several texts after January 6 that appeared to advocate for future violence against the government. For example, on January 8, Sturgeon texted about January 6, "Republicans get mad and commit felonies just so you're aware" and "Its time" and "We will make the best of it and or fight. Crimes half [sic] to be committed to start a revolution." On January 9, he texted, "Yeah peace hasn't worked for us. We are dying." He followed up with "Yeah I understand the code talk ideology and all that haha but blood shed is the only way now. Biblical."

Sturgeon made similar statements on his social media accounts. For example, on January 7, Sturgeon sent Facebook messages telling others, "A revolution never started peacefully" and, referring to January 6, "Definitely wild and a little bloody. Needed to happen [prayer hands emoji]."   Sturgeon also posted numerous photographs and videos from January 6 on his Instagram account which included comments like, "I fear this is just the beginning."   Sturgeon also posted at least two of the videos he took of rioters assaulting police (referenced above) to his Instagram account.

### D.  Bingert's Trial Testimony

Bingert exercised his right to testify at trial. He testified that he traveled to the Washington, D.C. area from Pennsylvania on January 5, 2021 and stayed overnight with a friend in Arlington, Virginia. May 23, 2023 Trial Transcript at 7:22-8:2. Bingert woke up early on the morning of

January 6, 2021 and took an Uber by himself to the Stop the Steal Rally. *Id.* 8:3-8. Bingert testified that he listened to the entirety of President Trump's speech. *Id.* 9:22-10:1. After the rally, Bingert joined the crowd marching to the Capitol and stopped along the way to buy a flag. *Id.* 10:12-11:9. Bingert testified that he did not see any fences or barricades when he arrived at the Capitol grounds. *Id.* 11:10-12. As he stood on the West Plaza, Bingert held up his phone to either check a text message or take a picture. *Id.* 14:10-13. From the West Plaza, Bingert proceeded up the steps and through the scaffolding to a line of police officers and bike racks at the top of the stairs. *Id.* 14:18-15:21. Bingert claimed that as he stood at the top of the steps a "skirmish" broke out "between the police officers and protesters." *Id.* 16:6-8. Bingert testified that during this "skirmish" he "held my hand up just to protect the bicycle rack from falling on me and also to protect the elderly woman that was behind me at that time." *Id.* 16:23-17:2; *see also* 18:20-19:21; 22:12-16. Bingert also testified that he did not understand what the electoral college was, he was not aware that the certification of electoral votes was occurring at the U.S. Capitol that day, and he did not know that the Vice President was in the Capitol building. *Id.* 22:19-23:12. After the assault on police, Bingert went to a ledge overlooking the Lower West Terrace tunnel but testified that he spent the majority of his time there "gazing at [the Washington Monument]." *Id.* 23:34-24:7. Bingert testified that he was not in communication with anyone while he was on Capitol grounds on January 6 because his phone died. *Id*. 24:22-25:23. Finally, Bingert testified that he turned himself into the FBI on January 18, 2021, immediately after seeing that he was wanted. *Id.* 26:17-27:15.

On cross-examination, Bingert admitted that he knew the Stop the Steal rally was about a claim that the 2020 election was fraudulent and that President Trump wanted Vice President Pence to fix that by recertifying the electoral votes. *Id.* 32:21-23; 33:18-34:4; 36:14-37:1; 37:18-21. Bingert also admitted that he knew Congress was at work inside the U.S. Capitol building on January 6 (*Id.* 35:7-9) and that he was getting text message updates from a friend about the

certification proceeding as he was marching to the U.S. Capitol building on January 6 (*Id.* 38:17-22; 39:23-40:2). Bingert also admitted that when he arrived on the West Plaza, he saw 9 police officers and he also saw members of the riot fighting the police. *Id.* 44:19-21; 46:16-18. Bingert also repeatedly claimed that he did not see an "AREA CLOSED" sign affixed to the barricade at the top of the southwest stairs despite numerous video clips showing him standing directly in front of and even touching, the sign. *Id.* 48:23-49:21; 54:9-11. Bingert also testified that the distinctive "woo hoo" noise that he made at various points in the day were the result of a "nervous tic" (*Id.* 51:1-11) and that when he yelled "go! go!" while on the southwest stairs filming on his phone, he was not cheering for the rioter who was spraying the police line with a fire extinguisher from that exact same location and time (*Id.* 51:12-53:21). Bingert also admitted that by at least 3:19 p.m., Bingert knew that he was not a part of a peaceful protest. *Id.* 56:25-58:4.

With respect to the assault on the southwest stairs, Bingert admitted on cross examination that he was originally 4 or 5 steps down from the barricade but stepped up so that he was on the top stair. *Id.* 66:19-68:1. He also admitted to hearing his co-defendants say "pack it in," "one foot" and "push" as he moved closer to the barricade. *Id.* 69:14-70:7. He also admitted to placing his hand on the barricade two separate times during the assault and keeping his hand on the barricade for at least 10 seconds. *Id.*71:16-75:25.

### E.  Bingert's GiveSendGo Fund

Prior to the start of the trial, Bingert established a fundraising website on GiveSendGo.com. The title of Bingert's GiveSendGo account is "January 6th Legal Fund for Craig Bingert" and as of the submission of this memorandum the fund is showing a balance of $1,865. The website currently includes three photographs: two photographs of Bingert and one still image from BWC

from January 6.[4]  *See* GX 1111A, GX 1111B, GX1111D.   The website reads:



Of note, in response to a $100 donation, Bingert posted, "No problem I will do whatever it takes to defend my country."

## III.    THE CHARGES AND TRIAL

On November 10, 2021, a federal grand jury returned a second superseding indictment charging Bingert and Sturgeon (as well as co-defendant Johnatakis, who is still pending trial) with the following eight counts:

Count One:    Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2;

Count Two:    Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C.  § 111(a)(1);

---

[4]  Notably, the website appears to have been edited since Bingert's trial and the still image from body-worn camera of Bingert during the assault of officers has been removed. *See* Government Trial Exhibit 1111A, depicting the still image from body-worn camera that has since been removed from Bingert's GiveSendGo.

Count Three:  Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

Count Four:  Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

Count Five:  Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

Count Six:  Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4);

Count Seven:  Obstructing, or Impeding Passage Through or Within, the Grounds or Any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(E); and

Count Eight:  Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol Buildings, in violation of Assaulting, Resisting or Impeding Certain Officers, in violation of 40 U.S.C. § 5104(e)(2)(F).

On May 24, 2023, following a bench trial, the Court convicted defendants Bingert and Sturgeon on Counts One through Six and Count Eight (the government voluntarily dismissed Count Seven prior to trial).

## IV.    STATUTORY PENALTIES

Bingert and Sturgeon now face sentencing on Counts One through Six and Count Eight. As noted by the Presentence Report ("PSR"), each defendant faces: (1) on Count One (Obstruction) up to 20 years of imprisonment, a supervised release term of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100; (2) on Count Two (Assault on Federal Officer) up to 8 years of imprisonment, a supervised release term of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100; (3) on Count Three (Civil Disorder), up to five years of imprisonment, a supervised release term of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100; (4) on Count Four (Remaining on Restricted Grounds), up to one year of imprisonment, a supervised release term of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25;

(5) on Count Five (Disorderly Conduct on Restricted Grounds), up to one year of imprisonment, a supervised release term of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25; (6) on Count Six (Engaging in Act of Violence on Restricted Grounds), up to one year of imprisonment, a supervised release term of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25; (7) on Count Eight (Engaging in Act of Violence on Capitol Grounds), up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Guidelines calculation set out in each PSR for Bingert and Sturgeon (ECF 189 ("Bingert PSR"), 191 ("Sturgeon PSR")) for Count One (Obstruction) (Bingert PSR ¶¶ 44-65; Sturgeon PSR ¶¶ 45-66).   But the PSR does not include a Guidelines analysis for all other Counts of conviction,[5] so the Government sets out the full calculations for all Counts below and asks this Court to conduct a full analysis of the Guidelines calculations before imposing sentence.

---

[5] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

## A.  Offense Level Calculations

**Count One: 18 U.S.C. § 1512(c)(2) and § 2—Obstruction of an Official Proceeding before Congress (and aiding and abetting)**

The Statutory Index lists U.S.S.G. § 2J1.2 (Obstruction of Justice) as the guideline for

a Section 1512(c) offense.

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) Obstruction |
|---|---|---|
| Specific Offense Characteristic | +8 | U.S.S.G. § 2J1.2(b)(1)(B): "If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels." |
| | | For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding: as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress." § 1515(a)(1)(B). |
| | | There are multiple theories for the application of this offense characteristic based on U.S.S.G. § 1B1.3, which encompasses both Bingert and Sturgeon's own acts or omissions and those the defendants aided, abetted, counseled, commanded, induced, procured, or willfully caused. It also includes "all harm that resulted from" the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant. § 1B1.3(a)(1)(A) and (B). |
| | | Here, Bingert and Sturgeon pushed a barricade into officers, including Officer Gonzalez, who the barricade struck in the leg, causing him to stumble out of the police line and fall to the ground. |
| | | This Court found that "both defendants' purpose in pushing into the police line was to ensure that the proceeding was in fact obstructed or impeded" and "at least one officer—Officer Gonzalez—was injured when that bike rack pushed him into another barricade."  ECF 166 at 3 (Court's Notes for Oral Ruling from the Bench under Rule 23(c)). |

| Specific Offense Characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "If the offense resulted in substantial interference with the administration of justice, increase by 3 levels."<br><br>This enhancement has been applied to most January 6 defendants convicted of violating Section 1512(c)(2).<br><br>The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety as a result of the conduct of Bingert and Sturgeon with their fellow rioters in and around the Capitol building.<br><br>As this Court found: "The defendants' actions obstructed and impeded the proceeding by, together with the actions of others, forcing the evacuation of Congress and the end of the certification session, as shown by the testimony of Inspector Hawa and Mr. Jones.   By joining the mob and pushing the barricade into the officers, both defendants helped ensure that Congress was under a sufficient security threat requiring adjournment and then an inability to resume the official proceeding that their actions helped to disrupt."   ECF 166 at 3 (Court's Notes for Oral Ruling from the Bench under Rule 23(c)). |
| Chapter 3 Adjustment | +6 | U.S.S.G. § 3A1.2(c)(1): "If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable – knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom . . . increase by 6 levels."<br><br>The officers at the top of the southwest stairs were wearing law enforcement gear and insignia.   They were enforcing a barricade to protect the Capitol and the members of Congress inside.   Bingert and Sturgeon assaulted those officers in an attempt to gain entry into the Capitol building and obstruct the certification.   As the Court found, "both defendants' purpose in pushing into the police line was to ensure that the proceeding was in fact obstructed or impeded." ECF 166 at 3.<br><br>By picking up the barricade and using it to assault a line of officers at the stop of the Southwest Stairs, the defendants assaulted the officers in the course of the |

| | | |
|---|---|---|
| | | obstruction offense in a manner creating a substantial risk of serious bodily injury. |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels." <br><br> Bingert's obstructive conduct took two forms: (1) untruthful testimony under oath at trial, as detailed above and in the Court's Notes for Oral Ruling from the Bench under Rule 23(c) (ECF 166); and (2) destruction of evidence on his phone, including videos and photographs that he took at the U.S. Capitol. <br><br> Sturgeon's obstructive conduct was the deletion of evidence on his phone, including videos or photographs that he took at the police line at the top of the stairs to the Upper West Terrace. Sturgeon deleted videos that would have placed him at the scene of his assault on Officer Gonzalez and the other officers protecting the Upper West Terrace, while leaving other videos on his phone depicting events in which he was not personally involved and that took place in other locations on Capitol grounds. |
| Total | 33 | |

**Count Two: 18 U.S.C. § 111(a)(1) —Assaulting, Resisting or Impeding Certain Officers**

The Statutory Index lists two guidelines for a Section 111 offense, U.S.S.G. § 2A2.2 (Aggravated Assault) and U.S.S.G §2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2A2.4 (Obstructing or Impeding Officers).

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |

23

| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." |
|---|---|---|
| | | Bingert and Sturgeon made physical contact with the officers when each pushed the barricade into the line of police. The Court specifically made this finding. ECF 166 at 8 (Court's Notes for Oral Ruling from the Bench under Rule 23(c)) ("Finally, Mr. Bingert and Mr. Sturgeon made physical contact with the officers by physically pushing the barricade into them."). |
| | | Physical contact need not be direct and encompasses indirect uses of force. *See, e.g., United States v. Taliaferro,* 211 F.3d 412, 415-16 (7th Cir. 2000) (specific offense characteristics properly applied where inmate threw a cup of urine into a prison guard's face); *United States v. Shelton,* 431 F. Supp. 2d 675, 675-77 (E.D. Texas 2006) (defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd,* 230 F. App'x 457 (5th Cir. 2007). Courts have held that the specific offense characteristic applied to a defendant who worked in concert with a codefendant who made indirect contact with a victim. *See United States v. Beltran-Higuera,* 642 F. App'x 780, 782-84 (9th Cir. 2016). |
| Cross reference | See below | U.S.S.G. § 2A2.4(c): "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)." |
| | | The Application Notes to Section 2A2.2 define "aggravated assault" as a "felonious assault that involved … (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; … or (D) an intent to commit another felony." U.S.S.G. §2A2.2, cmt. (n.1). |
| | | Bingert's and Sturgeon's conduct constituted aggravated assault because it was a felonious assault that involved the intent to commit another felony. The Guidelines do not define "assault" or "felonious assault." Sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton,* 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence |

|  |  | to another.  *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (defendant assaulted a police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979).<br><br>Here, Bingert and Sturgeon pushed a barricade into a line of police officers, injuring at least one officer, Officer Gonzalez, and "they took this action with the intent to both obstruct the Electoral College Certification…and to Commit Civil Disorder…." ECF 166 at 8 (Court's Notes for Oral Ruling from the Bench under Rule 23(c)).  Accordingly, as the Court found, Bingert and Sturgeon's conduct constituted aggravated assault because their assault was committed with the intent to commit another felony. Therefore, the cross-reference to U.S.S.G. §2A2.2 applies. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense Characteristic | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "If…(B) a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels;"<br><br>Application Note 1 of the Commentary provides that "dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury…" Application Note 1 to U.S.S.G. § 2A2.2 further defines "dangerous weapon" to "include[] any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury."<br><br>Here, the defendants used a bike rack to assault police. Although a bike rack is not ordinarily a dangerous weapon, it was capable of inflicting serious bodily injury under the circumstances in which it was used here. As described above, the police were at the top of the Southwest Stairs, defending against assault by the |

| | | |
|---|---|---|
| | | defendants and other rioters on the stairs. In ramming the police with the bike rack with sufficient force to cause Officer Gonzalez to fall back from the line, the defendants could have caused him or other officers to strike their heads, break bones, or tumble down the stairs. Indeed, Officer D'Avignon testified about the assault: "It was frightening.  I thought we were going to die."  May 15, 2023 Transcript at 180:23-24.  Thus, the bike rack was capable of inflicting serious bodily injury. Moreover, in pushing the bike rack into the officers with the force that the defendants used, the defendants intended to commit bodily injury. In this way, the bike rack was used as a weapon and the defendants had the intent to commit bodily injury. |
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.2(b)(3): "If the victim sustained bodily injury, increase the offense level according to the seriousness of the injury: (A) [For Bodily Injury, add 3 levels]." <br><br> Application Note 1 of the Commentary provides that "bodily injury" has the meaning given to that term in § 1B1.1 (Application Instructions), Application Note 1. That Note in turn defines "bodily injury" as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." <br><br> Officer Gonzalez testified that when he was struck in the leg with the bike rack, "it felt like a serious injury." May 15, 2023 Transcript at 138:8.  The pain was so severe that Officer Gonzalez stumbled back from the line and fell to the ground.  GX101 at 2:46 – 2:47. The officer's injury was thus "painful and obvious" and so constituted "bodily injury" for purposes of U.S.S.G. § 2A2.2(b)(3). |
| Chapter 3 Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." <br><br> Officer Gonzalez was a member of the Metropolitan Police Department and was in full uniform that day, as were the other members of the Metropolitan Police Department in the police line attempting to defend the |

| | | |
|---|---|---|
| | | Upper West Terrace.  Bingert and Sturgeon's assault on the police line was motivated by the officers' status. |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels." <br><br> *See* the analysis for Count One, above. |
| Total | 29 | |

**Count Three: 18 U.S.C. § 231(a)(3) – Civil Disorder**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. §2X5.1.  Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." <br><br> *See* analysis for Count Two, above. |
| Cross reference | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." <br><br> *See* analysis for Count Two, above. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense Characteristic | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "If…(B) a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels;" <br><br> *See* analysis for Count Two, above. |
| Specific Offense | +3 | U.S.S.G. § 2A2.2(3): "If the victim sustained bodily |

| Characteristic | | injury, increase the offense level according to the seriousness of the injury…." (A) [For] Bodily Injury, add 3 levels."<br><br>*See* analysis for Count Two, above. |
|---|---|---|
| Chapter 3 Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>*See* analysis for Count Two, above. |
| Chapter 3 Adjustment | +2 | U.S.S.G. § 3C1.1: "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."<br><br>*See* the analysis for Count One, above. |
| Total | 29 | |

**Count Four: 18 U.S.C. § 1752(a)(1)--Entering and Remaining in a Restricted Building or Grounds**

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2B2.3.

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with |

| | | |
|---|---|---|
| | | the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| | | Here, Bingert and Sturgeon trespassed with the intent to obstruct an official proceeding in violation of 18 U.S.C. § 1512. |
| Base Offense Level (adjusted) | 25 (from Count One) | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| | | As described above, Bingert and Sturgeon entered the restricted area of the Capitol to obstruct the official proceeding—that is, stopping Congress from doing its work. The substantive offense is thus Count One, and the base offense level and the Special Offense Characteristics for that offense should be applied. |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |
| | | *See* analysis under Count One, above. |
| Total | 27 | |

## Count Five: 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline."   U.S.S.G. §2X5.1.   Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| Specific Offense Characteristic | +3 | U.S.S.G. §2A2.4(b)(1)(A): "If (A) the offense involved physical contact … increase by 3 levels." |
| | | *See* analysis for Count Two, above. |

| | | |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. §2A2.4(b): "If the victim sustained bodily injury, increase by 2 levels."<br><br>*See* analysis for Count Two, above. |
| Cross reference | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)."<br><br>*See* analysis for Count Two, above. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.2(3): "If the victim sustained bodily injury, increase the offense level according to the seriousness of the injury…." (A) [For] Bodily Injury, add 3 levels."<br><br>*See* analysis for Count Two, above. |
| Chapter 3 Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>*See* analysis for Count Two, above. |
| Chapter 3 Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense"<br><br>*See* analysis under Count One. |
| Total | 25 | |

**Count Six: 18 U.S.C. § 1752(a)(4)—Engaging in Physical Violence in a Restricted Building or Grounds**

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2A2.4.

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1) – If the offense (A) involved physical contact, or (B) a dangerous weapon was possessed and its use threatened, increase by **3** levels.<br><br>*See* analysis for Count One, above. |
| Cross Reference | | U.S.S.G. §2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." |
| Base Offense Level with Specific Offense Characteristics (adjusted) (from Count Two) | 17 | U.S.S.G. §2A2.2(a) |
| Chapter Three Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b)<br><br>*See* analysis for Count Two above. |
| Chapter Three Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See* analysis for Count One above. |
| Total | 25 | |

**Count Eight: 40 U.S.C. § 5104(e)(2)(F)—Engaging in an Act of Physical Violence in the Grounds of any of the Capitol Buildings**

Because this offense is a Class B misdemeanor, the Guidelines do not apply to it. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### B. Grouping Analysis

Under U.S.S.G. §3D1.2, "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction … [or] (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline appliable to another of the counts."

Here, Group One consists of Counts Two, Three, and Six, charging violations of 18 U.S.C. §§ 111, 231, and 1752(a)(4), because the victim of each of these counts is the police. The highest offense level for this Group is 29.

Group Two consists of Counts One, Four, and Five, charging violations of 18 U.S.C. §§ 1512(c)(2), 1752(a)(1), and 1752(a)(2), because the victim of each of these counts is Congress. The highest offense level for this Group is 33.

Group One and Group Two group pursuant to U.S.S.G. § 3D1.2(c) because Counts Two and Three embody conduct – namely the assault – that is a specific offense characteristic of Count One – namely, U.S.S.G. § 2J1.2(b)(1)(B), causing or threatening to cause injury to another person or property. Therefore, the combined offense level is 33.

### C. Acceptance of Responsibility

Neither Bingert nor Sturgeon are entitled to a reduction for acceptance of responsibility.

### D. Criminal History

Neither Bingert nor Sturgeon has any prior convictions and therefore each has a criminal

history category of I.   Bingert PSR ¶ 68; Sturgeon PSR ¶ 69.

### E.  Guidelines Range

An offense level of 33 combined with a criminal history category of I results in an anticipated Guidelines range of 135 to 168 months' imprisonment for both Bingert and Sturgeon. Bingert PSR ¶ 127; Sturgeon PSR ¶ 123. The fine range is $17,500 to $175,000 for each defendant.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.   Nature and Circumstances of the Offense

Bingert's and Sturgeon's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Bingert and Sturgeon were willing to commit numerous offenses in order to stop the certification on January 6—including joining a violent mob that broke down the police line on the West Front, climbing through scaffolding of the inaugural stage mere minutes after the police retreated, and ultimately using a barricade to assault a line of police officers defending the Capitol. Their words and actions on that day and the days surrounding January 6, as discussed above, show their intent and purpose.   For example, as the Court found, Bingert "actively cheered for rioters who are fighting with police" and Sturgeon "sent numerous messages in the immediate aftermath of January 6 speaking of the need to start a 'revolution' and the necessity of fighting and committing crimes to do so."   ECF 166 at 5 (Court's Notes for Oral Ruling from the Bench under Rule 23(c)).   Thus, the assault on police officers, the resulting injury to Officer Gonzalez, defendants' actions to encourage others during the riot, their remaining on Capitol grounds for long periods of time, their destruction of evidence from their phones, Bingert's false statements

under oath, and Sturgeon's post-riot statements advocating for more violence are all aggravating factors in this case.

In mitigation, neither defendant used a deadly or dangerous weapon during the commission of the assault, and the assault lasted less than one minute. Additionally, while both defendants remained on Capitol grounds and observed violence against the police, they did not participate in any additional acts of violence that day. When considering both the aggravating and mitigating aspects of the nature and circumstances of Bingert's and Sturgeon's offenses, this factor support the government's recommended sentence of 135 months, at the low end of the Guidelines range.

### B. Defendants' History and Characteristics

#### 1. Craig Bingert

Bingert is 32 years old and lives with his partner in Whitehall, Pennsylvania. Bingert has two siblings, a sister and a brother, who also reside in Pennsylvania. Bingert reported to U.S. Probation that he had a "great" childhood and denied experiencing any abuse or neglect. Bingert graduated from high school and college and has a bachelor's degree in criminal justice. Bingert is currently employed with a landscaping company in Copley, Pennsylvania. Notably, Bingert was a Pennsylvania State Police cadet for four days. Bingert PSR ¶ 114. Bingert has no criminal history except for minor traffic infractions. Bingert PSR ¶¶ 66-88.

Bingert's history and characteristics support a low-end Guidelines sentence in this case. He has clearly had many opportunities and advantages in his life. He grew up in a happy home and he received a good education. Unlike many criminal defendants, he had many choices other than to engage in criminal conduct – his crimes were not crimes driven by poverty, neglect or abuse. He should have known the full consequences of his actions since he received a degree in criminal justice and was employed with a state law enforcement agency at least for some amount of time. But despite these advantages, Bingert chose to travel to Washington, D.C. on January 6, to enter

restricted grounds, and to confront and assault police officers – the very group to which he once hoped to belong– and to take part in one of the worst attacks on our government in the nation's history. However, Bingert has no criminal history. He has a steady employment record, a stable living situation and a supportive partner. These factors weigh in favor of a sentence at the low end of the Guidelines range.

### 2.  Isaac Sturgeon

Sturgeon is 34 years old and lives in Dillon, Montana. Sturgeon has two sisters, lives with both of his parents, and had a good childhood. He was home schooled and received a high school equivalency diploma. Sturgeon owns and operates Isaac's Lawncare in Dillon, Montana. Sturgeon PSR ¶¶ 89-108.

Like Bingert, Sturgeon's family history, education, and employment provided him with the opportunity to succeed and make lawful choices.   But instead, Sturgeon chose to join the attack on the U.S. Capitol and assault members of law enforcement entrusted with protecting it. Sturgeon suggested during trial that he was a peaceful person who supported law enforcement, but evidence of his actions and words of war and revolution on January 6 (and surrounding days) belie that assertion.   For example, three days before January 6, Sturgeon sent a message referring to January 6 as the "last stand."   He described January 6 as "Definitely wild and a little bloody.   Needed to happen [prayer hands]."   After January 6, Sturgeon said in a series of messages, "Republicans get mad and commit felonies just so you're aware.   It's time… We will make the best of it and or fight.   Crimes have [sic] to be committed to start a revolution… Peace hasn't worked for us… blood shed is the only way now… Biblical."   The most significant example of this is, of course, Sturgeon's assault on law enforcement on January 6.   Indeed, even one of his character witnesses admitted that many of Sturgeon's statements and actions on or relating to January 6th were not peaceful. *See* May 17, 2023 Trial Transcript, Testimony of Edward Jones, 117:9-25; 120:4-7;

123:19-21.

While Sturgeon's choice to engage in criminal conduct on January 6 and his statements before and after the riot are aggravating, these factors are slightly outweighed by his lack of criminal history, his stable familial relationships, and his steady employment. Accordingly, Sturgeon's history and characteristics also support a low-end Guidelines sentence here.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration for both Bingert and Sturgeon. Their criminal conduct on January 6 was the epitome of disrespect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants also weighs in favor of a term of incarceration. Bingert's history and characteristics, most notably his education in criminal justice and brief time as a police cadet, show some need for specific deterrence in his case. His assault of police officers—when he himself appears to have had plans

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

to become a police officer—demonstrates the lengths to which he is willing to go in pursuit of his political beliefs. Bingert's actions on January 6—namely, his persistence in pursuing the police as they retreated and his remaining on Capitol grounds until dark—also show that he will require a sentence of incarceration to be deterred from similar conduct in the future. Finally, Bingert's total lack of remorse for his actions, as demonstrated by his statements during his trial testimony and his statements on his GiveSendGo page leading up to trial, also evidence a need for a sentence of incarceration to achieve specific deterrence. However, as noted above, Bingert has no prior criminal history which indicates he is at a lower risk of recidivism. Thus, this factor supports a low-end Guidelines sentence.

Sturgeon's actions on January 6 also indicate a need for a sentence of incarceration to achieve specific deterrence. Like Bingert, Sturgeon stubbornly remained on U.S. Capitol grounds long after the assault he committed on police. In fact, Sturgeon refused to heed police officers' calls to get down off a ledge and instead forced them to physically pull him down, at which point he laughed and joked, asking to take a selfie. Additionally, Sturgeon's words before, during, and after January 6 called for additional violence and evidenced a complete lack of remorse for his assault on police and his involvement in the Capitol riot. However, like Bingert, Sturgeon has no prior criminal history indicating his criminal actions on January 6 may have been aberrant (albeit serious). Under these circumstances, this factor supports a sentence at the low-end of the Guidelines range.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. At 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[8]

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

**United States v. Thomas Robertson, 21-CR-34 (CRC).** Robertson is a police sergeant from Virginia who was convicted following a jury trial of obstruction of an official proceeding, interfering with law enforcement during a civil disorder, and several misdemeanors. The government and U.S. Probation calculated Robertson's Guidelines range to be 87 to 108 months. The government recommended a sentence of 96 months' incarceration. Judge Cooper sentenced him to 87 months' incarceration. Unlike, Bingert and Sturgeon, Robertson was not convicted of assaulting police on January 6.

**United States v. Patrick McCaughey**, **21-CR-40 (TNM)**. McCaughey was convicted after a bench trial of nine counts, including obstruction of an official proceeding, assaulting, resisting, or impeding certain officers, including with a deadly or dangerous weapon, and interfering with law enforcement during a civil disorder, as well as several misdemeanors. McCaughey used a stolen police riot shield to press up against MPD Officer Daniel Hodges while Officer Hodges was stuck between the doors in the Lower West Terrace tunnel. The government and U.S. Probation calculated McCaughey's Guidelines range to be 151 to 188 months, and the government requested a sentence of 188 months.   Like Bingert and Sturgeon, McCaughey did not make it into the U.S. Capitol building and did not have any criminal history. However, McCaughey did use a deadly or dangerous weapon during the assault, and Bingert and Sturgeon did not.   Judge McFadden sentenced McCaughey to 90 months' incarceration.

**United States v. Thomas Webster, 21-CR-208 (APM).** Webster is a former NYPD officer who was convicted after a jury trial of assaulting, resisting, or impeding certain officers with a deadly or dangerous weapon, and interfering with law enforcement during a civil disorder, as well as four misdemeanors. While on the West Plaza, Webster threw a metal pole at officers, narrowly missing them, before charging an officer, tackling him to the ground and grabbing onto his gas mask. Webster, like Bingert and Sturgeon, made his way to the area near the Lower West Terrace after his assault on the West Plaza and watched assaults on police that occurred there, including the assault on MPD Officer Fanone. The government and U.S. Probation calculated Webster's Guidelines range to be 210 to 240 months and the government asked for a sentence of 210 months. Judge Mehta sentenced Webster to 120 months' incarceration.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), from a "crime of

violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because the defendants in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and their criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Bingert and Sturgeon to pay $2,000 in restitution for their convictions on Counts One through Six and Eight. This amount fairly reflects Bingert's and Sturgeon's roles in the offense and the damages resulting from their conduct.[10] Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

---

[10] The government is not aware of any monetary damages suffered by Officer Juan Gonzalez as a result of the injury he sustained from defendants' assaults with the bike rack.

## VIII.   FINE

Bingert's and Sturgeon's convictions under Sections 111 and 1512 subject them to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case against Bingert. As the PSR notes, Bingert has raised $1,865 in an online campaign on the website "Give Send Go" entitled "January 6th Legal Fund for Craig Bingert." Bingert PSR ¶ 118. Other than indicating it is a "Legal Fund," the website does not indicate how these funds will be used. Bingert's counsel, Allen Orenberg, was appointed by the CJA panel to represent Bingert. Therefore, it is not clear that Bingert had any legal expenses. Therefore, the government recommends imposing a fine in the amount of the entirety of this account $1,865 or the balance at the time of his sentencing hearing, whichever amount is greater.

IX.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 135 months' imprisonment, three years' supervised release, restitution in the amount of $2,000 each, and a special assessment of $385 each. The government also requests that Bingert be ordered to pay a fine in the amount of $1,865, or the balance on his GiveSendGo account as of his sentencing hearing, whichever amount is greater.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ Kaitlin Klamann*
        KAITLIN KLAMANN
        Assistant United States Attorney
        601 D Street NW
        Washington, D.C. 20530
        IL Bar No. 6316768
        (202) 252-6778
        Kaitlin.klamann@usdoj.gov

By:     */s/ Courtney A. Howard*
        COURTNEY A. HOWARD
        Trial Attorney, Criminal Division
        Detailed to the U.S. Attorney's Office
        601 D Street NW
        Washington, D.C. 20001
        NY Bar No. 4513909
        202-514-3130
        Courtney.Howard2@usdoj.gov