## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No.   21-cr-91 (RCL)** |
| **ISAAC STURGEON** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Isaac Sturgeon is a 34-year-old man from Dillon, Montana, who has lived a law abiding life spent working hard on his own business, supporting his family, and traveling the world. As the countless letters submitted on his behalf clearly demonstrate, the conduct for which he was convicted is completely outside of the character that Mr. Sturgeon has displayed for the past three decades. Mr. Sturgeon exercised his constitutional right to a trial in this case but elected to have a bench trial – making the proceedings streamlined and efficient. He requests a significant variance, as well as a downward departure (under U.S.S.G. § 5K2.20), from the excessive guideline range for the following reasons:

- Mr. Sturgeon has contributed positively to his community as a small businessman who provides essential services to his small town and he continues to do so.

- Prior to January 6, Mr. Sturgeon had never before been arrested, let alone convicted of a crime.

- Mr. Sturgeon has immense family support from individuals who rely upon him.

- Mr. Sturgeon came to D.C. for the rally on a whim, traveling alone, was not part of any organized group, had no weapons, and was not equipped with any riot gear. He did not enter the Capitol building, as hundreds of others did, nor did he seek to breach any door.

- Mr. Sturgeon's conduct that has the most severe consequences under the guidelines happened in just a few seconds and was not planned.

- Had it not been for the powerful messaging and propaganda spread by the former President and other powerful politicians about the supposed national security threat posed by an allegedly fraudulent election, Mr. Sturgeon would never have even come to Washington, D.C. for the rally. Most notably, had the former President never given an hour-long speech during which he incited thousands of citizens to go to the Capitol building to "fight like hell," Mr. Sturgeon would not be before this Court for sentencing.

- During the 2 years and 7 months since he was arrested, Mr. Sturgeon has complied with his conditions of pre-trial release without a single issue. He has also refrained from commenting about January 6 on social media. During this time, he has been doing nothing but working and providing for his young daughter – who relies on him for financial support.

The estimated sentencing guidelines range in the Presentence Investigation Report (PSR) and the government's sentencing recommendation are beyond excessive and are by no means proportionate to Mr. Sturgeon's conduct in this case. The government recommends a far harsher sentence than those imposed in other January 6 cases in which defendants engaged in similar – and much more serious – conduct. Its recommendation fails to properly assess the sentencing factors seeking only retribution – not fairness – and should be discredited entirely. Considering Mr. Sturgeon's background and his conduct on January 6, and the rest of the 3553(a) factors, a lengthy period of incarceration is not warranted.

## **BACKGROUND**

Before January 6, 2021, former President Trump encouraged millions of

ordinary Americans to travel to D.C. to attend the "Stop the Steal" rally, where he would further encourage them to go to the Capitol building to protest the certification of the Electoral College vote. The former President summoned his supporters to D.C. based on claims that the 2020 Presidential election was "stolen" from him.[1] This claim was repeated to the public over and over again, beginning immediately after the election when the former President falsely declared victory.[2] The former President led ordinary Americans like Mr. Sturgeon, who were not experts in election law, to believe or suspect that irregularities existed in the election and vote count and that the purported fraud would be uncovered if people demanded action. He held rallies all over the country, repeating these claims and firing up his base of followers.

Below are examples of some of the political rhetoric that was spreading through the Trump supporter community prior to January 6, 2021, that came directly from former President Trump:

> WE HAVE JUST BEGUN TO FIGHT!!!
> ***Tweet from Trump on December 12, 2022***.[3]

> A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!
> ***Tweet from Trump on December 19***.[4]

---

[1] Shivaram, Deepa, *The House Jan. 6 committee releases its final report on the Capitol attack*, NPR, December 22, 2022, available at https://www.npr.org/2022/12/21/1144489935/january-6-committee-full-report-release.

[2] *Id.* at pg. 36 of final report.

[3] Sherman, Amy, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The Poyner Insttitute, January 11, 2021, available at https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/

[4] *Id.*

The Justice Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th.[5]
***Trump tweet from December 26, 2022***.

If you are planning to attend peaceful protests in D.C. on the 6th, I recommend wearing a body camera. The more video angles of that day the better.
***Retweet by Trump on January 3, 2022***.[6]

If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now,"…We're going to take it back."
***Trump's words at a rally in Georgia on January 4, 2021***.[7]

If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect and even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!
***Tweet from former President Trump at 1:00 am on January 6, 2021***.[8]

On January 6, 2021, Mr. Sturgeon attended the rally he was invited to by his President, where he listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right."[9] Former President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd (including Mr. Sturgeon) on January 6,

---

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *January 6 Report* at 61.

[9] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

2021:

> We will not let them silence your voices. We're not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell**. And if you don't **fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave.**[10]

Even as the Capitol building was under attack, President Trump did and said nothing for hours.[11] The only thing he did during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike Pence didn't have the courage to do what should have been done to protect our country and our Constitution."[12]

---

[10] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).

[11] Jonathan Allen, *On Jan. 6, Trump ignored all pleas to call off the mob attacking the Capitol while 'pouring gasoline on fire' aide says*, NBC News, July 21, 2022, available at https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737

[12] Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-rioters-1568568. (last viewed on November 29, 2022).

## ARGUMENT

### I.    Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing.  While courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).[13]  As the Supreme Court made clear in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors.  *Nelson v. United States*, 129 S. Ct. 890 (2009), 2009 WL 160585 (Jan. 26, 2009); *Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009).  "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*.  2009 WL 160585, at *1.  "The Guidelines are not only *not mandatory* on

---

[13] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

sentencing courts; they are also not be presumed reasonable." *Id*. At *2.  In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range. Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

## II.   <u>Imposing a Variant Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).</u>

### a.  Mr. Sturgeon's Personal History and Characteristics[14]

Mr. Sturgeon was born in Dillon, Montana and has lived his entire life there. Dillon is a small town of less than 4,000 people located about 200 miles Northwest of Yellowstone National Park.  Mr. Sturgeon was raised by both of his parents, who remain married to this day. His father is a retired pastor and his mother is a school teacher. Mr. Sturgeon was raised in a loving environment with dedicated parents along with two older sisters.



---

[14] *See also* Enclosed Exhibit A, a video provided to the Court in advance of sentencing, describing some of Mr. Sturgeon's history and characteristics through family and through Mr. Sturgeon himself.

Mr. Sturgeon grew up doing all of the normal things that kids do in Montana, like camping and fishing. He was home-schooled after the age of 7 and throughout



high school. His father was a pastor for 40 years, so Mr. Sturgeon grew up in a small church community where he learned Christian values and formed lifelong relationships with prominent people in the community. He never got into

**Mr. Sturgeon and his mother preparing to sky dive**

any trouble and is described by all of his family and peers as a calm and peaceful person. He grew an adventurous spirit as a young man, traveling outside of Montana, and doing any outdoor activity available.

Mr. Sturgeon also joined the family tradition of hunting – which in Montana is a way of life – not only as a sport but also as a main source of food. Mr. Sturgeon, like his



**Duck hunting with his father**

father, loves to hunt in the area around Dillon for elk, ducks, moose, and other wildlife.

After high school, Mr. Sturgeon became gainfully employed rather than pursing higher education. He carried several different jobs until he started his own lawn care business in 2011. This business has been successful and individuals from his community attribute this success to his work ethic and sense of responsibility as well as his polite and respectful demeanor. *See* Exhibit 1, Letters of Support. One customer describes him as "honest, hardworking, timely, and respectful….an honest, hardworking man who has made himself successful in our small community." *Id.* Letter from Robert Dixon. While Mr. Sturgeon's business does well, it is seasonal by nature, so in the winter months he travels and takes other contract work installing cellular towers.



The home Mr. Sturgeon is building in Dillon

Mr. Sturgeon is currently residing with his parents temporarily until he finishes building his very own house on the same land that his parents sold to him after their family home burned down in an unfortunate accident. Mr. Sturgeon's fond memories of his childhood on this property led him to want to settle down there

with his future family. Mr. Sturgeon has been working on this property for quite some time and hopes to move into the house when it is completed before the winter starts this year.

As a result of Mr. Sturgeon's love for travel and adventure, he has been to many exotic destinations, including China, Africa, and Egypt. He has also been to on volunteer mission trips to places like Papua New Guinea.  Mr. Sturgeon is genuinely curious about history and cultures around the world and he treasures the times he has spent meeting and learning from people from entirely different

backgrounds.







**Teaching English to preschoolers in 2012**



**Enjoying an After Party of a Wedding in Kenya in the mountains**



**Hiking with a missionary to Papa New Guinea villages. Singing with small churches along the way.**



        It was during his travels that Mr. Sturgeon met a young lady named Lydia,

who is now the mother of his two year old

daughter. Mr. Sturgeon's daughter lives with

her mother in Namibia, Africa, and he has

never seen her in person due to the instant

charges – he has been prohibited from

leaving the country ever since his arrest.

Being separated from his daughter has been

extremely difficult for Mr. Sturgeon.  Despite

the inability to be with her, Mr. Sturgeon

financially supports his daughter and is in





the process of helping her to obtain legal status in America so that she can travel to see him.

Mr. Sturgeon was never particularly engaged in U.S. politics and – other than his love of travel – he led a completely average and normal life. While on his way to Africa in 2021 to see Lydia, and while waiting for his visa to be approved, Mr. Sturgeon traveled to D.C. on a whim to attend the "Stop the Steal" Rally.

### b. Nature and Circumstances of the Offense

Mr. Sturgeon was not even planning to attend President Trump's rally on January 6, 2021, until someone randomly mentioned to him that this rally was taking place in D.C. Mr. Sturgeon was traveling at the time and was experiencing delays in getting his visa approved to visit Kenya. So he made a last-minute decision to stop in D.C. on his way to Africa to attend the rally and to get an appointment to see about his visa. Had it not been for Mr. Sturgeon's travel plans, he would have never traveled from Montana to D.C. solely for the purpose of attending this rally. Unlike many other January 6 defendants, he did not have prior social media messages discussing plans to disrupt the Electoral College vote.

13

However, being from a small town in Montana where most residents hold conservative views, Mr. Sturgeon had followed President Trump's public statements and he therefore had serious concerns about whether the 2020 Presidential election had been conducted in a fair manner. He listened closely to what the former President said about supposed voting irregularities. During the rally, Mr. Sturgeon observed thousands of people from all over the country who supported the President and who were sincerely upset because they believed that the election was stolen from them. Mr. Sturgeon listened to the President tell everyone, including himself, that the next step was to go to the Capitol Building to continue protesting. Mr. Sturgeon listened and followed the massive crowd to the building.

Notably, Mr. Sturgeon did not enter the building, which separates him from most of the other Capitol riot defendants. This was not for lack of opportunity, as Mr. Sturgeon could have entered the same way that thousands of others did that day. But that is not what he was there to do. He had never been to a protest before so he had no idea what to expect, but his intentions were to protest outside the building. What actually occurred that day was not even fathomable at the time he made the decision to walk with the thousands of Trump supporters to the Capitol grounds. Mr. Sturgeon writes to the Court in advance of sentencing explaining his remorse:

> I did not understand all the complexities of the situation on January 6th as I desired to be just part of something bigger than myself....If I knew what I know and realize now, I would have just left after the rally and never entered onto Capitol Grounds. At the time I walked over to the grounds, I did not understand the officers had been physically fighting with people and under immense pressure!...If you

find in your heart to have mercy on me with your decision, I will be the very best version of myself no matter the outcome. *See* Exhibit 2, Letter from Isaac Sturgeon.

Mr. Sturgeon's curiosity and the urgency generated by President Trump's words to the crowd led him to remain on the grounds that day. When Mr. Sturgeon ended up at the Upper West Terrace stairway, he had no prior plan to push past police or to be involved in any altercation whatsoever with the police. This is supported by the evidence at trial that showed that he was mostly standing with his hands in his pockets observing the scene. Unlike many others, he did not yell insults at the police or make demands of them. Mr. Sturgeon respects law enforcement. When a person behind him threw a metal object toward the police, Mr. Sturgeon picked it up and put it on the police side of the line so that it could not be used again. The convictions in this case stem almost entirely from mere seconds when Mr. Johnatakis riled up the crowd and encouraged the front line to push the barricades that police had to then push back to resist a breach of their line. What happened was not calculated and was entirely inconsistent with his non-confrontational behavior the rest of the day.

What happened in those seconds was also entirely inconsistent with the way Mr. Sturgeon has lived his entire life. The Court heard this first-hand from people who have known Mr. Sturgeon not for seconds, but for years and years. At trial, Dr. Kenneth Hunt, a close family friend who has known Mr. Sturgeon his whole life testified and said:

> He always has been a very controlled person. He always has been pour oil on troubled waters sort of person…..I have always thought that he

> is a person who tries to work things out amongst people in conflict. He
> doesn't seek conflict. And that conflict he inadvertently has, he handles
> very amicably and very peacefully.

*See* Trial Transcript, May 17, 2023, at 90-91. Ed Jones, a former law enforcement

officer in Dillon, also testified at trial and said that growing up, Isaac was not a

troublemaker and he had a reputation for nonviolence in the community. *Id.* at 114-

115. Several other people who know Mr. Sturgeon well have written letters on his

behalf attesting to his wonderful character. *See* Exhibit 1, Letters of Support. Below

are touching excerpts from just a few of the 20+ letters written by people who think

very highly of Mr. Sturgeon:

> His work ethics are beyond reproach, as well as his professional
> demeanor and kind mannerism. As a result of knowing Isaac for the
> past 5 years, I can assure you that he is a person of remarkable
> maturity and reliability…I should also point out that Isaac is a good
> friend who is generous, thoughtful, extremely interesting and quite an
> intelligent person. *Id.* Letter from Retired Navy Veteran, Kevin Brown.
>
> I have found Isaac to not only be a pleasure to work with and someone
> whose opinion I value at the work site, but also a trustworthy young
> man who is a credit to our community. Multiple times Isaac has, of his
> own accord, either stayed late to help finish the project's need or come
> in to help out my family on his own, sacrificing his own time to help
> others. *Id.* Letter from Kon Peters.
>
> I am confident that whatever his involvement was as events unfolded,
> it was unplanned, without malice or nefarious intent, and by his own
> admission regrettable. I have only known Isaac to be a responsible,
> hard-working young man with outstanding pedigree and potential, and
> only wish for him to have the opportunity to continue to demonstrate
> that going forward. *Id.* Letter from Keith Barton, Retired Navy
> Captain.
>
> After his conviction, his strength has not bowed. I have watched the
> weight of this trial, and finally, conviction affect him, but he continues
> to be a kind, loving man who doesn't show a slow in his pace to

accomplish what he sets out to do. He has not changed his soft heart and kind spirit towards others. *Id*. Letter from Desiree Garwick.

When I have been distressed he has always provided a calmness to the circumstances. He has consistently brought composure in the midst of any discord in gatherings and conversations. He is steady. He is patient. He honors his parents and respects his sisters. *Id*. Letter from his mother, Mary Sturgeon.

Lastly, Mr. Sturgeon traveled alone and certainly was not a part of any organized groups. He did not wear Trump gear or chant with the crowd. He did not have weapons or any riot gear. Young men like Mr. Sturgeon were not only pawns of the Trump campaign, but more organized groups on January 6, 2021, like the Proud Boys, who also intended to rile up normal people in the crowd to serve their agenda. The New York Times investigated this dynamic and learned that there were different groups who went to the Capitol building, ones that simply intended to protest peacefully and others with a plan to incite the crowd and breach the building.[15] The Proud Boys called people like Mr. Sturgeon "normies" and had an intent to rile them up in order to support their agenda.[16] Mr. Sturgeon went to D.C. naively being completely unaware of the powers at be that had paved the way for the perfect storm of January 6. He was used to serve a purpose and is now a felon because of it. In the sentencing of Andrew Cavanaugh, the Honorable Amit P.

---

[15] New York Times, Proud Boys Led Major Breaches on Jan. 6 Video, July 11, 2022, available at https://www.nytimes.com/2022/07/12/us/politics/proud-boys-jan-6.html (last viewed on April 7, 2023).

[16] Reneau, Natalie, New York Times, How the Proud Boys Breached the Capitol on Jan. 6: Rile up the Normies, June 17, 2022, available at https://www.nytimes.com/video/us/politics/100000008392796/rile-up-the-normies-how-proud-boys-breached-the-capitol.html

Mehta opined that perhaps some January 6 defendants are victims too and were ordinary Americans with no criminal history who were subject to the "power of being told lies over and over again by leaders who knew better." *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-27.

Lastly, after January 6, 2021, Mr. Sturgeon cooperated with the FBI's execution of a search warrant and provided access to his cellular telephone – which incriminated him at trial. He was respectful and decent to agents with whom he interacted.  He was cooperative with the investigation and has attended all of his pre-trial and trial court hearings.  The Court no doubt noticed that Mr. Sturgeon was respectful to the Court, his counsel, court personnel, and the government throughout the proceedings.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Based on the past three years, the Court can be assured that Mr. Sturgeon will not repeat the same conduct. Firstly, Mr. Sturgeon's compliance on pre-trial supervision has been perfect. Second, Mr. Sturgeon's lack of criminal history and his behavior in the past 3 years pending trial has shown that his focus is solely on work, being with his family, and providing for his young daughter. *See also* PSR at Par. 162(a) (noting that the defendant's lack of criminal record, compliance with supervision, and need to provide financial assistance for his daughter may be considerations for a variance). He is not focused on politics and will never go to another rally again. Furthermore, Mr. Sturgeon is now a young felon and will have

to deal with the collateral consequences that stem from that for the rest of his life. Perhaps most significant is the lifetime bar on gun ownership.  Mr. Sturgeon grew up in a hunting culture and hunting trips have been some of the most memorable times of his life.  The trips provide food for Mr. Sturgeon and his family, but also offer time for conversation and bonding with family members and friends. Not being able to hunt with his family and friends is devastating to him. Members of Mr. Sturgeon's family have raised concerns about the bar on gun ownership to the undersigned repeatedly as it will result in Mr. Sturgeon missing countless hunting trips with family and friends for the rest of his life.  This punishment is severe for a young man like Mr. Sturgeon and has more than deterred him from future similar conduct.

Notably, the government now argues for an astonishing 11 years and 3 month sentence which is not only unsupported by the past January 6 cases described below, but is also 7 years more than the sentence they thought was appropriate in their proposed plea agreement. *See* Exhibit 3, Government Plea Letter. For the government to now argue that 11 years is appropriate simply because Mr. Sturgeon elected to have a trial is incredible. For this reason, the government's recommendation does not promote respect for the law and does not avoid unwarranted sentencing disparities.

Although there are no cases that are identical, a review of past January 6 sentences imposed for other defendants convicted of similar charges further demonstrates that a significant variance is warranted in the instant case. Firstly,

others involved in the same pushing incident on the Upper West Terrace stairwell
have received far less harsh sentences than proposed by the government here.[17]

- *US v. Philip Young*, 21-cr-617 (DLF): Mr. Young was sentenced to 8
  months' incarceration for very similar conduct to the instant offense. Mr.
  Young was also at the same bike rack at the Upper West Terrace stairwell
  and helped to assist others in pushing the bike rack into the wall of
  officers. The difference, however, is that Mr. Young did it *twice*, the first
  time at 2:46pm and the second at 3:17pm. Furthermore, Mr. Young went
  to a US government vehicle afterwards to let the air out of its tires. While
  Mr. Young pled guilty and did not go to trial, his conduct was similar to
  Mr. Sturgeon's – if not more aggravating – and should be considered when
  imposing a sentence in this matter.

Second, other defendants engaged in conduct that was far more serious than
Mr. Sturgeon: striking and kicking law enforcement officers, including with
weapons.  Yet even those defendants have received sentences far less harsh than
proposed by the government here.

- *US v. Kevin Creek*, 21-cr-645 (DLF): Mr. Creek was sentenced to 27
  months' incarceration after pleading guilty to one count of Assault on a
  Police Officer. Mr. Creek admitted to hitting a police officer in the face

---

[17] This case analysis is not meant to suggest that the defense believes incarceration is
appropriate in these matters or that the involved allegations were in fact true as
undersigned counsel was not counsel in all of these cases. Rather, the analysis is meant to
provide a summary of past cases that are relevant for the Court's consideration in this
matter.

shield of his helmet to try to get past a bike rack barrier. He also admitted to shoving and kicking another officer causing him to fall to the ground. While he entered a guilty plea, he allegedly denied the conduct to which he pled guilty and did not express remorse for his actions.  To be clear, Mr. Sturgeon neither hit nor kicked any police officer.

• *US v. Scott Fairlamb,* 21-cr-120 (RCL): This Court sentenced Mr. Fairlamb to 41 months' incarceration after he pled guilty to 18 U.S.C. §1512(c)(2) and 18 U.S.C. § 111(a). Mr. Fairlamb not only entered the Capitol building but found a police baton that he used to encourage the crowd to storm the building and to "disarm" the police. He then shoved a police officer and punched him in the face.[18] Mr. Fairlamb told the FBI after January 6, 2021, that he would go again and posted social media statements where he blamed Antifa for what occurred that day. Notably, the government also accused Mr. Fairlamb of destroying evidence from his phone but did not argue for a two level adjustment for obstruction of justice as they did here.

• *United States v. Michael Perkins,* 21-cr-447 (CJN): Defendant Perkins also proceeded to a bench trial but in addition to being convicted of Civil Disorder, was also convicted of Assault *with a deadly weapon.* He was sentenced to 48 months' incarceration. The Court in Perkins rejected the

---

[18]*See* Rabinowitz, Hannah, US Capitol rioter who assaulted police gets 41 months in prison, CNN, November 10, 2021, available at: https://www.cnn.com/2021/11/10/politics/fairlamb-sentence-capitol-riot/index.html

government's high recommendation of 90 months' incarceration. Mr. Perkins was found guilty of using a flagpole to assault officers, including kicking an officer who had fallen to the ground. Mr. Perkins's conduct was far more severe than Mr. Sturgeon's conduct and he should not receive a sentence higher than Mr. Perkins. Like Mr. Sturgeon, Mr. Perkins' background and history favored a variant sentence.

• *US v. Devlyn Thompson,* 21-cr-461 (RCL): Mr. Thompson was sentenced to 46 months' incarceration after pleading guilty to 18 U.S.C. §111(a)(b). Mr. Thompson was involved in the lower west terrace assaults assisting rioters to assault police and he struck an officer with one of their own police batons.

• *US v. Matthew Miller,* 1:21-cr-075 (RDM): Mr. Miller was sentenced to 33 months' incarceration after pleading guilty to Obstruction of an Official Proceeding and Assault on an Officer. Mr. Miller admitted to throwing objects at officers in the lower west terrace at the time that hundreds of rioters were trying gain entry to that tunnel.

• *US v. Duke Wilson,* 21-cr-345 (RCL): Mr. Wilson was sentenced to 51 months' incarceration after pleading guilty to Obstruction of an Official Proceeding and Assault on an Officer. Mr. Wilson was involved in the lower west terrace assaults and admitted to using a metal pipe to strike a police officer – which resulted in the officer being injured. Mr. Wilson also

admitted to trying to open the door that police were furiously trying to

shut while rioters were trying to fight their way in.

In short, the government here recommends a sentence that is more than

double than that of defendants whose conduct was significantly more serious than

Mr. Sturgeon, who neither struck nor kicked any officer, and who never possessed

or used any weapon. Taken further, the government's sentencing recommendation

is similar to or harsher than sentences imposed for January 6 defendants who were

indisputably the worst of the worst:

> • *US v. Thomas Webster*, 21-cr-208 (APM): Mr. Webster was sentenced to 10
>
> years of incarceration after being convicted by a jury of Assault with a deadly
>
> weapon and Civil Disorder. Mr. Webster came to D.C. armed with a firearm.
>
> He wore a bullet proof vest to the Capitol building. Mr. Webster also had a
>
> flagpole that he used to strike the metal barricades that police were
>
> guarding. He did this multiple times. He then got into a confrontation with
>
> an officer and tackled him to the ground – trying to rip his gas mask off
>
> causing the officer to not be able to breathe – all while other rioters were
>
> kicking the officer. Mr. Webster then proceeded to the lower west terrace
>
> tunnel. Mr. Webster was a former NYPD police officer who antagonized police
>
> at the Capitol building in addition to assaulting one. To argue that Mr.
>
> Sturgeon should receive an *even higher* sentence than Mr. Webster is not a
>
> credible argument and should be sharply rejected.

• *US v. Kyle Young*, 21-cr-291 (ABJ): Mr. Young was sentenced to 86 months' incarceration after pleading guilty to Assault on a Police Officer. Mr. Young admitted to assaulting two police officers that were dragged from the lower west tunnel into the crowd while other rioters were assaulting them. One of the officers was tased during this process and ended up in the Emergency Room with serious bodily injury.

• *US v. Cosper Albuquerque Head*, 21-cr-291 (ABJ): Mr. Head was sentenced to 90 months' incarceration after admitting that he was responsible for pulling the above officer into the crowd at the lower west terrace tunnel where he was later brutally assaulted and ended up in the hospital with serious bodily injury. Again, to equate Mr. Sturgeon to this defendant is nonsensical.

• *US v. Josiah Kenyon*, 21-cr-726 (CJN): Mr. Kenyon was sentenced to 72 months' incarceration after admitting that he used a flag pole to break a window of the Capitol building. He also admitted to assaulting officers in the lower west terrace tunnel, including hitting an officer in the head with the leg of a chair.

Lastly, it is worthwhile to review the cases where defendants were only convicted of 18 U.S.C. §231(a)(3) (Civil Disorder). While Mr. Sturgeon was convicted of additional charges, the overall conduct for some defendants who were offered a plea of Civil Disorder is similar to Mr. Sturgeon's overall conduct. Despite the fact that many of these defendants' conduct amounted to assault, they were offered

pleas that resulted in significantly lower sentences than those defendants convicted of Assault on an Officer and Obstruction of an Official Proceeding because the guidelines for Civil Disorder are significantly less than the guidelines in 18 U.S.C. §1512(c)(2). Notably, Mr. Sturgeon indicated a willingness to plead guilty pursuant to a Civil Disorder plea prior to trial, which was promptly rejected by the government.

- *US v. Aaron Mostofsky,* 21-cr-138 (JEB): Mr. Mostofsky was sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3) and 18 U.S.C. §641. Mr. Mostofsky's guideline range was 12-18 months. He was accused of forcibly engaging in confrontation with police by pushing against a barrier with all of his strength to resist officer efforts to contain the riot. Mr. Mostofsky also allegedly took a bullet proof vest that a Capitol Police officer was wearing and later wore this along with a riot shield he found.

- *US v. Derrick Evans*, 21-cr-337 (RCL): Mr. Evans was sentenced to 3 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Evans was a former West Virginia state legislator who joined the push at the Rotunda Doors and live streamed filmed violence against police officers. He urged others around him to "take" the Capitol and yelled that "a revolution has started!" The sentencing guidelines in this case were 0-6 months.

- *US v. Daniel Johnson,* 21-cr-407 (DLF): Mr. Johnson was sentenced to 4 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Johnson pushed against a line of officers who were guarding the East

Rotunda doors trying to prevent rioters from gaining entry to the building. The pushing of rioters caused these officers to be sandwiched against the doors and the effort of the rioters were successful as that door was breached. Mr. Johnson also said afterwards that he was trying to find a way into the Senate Chamber.

- *US v. David Blair,* 21-cr-186 (CRC): Mr. Blair was sentenced to 5 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Blair was accused of bringing tactical gloves, carrying a lacrosse stick with a large Confederate flag attached to it and using that stick to push against a police officer's chest. The government also alleged he carried a backpack with a knife and roll of duct tape inside.  Mr. Blair never made it inside the Capitol building because he was detained on the spot after assaulting officers with his stick.

### General Deterrence

Sentencing Mr. Sturgeon to a significant period of incarceration is not the way to ensure that the isolated events on January 6 will never occur again. An event like January 6 is unlikely to happen again[19] Empirical evidence proves that the certainty of prosecution, rather than the severity of the punishment is the greater deterrent.[20] Individuals like Mr. Sturgeon, who have no criminal history,

---

[19] *See* transcript of video sentencing in *United States v. Douglas Sweet*, 21CR41-3 (The Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crow, to protest and demonstrate, even fight at the Capitol. . . ").
[20] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

have already been deterred by this threat of prosecution. Most individuals involved in January 6, 2021, were encouraged to do what they did by the most powerful executive in our country and yet the government has not hesitated to prosecute these individuals to the fullest extent possible. Young men like Mr. Sturgeon, who are not activists, and who have led simple law abiding lives, would be deterred just by the prospect of such a harsh prosecution and the collateral consequences that result from a felony conviction. For these reasons, the goal of general deterrence would be more than met by a variant sentence.

## III.   **Sentencing Guidelines Objections**

Mr. Sturgeon requests that the Court reject probation's calculation of the sentencing guidelines. Rather than reiterate the extensive objections already filed on September 1, 2023, attached as Exhibit 4, are the objections already submitted to probation as well as the *Seefried* Memorandum Opinion from the Honorable Trevor N. McFadden regarding U.S.S.G. §2J1.2(b)(2). (attached as Exhibit 5).[21]

Based on the objections submitted, Mr. Sturgeon's guideline range should be 15-21 months based on an overall offense level of 14 and a criminal history category I. In the alternative, if the Court does not agree with the defense's assessment regarding U.S.S.G. § 2J1.2(b)(1)(B) and § 2J1.2(b)(2), Mr. Sturgeon's guideline range should be 57-71. As already stated in the

---

[21] Probation, in its final pre-sentence report has made the requested additions to Par. 29 and 31.

objections to the PSR, Mr. Sturgeon did not obstruct justice and the official victim enhancement does not apply under § 2J1.2. *See* Exhibit 3, PSR objections. Notably, the government, in every other January 6 case, has conceded that the 6 level official victim enhancement does not apply when using 2J1.2 – yet government counsel in this case still insist that it does. *See* Exhibit 4, PSR objections at 6-8.

## IV.   A Downward Departure Pursuant to U.S.S.G. § 5K2.20 for Aberrant Behavior is Warranted

Mr. Sturgeon's case is the exceptional case where a downward departure is warranted based on this offense representing a "marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G § 5K2.20 (b)(3). Mr. Sturgeon is also eligible for this departure because he meets the other requirements set forth in § 5K2.20 (a), (b)(1), and (2) in that he does not have a criminal history, the offense was committed without significant planning, and it was of limited duration.

As discussed at length above, Mr. Sturgeon lived a remarkably upstanding life up until January 6 as detailed by the many letters of support provided to the Court and as evident from his employment history, family support, and lack of criminal history. He clearly did not plan to break the law on January 6, 2021, as he came unequipped with any riot gear or any weapons. The bulk of the offense conduct lasted seconds in a high stress and fast pace environment.

The application notes in U.S.S.G. § 5K2.20 direct the Court, in making its decision to depart under this guideline, to consider the defendant's (1) mental and emotional conditions; (2) employment record; (3) record of prior good works; (4) motivation for committing the offense, and (5) efforts to mitigate the offense. *See* Application Note 3. Mr. Sturgeon's employment record is impressive as he started his own business that has been successful for several years. He also has traveled the world participating in mission trips where he served communities in need. Furthermore, Mr. Sturgeon did not anticipate committing the offense and was responding in the moment to the former President urging the crowd to go to the Capitol building. He stated over and over throughout the day that his intention was not to hurt the police and immediately after the charged incident, he raised his hand up in the air in submission and backed off.

Courts have granted this departure in similar cases where defendants also met the above factors. *See United States v. Booe*, 252 F.Supp. 584 (E.D. Tennessee, March 19, 2003) (court departed downward nine levels for aberrant behavior given the lack of planning and otherwise law abiding life – coming from a good family and stable background); *United States v. Langille*, 324 F.Supp.2d 38 (D. Maine, April 7, 2004) (downward departure granted when no significant planning, offense was spontaneous, had prior good deeds and no criminal history).

For the above reasons, Mr. Sturgeon requests that the Court grant a downward departure because his case is exceptional in numerous respects, warranting a finding that his conduct deviated drastically from his otherwise law abiding life.

## V.    <u>**Response to Government Sentencing Memorandum**</u>

Firstly, the government's sentencing recommendation of 135 months' of prison time – over 10 years - is so far out of the realm of what is appropriate or fair that it should be disregarded entirely. It is not based on a sincere analysis of the 3553(a) factors and it represents a true miscarriage of justice in the midst of a time where the Department of Justice should be striving to be consistent with all similarly situated January 6 defendants. That punishment just simply doesn't fit the crime – especially when considering what kinds of crimes are usually associated with 10 years + sentences (shootings, brutal kidnappings, robberies, carjacking, and even manslaughter). The government has completely botched its obligation to seek justice – not retribution – and that failure should not credited but rather should be discouraged.

### a.  **The government's narrative of facts is irresponsible**

The government blatantly either leaves or important factual details or completely misrepresents them even though there is a written transcript of the trial to rely upon. Firstly, the government insists on trying to argue that Mr. Sturgeon "followed closely behind the retreating officers, climbing

through the scaffolding." *See* Gov. Memo. at 10.  The government provided this same narrative to probation during its preparation of the PSR and after the defense responded objecting – probation decided not to include this in its PSR. *See* PSR at 24. Even still, the government tries again to misrepresent the facts.

The testimony at trial does not support this assertion. According to Officer David Augustine, who was one of the retreating officers, Mr. Sturgeon (the man in the green jacket) did not appear in the video surveillance as one of the people who followed "closely" behind officers as they were retreating up the stairs. *See* Trial Transcript, May 15, 2023, at 113-115. Officer Augustine acknowledged that when looking at the video, Mr. Sturgeon was not there. *Id*. at 115. Furthermore, the government's own evidence shows that Mr. Sturgeon was approximately 5 minutes behind the officers. Below is a screenshot of officers arriving at the top of the stairs to form a barricade at minute 14:32 and then another screenshot of Mr. Sturgeon arriving at the bottom of those same stairs at minute 14:37.





Therefore, the government's assertion that Mr. Sturgeon was "closely

behind retreating officers" is not accurate.

The government then provides an *opinion* of what was in Mr. Sturgeon's

mind when describing the lead up scene immediately prior to the barricade being

pushed. *See* Gov. Memo at 10. The government speculates that Mr. Sturgeon

"confirmed with Johnatakis that he (Sturgeon) would "push.." and that Sturgeon

"realized that it was not yet time to push and stealthily put his hands in his pockets

and waited for Johnatakis's count." *Id.*  Mr. Sturgeon did not testify as to his

thoughts and these comments are *sheer opinion* from the government. What the

evidence did support, however, is the following lead up scene taken directly from

video surveillance: As Mr. Sturgeon was among the crowd of individuals behind the

police barricade, Mr. Sturgeon saw Johnatakis trying to say something to him, and

in response said "push," then Sturgeon looked away in the other direction. *See Id.*,

Testimony of Officer Juan Gonzalez. There is nothing contained in the trial

testimony that ever supports what exactly Mr. Sturgeon was thinking in these

moments and for those reasons, he asks that the Court not consider the government's unsupported speculation.

Furthermore, the government selectively provides statements of Mr. Sturgeon to police officers right after he is pulled down by police officers off a ledge. *See* Gov. Memo at 12. The government fails to include that when pulled down by police officers, Mr. Sturgeon also said to officers, "We don't want to hurt you." *See* Gov. Trial Exhibit 209(A) at 1:25. Probation has since added this statement to its final PSR – yet the government purposely leaves it out (among other mitigating police interactions) in order to paint Mr. Sturgeon only in a negative light.

Then, the government again misrepresents the testimony at trial when it insists that "law enforcement did not recover any videos taken at the police line at the stairs to the Upper West Terrace…despite police body worn camera footage that showed Sturgeon filming on his phone while in that area." *Id*. The government cannot conclude that Mr. Sturgeon was actually filming on his phone when its own case agent could not definitively conclude that at trial. Agent Chen testified that she could not confirm whether he was taking a video, saying, "He *appears* to have his phone up in front of him, *possibly* taking a video." *See* Trial Transcript, May 16, 2023, at 141. (Emphasis added). Despite its own case agent's testimony, the government irresponsibly represents that he was *in fact* filming on his phone even though the trial evidence does not support such a conclusion. The government also completely ignores the fact that the forensic extraction report did not reveal any deleted videos. The government only conjures this narrative to seek a further

enhancement under the sentencing guidelines, which clearly does not apply for many reasons.

Lastly, the government fails to provide the full context to Mr. Sturgeon's post January 6 actions. The government suggests that Mr. Sturgeon failed to self-surrender, "but instead was arrested after deboarding a plane almost six weeks later on March 6, 2021." *See* Gov. Memo at 15-16. The government conveniently fails to explain that when Mr. Sturgeon learned that he may have been under investigation by the FBI that he was *already* overseas on a trip to Kenya and that the FBI was aware that he was overseas as early as January 26, 2021. The government also does not explain to the Court that Mr. Sturgeon agreed to voluntary deportation from Kenya to JFK where he knew he would be arrested. In fact, the government produced Jencks prior to trial – including emails from Agent Chen explaining that the FBI was working with Kenyan authorities to deport him – all of which Mr. Sturgeon was aware of and agreed to voluntarily. In fact, one of the emails stated that on the flight back to JFK – Mr. Sturgeon would not be in custody – indicating Mr. Sturgeon's complete cooperation with authorities. Lastly, in an email dated February 12, 2021, Agent Chen explained that he appeared to be overseas on vacation and that he is the "globe trotter type," and that if he had refused deportation, the government would have to put a Red Notice out to forcibly return him to the United States. We know this was never necessary because Mr. Sturgeon *cooperated* with authorities.

### b. Sentencing Guidelines

For the reasons stated in depth in Defense Exhibit 4, the assessment of the guidelines by the government is incorrect. The government further goes on to analyze the guidelines for the other counts of conviction even though probation has determined that the guidelines under § 2J1.2 is the highest producing guideline and so it is not necessary to analyze the guidelines for the remaining counts.

### c. The Government Fails to Properly Assess Mr. Sturgeon's Background and History

The government glosses over Mr. Sturgeon's background and history and even suggests that it is an aggravating factor when it says "Sturgeon's family history, education, and employment provided him with the opportunity to succeed and make lawful choices…but instead Sturgeon chose to join the attack on the U.S. Capitol." *See* Gov. Memo at 35. This assertion is completely ingenious. If Mr. Sturgeon had a prior criminal history, and lack of family support, the government would undoubtedly point to those things as aggravating factors. This assertion shows that the government has not sincerely assessed the mitigating factors in this case. There are many January 6 cases where the government has been quick to distinguish defendants by pointing out a negative background and history as being more aggravating and deserving of harsher punishment. Here, instead of fairly giving credit to Mr. Sturgeon's positive history – it does the opposite and suggests (without any basis in the 3553(a) factors), that this should somehow be held against him.

Instead of giving credit where it is due, the government focuses on social media messages said close in time to January 6, 2021, rather than providing a full picture of Mr. Sturgeon's behavior throughout the past 3 years since his arrest. The government has also been quick in past cases to identify when defendants had remained active on social media commenting on January 6 arguing this shows a lack of remorse. However, nowhere in the government's memorandum does it acknowledge that (1) Mr. Sturgeon refrained from January 6 messages very shortly after January 6, 2021; (2) cooperated with authorities after January 6, 2021, (3) and has had perfect compliance on pre-trial release.

### d.  Unwanted Sentencing Disparities

Lastly, the government provides no credible support for its sentencing recommendation based on its comparative case analysis. *See* Gov. Memo at 40-41. It provides past January 6 cases, one of which was already discussed above (*Webster*), that entail the "worst of the worst" type of January 6 conduct – including the use of deadly weapons and several assaults on police in the most dangerous assaults at the lower west terrace tunnel. These cases are completely inappropriate for comparison and further show that the government seeks a disparate sentence for Mr. Sturgeon.

- **Thomas Robertson, 21-cr-034 (CRC):** The government fails to mention that Mr. Robertson came to the Capitol building equipped with a gas mask, and a large wooden stick – which he used to block

36

police officers trying to do their job. He was also involved in the first breach of the Capitol building that day, entering the building, advanced into the Crypt and pushing past police while banging his stick in triumph on the ground. After January 6, 2021, the government actually had definitive proof that Mr. Robertson destroyed his phone after learning he had a warrant out for his arrest. Most surprisingly, the government conveniently leaves out the fact that Mr. Robertson – post January 6 – was arrested for trafficking firearms and pursuant to a search warrant a partially assembled pipe bomb and M4 rile was found in his home. All of this was done while on pre-trial release. That undoubtedly led the Court to impose a sentence much higher than it would have had Mr. Robertson been compliant on pre-trial release.

- **United States v. Patrick McCaughey**, **21-cr-40 (TNM)**: It is shocking that the government would include a comparison case where the defendant was convicted after trial of using a stolen riot shield to aid the effort to press up against a police officer who was stuck between the doors at the lower west terrace tunnel desperately fighting for his life to break free. This is the same location where literal chaos ensued for hours while police officers were seriously injured in the midst of brutal violence towards them. Even still, the Court imposed 90 months' incarceration for Mr. McGaughey, which is

*45 months less* than what the government is asking the Court to

impose in this case.

## CONCLUSION

For the reasons stated above, Mr. Sturgeon respectfully requests that the

Court grant a significant variance and downward departure based on the factors

outlined in 3553(a) as well as the departures available under the Sentencing

Guidelines.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org